UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SMALL JUSTICE LLC,<br>RICHARD A. GOREN, and<br>CHRISTIAN DUPONT dba<br>ARABIANNIGHTS-BOSTON<br>MASSACHUSETTS,<br><br>Plaintiffs,<br><br>vs.<br><br>XCENTRIC VENTURES LLC,<br><br>Defendant. | Case No.:  1:13-cv-11701-DJC<br><br>**DEFENDANT'S REPLY IN SUPPORT<br>OF MOTION TO DISMISS<br>FIRST AMENDED COMPLAINT**<br><br><br><br>*Leave to file granted on October 18, 2013* |

Pursuant to Local Rule 7.1(b)(3) and this Court's October 18, 2013 Order (Doc. #23), Defendant Xcentric Ventures LLC ("Defendant") respectfully submits the following reply in support of its Motion to Dismiss (Doc. #14; "Motion") First Amended Complaint (Doc. #13).

## PREFATORY COMMENTS

Xcentric began its Motion with a summary of the procedural posture of this case, explaining its understanding of the differences between the original and first amended complaints.  Motion pp. 1-3.  Notably absent from that summary was any mention of this fact: the First Amended Complaint purports to include a new party named Christian DuPont ("Mr. DuPont").  Indeed, Xcentric's Motion made no reference to the new party, even in the caption.

Normally, the addition of a new party is not necessarily a significant event, and in this case it does not affect the outcome of this case or the disposition of Xcentric's Motion. However, the significance Plaintiffs give this addition in their Memorandum (Doc. #21) warrants some introductory remarks to ensure the Court fully understands what has occurred here.

As explained in Xcentric's Motion, Plaintiff Richard Goren ("Mr. Goren") is unhappy with two derogatory reports posted about him on Xcentric's website, www.RipoffReport.com. As also explained in that Motion, Xcentric is generally immune from liability for "publishing" any content submitted to the site by third parties pursuant to the Communications Decency Act, 47 U.S.C. § 230(c)(1).

For that reason, Mr. Goren did not initially sue Xcentric. Instead he sued the putative author of the reports—Mr. DuPont—in Massachusetts state court.  After Mr. DuPont failed to appear, Mr. Goren obtained a default judgment purporting to transfer ownership of the copyright in the reports from their author (Mr. DuPont) to Mr. Goren.  Mr. Goren now claims that he (or his entity, Plaintiff Small Justice, LLC) is the rightful owner of the copyright in the reports, and thus Xcentric is infringing his copyright by refusing to remove the reports.  This convoluted approach appears to be a strategic effort to avoid the limitations imposed by the CDA.

Specifically, under the CDA Xcentric is protected from liability even if it refuses to remove content that is claimed to be false.  *See Mmubango v. Google, Inc.*, 2013 WL 664231, *3 (E.D.Pa. 2013) ("Google cannot be held liable for failing to withdraw this statement once it has been published."); *see also Global Royalties, Ltd. v. Xcentric Ventures, LLC*, *4 2007 WL 2949002 (D.Ariz. 2007) (agreeing Xcentric is protected by CDA even when it refuses to remove material).  However, the CDA also contains a limited exception for intellectual property claims. *See* 47 U.S.C. § 230(e)(2).  Thus, although Mr. Goren is seeking relief which in substance is barred by the CDA, he is trying to use a copyright claim to overcome that problem.

As explained in the Motion, this approach fails for two main reasons.  First, a state court has no authority to effect an involuntary transfer of copyrights pursuant to 17 U.S.C. § 201(e).

Second, Mr. Goren had both actual and constructive knowledge that Xcentric holds a registered copyright in the disputed reports, so his after-the-fact transfer fails under 17 U.S.C. § 205(d).

In the course of explaining these important issues, Xcentric overlooked something else in the First Amended Complaint—Mr. Goren's addition of Mr. DuPont as a plaintiff is apparently based on authority purportedly granted to him in an amended default judgment entered in the state court proceeding on August 16, 2013.  Doc. #13-3.  This judgment purports to appoint Mr. Goren as the "attorney in fact" for Mr. DuPont <u>in the same action in which Mr. Goren was the plaintiff and Mr. DuPont was the defendant</u>.

The obvious conflict of interest and other ethical considerations aside, Mr. Goren now argues the default judgment allows him to literally stand in the shoes of Mr. DuPont and/or take actions on behalf of Mr. DuPont, as if an actual attorney-client relationship existed between them even though it does not.  Based on that authority, Mr. Goren has named Mr. DuPont as a plaintiff in this case, even though Mr. DuPont (acting through Mr. Goren) alleges no injury whatsoever and seeks no relief of any kind.   Mr. Goren even signed written two copyright assignments <u>on behalf of Mr. DuPont</u> dated August 30, 2013 (Doc. #20-1 pp. 4-5), by which he again purports to transfer ownership of the copyrights of the two reports written by Mr. DuPont, in hopes of avoiding the problem of 17 U.S.C. § 201(e)).

These exceptionally bizarre events are troubling, yet largely irrelevant.  At first blush, it is clear that Mr. Goren is taking positions directly contrary to the best interests of his supposed "client," Mr. DuPont.   Indeed, Mr. Goren's conduct has exposed Mr. DuPont to liability to Xcentric for, *inter alia*, breach of contract.   In addition, Mr. Goren has subjected himself to liability for tortiously interfering with the contractual relationship between Mr. DuPont and

Xcentric. These points can and will be pursued assuming this matter is not dismissed. But placing aside the strange means by which Mr. Goren claims to have acquired ownership of the copyrights, his convoluted maneuvers do not change the case's necessary outcome.

Xcentric must still prevail under the Copyright Act's clear rules for resolving conflicting transfers. Even if Mr. DuPont himself actually appeared in this case, the result would not change. Without resolving the question of whether Mr. Goren is actually Mr. DuPont's "duly authorized agent" within the meaning of 17 U.S.C. § 204(a) (a point Xcentric disputes) the alleged transfer from Mr. DuPont to Mr. Goren (and then to Small Justice, LLC) fails under 17 U.S.C. § 205(e), for two independent reasons: the earlier transfer to Xcentric was recorded first, and both Mr. Goren and Mr. DuPont had actual and constructive notice of the earlier transfer to Xcentric. His legal and ethical gymnastics aside, Mr. Goren still cannot establish that he has standing to sue for infringement. Neither he nor his entity owns any rights in the works at issue here. For that reason, Xcentric's Motion should be granted.

## ARGUMENT

### I. Claims 3–5 Are Barred By The Communications Decency Act.

Xcentric respectfully suggests that the Court begin with the easier issue first—the Communications Decency Act ("CDA"). Xcentric's Motion noted that every court that has considered the merits of the CDA has agreed that Xcentric is entitled to absolute immunity from any state-law claim that requires treating it as the "publisher or speaker" of information posted on its website by a third party. *See*, *e.g.*, *Asia Economic Institute, LLC v. Xcentric Ventures, LLC*, 2011 WL 2469822 (C.D.Cal. 2011) (explaining, "The Court notes that this very issue has been litigated by several district courts to date, where nearly identical allegations against Xcentric …

based on Ripoff Report postings have been barred under the CDA.  The Court also finds that the CDA applies to [Xcentric] here.") (citing *GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173 (N.D. Tex. 2009) (finding Xcentric entitled to CDA immunity); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273 (N.Y. App. Div. 2008) (same); *Whitney Information Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095 (M.D. Fla. 2008) (same); *Global Royalties v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929 (D. Ariz. 2008).

Mr. Goren's response to this argument is two-fold.  First, citing a single case—*FTC v. LeanSpa, LLC*, 920 F.Supp. 270 (D. Conn. 2013)—Mr. Goren argues that the CDA is an "affirmative defense that is generally not fodder for a Rule 12(b)(6) motion."  His assertion is neither an accurate statement of the law in general nor an accurate discussion of *LeanSpa*. Most courts (including the First Circuit) agree that the CDA <u>can</u> be properly raised in a 12(b)(6) motion.  *See*, *e.g.*, *Universal Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) (affirming Rule 12(b)(6) dismissal of claims based on CDA).  Other courts have agreed that 12 (b)(6) dismissal is proper when the application of the CDA is apparent from the facts set forth in the Complaint.  *See Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 2007 WL 2949002 (D.Ariz. 2007) (finding Rule 12(b)(6) dismissal of defamation claims proper when allegations in Complaint show claims are barred by the CDA); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) (agreeing 12(b)(6) dismissal is proper vehicle to resolve claims based on CDA immunity); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) (same); *Beyond Systems, Inc. v. Keynetics, Inc.*, 422 F.Supp.2d 523 (D.Md. 2006).  *See* Motion p. 6.

Mr. Goren's reliance on *LeanSpa* is also misplaced because in that case, the district court did not say that CDA immunity can never be raised in a 12(b)(6) motion.  Rather, it denied the

motion because the allegations in the Complaint did not clearly show the CDA applied: "This court cannot conclude from the face of the Amended Complaint that … defendants are entitled to immunity under the CDA." *LeanSpa*, 920 F. Supp. 2d at 275.

Such is not the case here. For the reasons noted in Xcentric's Motion, the Court *can* determine that the CDA applies based on the facts set forth in the Complaint. This is so because Plaintiffs do not allege that Xcentric created any part of the two reports at issue. On the contrary, the allegations are unequivocal—the reports were created by Mr. DuPont. On its face, this presents a classic scenario implicating the CDA, for reasons cited in other cases in which Xcentric has prevailed on the same issue. *See*, *e.g.*, *Giordano v. Romeo*, 76 So.3d 1100, 1102 (Fla. 3d Dist. 2011) (noting, "the law on this issue is clear. Xcentric enjoys complete immunity from any action brought against it as a result of the postings of third party users of its website.").

Incredibly, Mr. Goren's response simply ignores all of the cases cited in the Motion in which other courts have agreed with Xcentric's position. Plaintiffs offer no explanation as to why all of these other decisions are legally erroneous or otherwise distinguishable.

Instead, Mr. Goren seems to argue that the CDA does not apply here for two reasons. First, he suggests that "Xcentric instructed Google's robot crawler periodically to visit the Ripoff Report website and take snapshots of the two libelous works," Doc. #21 p. 28, and that as a result, the works are more readily visible in Google's search results than might otherwise be the case. This argument seems to be further explained in the First Amended Complaint as follows:

> 37. By its published directives, actions and/or inaction under generally accepted internet industry standard protocols, including without limitation its uses of robots meta tag and so-called serving directives, XCENTRIC communicates with Google, Yahoo, Bing and other search engines and has thereby caused Christian DuPont's January 31, and February 2, 2012 Ripoff Reports to be indexed by

Google and other search engines <u>so as to maximize the number of hits or page views by search engine users</u>.

Doc. #13 pp. 8–9 (emphasis added).

Although the basis of this allegation is unclear, the fact remains that all Mr. Goren is claiming is that *after* Mr. DuPont posted his two reports on the Ripoff Report website, Xcentric took various steps to make those reports more visible in search engines such as Google, Yahoo! and Bing.  This assertion is not true, but even if it was the CDA would still fully apply.

This exact issue was previously litigated in *Asia Economic Institute, LLC v. Xcentric Ventures, LLC*, 2011 WL 2469822 (C.D.Cal. 2011).   In that case, the plaintiff argued that Xcentric lost immunity under the CDA by "adding index tags" to its website code to make reports appear higher in Google's search results.  The district court flatly rejected this argument:

> Plaintiffs fail to cite any authority that increasing the prominence of a page in internet searches amounts to "creation or development of information" that would render Defendants "information content providers" under the CDA. The very purpose of consumer reports such as the Ripoff Report website is to provide accessibility to the public on a grand scale.  <u>Increasing the visibility of a statement is not tantamount to altering its message</u>. This holding is bolstered by the Ninth Circuit's en banc opinion in [*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174–75 (9th Cir.2008) (en banc)].   The Ninth Circuit asserted that "in cases of enhancement by implication or development by inference ... section 230 must be interpreted to protect websites." At best, <u>increasing the visibility of a website in internet searches amounts to "enhancement by implication," which is insufficient to remove Defendants from the ambit of the CDA. Absent a changing of the disputed reports' substantive content that is visible to consumers, liability cannot be found</u>.

*Asia Economic Inst.*, 2011 WL 2469822, *6 (citing *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D.Cal. 2009) (agreeing, "a website operator does not become liable as an 'information content provider' merely by 'augmenting the content [of online material] generally'").

Xcentric contends that Mr. Goren has no legitimate Rule 11 basis for any of his allegations that Xcentric took steps to "communicate with Google" in an clandestine effort to somehow increase the visibility of the complaints Mr. DuPont posted about Mr. Goren. However, even assuming *arguendo* that these allegations are true and that Xcentric takes steps "so as to maximize the number of hits or page views by search engine users[]", this conduct is squarely within the scope of the CDA's "broad" protection.

> Unless Congress amends the statute, it is legally (although perhaps not ethically) beside the point whether defendants refuse to remove the material, or how they might use it to their advantage. Through the CDA, "Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party."

*Global Royalties*, 544 F. Supp. 2d at 933 (quoting *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1122-23 (9th Cir. 2003)).

The second reason Mr. Goren contends the CDA does not apply is because Xcentric happens to require users to transfer ownership of the copyright in their reports to Xcentric.  Mr. Goren claims this transfer somehow affects Xcentric's ability to invoke CDA immunity, but he cites no legal authority for this premise and, despite its experience in successfully defending dozens of virtually identical cases, Xcentric is aware of no authority to support this conclusion. On the contrary, Xcentric's status as copyright owner is irrelevant to the application of the CDA, which generally focuses on whether the website owner "created or developed" material in the first instance, not whether the author subsequently granted a license or otherwise transferred ownership of that material to someone else.

That is essentially the holding of the Arizona district court in two prior holdings in *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 2007 WL 2949002 (D.Ariz. 2007) ("*Global*

*Royalties I*") and *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929 (D.Ariz. 2008) ("*Global Royalties II*"). In *Global Royalties I*, as in this case, the plaintiff was the subject of a critical report posted on www.RipoffReport.com, and the plaintiff sued the author and the author failed to appear.  However, unlike in this case, the plaintiff in *Global Royalties I* obtained an injunction which required the report to be removed.   Xcentric refused to comply with the default injunction and refused to remove the report. The plaintiff argued that by refusing to remove the report in defiance of an injunction (albeit a foreign injunction, which the district court found was not entitled to recognition in the United States), Xcentric "adopted" the author's statements as its own and was no longer protected by the CDA—substantively identical to Mr. Goren's position.  Citing the First Circuit, the Arizona district court rejected this argument:

> The three allegedly defamatory statements at issue were written by Spencer Sullivan, not defendant. Plaintiff contends, however, that defendant [Xcentric] "adopted" Sullivan's statements by failing to remove them after Sullivan disavowed their contents and asked that they be taken down, and that this "adoption" is tantamount to creation or development.  Yet, it is "well established that notice of the unlawful nature of the [content] provided is not enough to make it the [website operator's] own speech."

*Global Royalties, I*, 2007 WL 2949002, *3 (quoting *Universal Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)).

Ultimately, the district court found that even if Xcentric refused to remove reports, the CDA nevertheless applied; "[Xcentric's] failure to remove the three statements was an 'exercise of a publisher's traditional editorial functions' and does not defeat CDA immunity."  *Id*. (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

In *Global Royalties II*, the plaintiff re-raised the argument after the author appeared and made a direct request that Xcentric remove his report.  This is equivalent to Mr. Goren's position

here, if Mr. DuPont was personally appearing in this case to demand that Xcentric remove his reports.   The *Global Royalties II* court found this would not affect Xcentric's entitlement to protection under the CDA.

> We conclude that liability based on an author's notice, workable or not, is without statutory support and is contrary to well-settled precedent that the CDA is a complete bar to suit against a website operator for its "exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone or alter content."

> *Global Royalties II*, 544 F.Supp.2d at 932.

The same logic applies here, though Mr. Goren is seeking to present a slightly different theory than other plaintiffs have tried.   Substantively, Mr. Goren's strategy is virtually identical to the one seen in *Global Royalties*, though in that case, the author actually participated in the case and asked Xcentric remove the reports he created.   Here, the author is *not* a real party to this case; he is appearing only based on Mr. Goren's alleged status as his "attorney in fact."

Xcentric's decision to require authors to assign their copyrights is neither unusual nor improper.   It is a crucial tool commonly used by websites to ensure that competitors do not copy and republish vast quantities of material.   *See Metropolitan Regional Inf. Sys., Inc. v. American Home Realty Network, Inc.*, 722 F.3d 591 (4th Cir. 2013) (noting that owner of real estate website requires users to assign copyrights to the website owner as a condition of using the site). For example, as discussed in *Craigslist, Inc. v. 3Taps, Inc.*, --- F.Supp.2d ----, 2013 WL 1819999 (N.D.Cal. 2013), the operator of www.craigslist.org (a popular online classified advertising site) generally requires all users to grant it an exclusive license to their classified ads.   Like Xcentric, Craigslist registers copyrights in this content which it uses to prevent competitors from stealing material from its site.   Xcentric uses the same practice for the same reason.   *See, e.g., Xcentric*

*Ventures, LLC v. Mediolex, Ltd.*, 2012 WL 5269403, *1 (D.Ariz. 2012) (describing Xcentric's

infringement claims against competing website www.ComplaintsBoard.com "for systematically

copying complaints from the Ripoff Report and posting them onto the ComplaintsBoard.com

website.") Just as they have for Xcentric, courts have universally agreed that Craigslist is entitled

to protection under the CDA. *See Chicago Lawyers Comm. For Civil Rights Under Law, Inc. v.

Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) (holding Craigslist entitled to CDA immunity); *Dart

v. Craigslist, Inc*., 665 F.Supp.2d 961 (N.D.Ill. 2009) (same); *Gibson v. Craigslist, Inc*., 2009

WL 1704355 (S.D.N.Y. 2009) (same, and agreeing that application of the CDA was proper in a

Rule 12(b)(6) motion to dismiss).

      Other courts have rejected the idea that a website owner may lose CDA protection by

"adopting" material created by third parties. In *Parisi v. Sinclair*, 774 F.Supp.2d 310 (D.D.C.

2011), the plaintiff sued various defendants for defamation arising from the online marketing and

sale of a book.  It was undisputed that one defendant (a bookstore called "Books-A-Million" or

"BAM") did not create the actionable material. The district court rejected the plaintiff's argument

that BAM lost CDA immunity because it "adopted" the false statements as its own:

> Plaintiffs also attempt to claim that CDA immunity should be withheld because
> BAM <u>adopted the promotional statements as its own</u>.   However, they cite no
> applicable law for this proposition.  Indeed, it would be contrary to the purpose of
> the CDA, which sought to encourage the "'vibrant and competitive free market' of
> ideas on the Internet," by establishing immunity for internet publication of third-
> party content to require a fact-based analysis of if and when a defendant
> "adopted" particular statements and revoke immunity on that basis.

*Parisi*, 774 F.Supp.2d at 316 (emphasis added) (citing *Nemet Chevrolet*, 591 F.3d at 253 (quoting

47 U.S.C. § 230(b)(2)).

While not considering the exact same question presented here, the First Circuit has rejected a similar argument that website operator Lycos forfeited its CDA protection by "taking legal action to protect its subscribers. ... Actions taken to protect subscribers' legal rights, however, cannot be construed as inducement of unlawful activity, and [plaintiff] does not allege that Lycos lacked a reasonable basis for its legal activities." *Universal Comm.*, 478 F.3d at 421.

The same is true here. At the end of the day, Xcentric's practice of acquiring copyrights in the reports submitted by its users is neither improper nor unusual.  It is exactly the same practice employed by other mainstream websites, and no court anywhere has found this affects the site's CDA protection.   Indeed, given that one of the CDA's fundamental purposes is to ensure that websites are not pressured into removing content, accepting Mr. Goren's argument would punish website owners for their efforts to protect and preserve online speech.   This is exactly the opposite of the CDA's intended function. "We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content ... . [S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc) (emphasis added).

One additional comment on this topic is necessary.  Mr. Goren argues, without citing any authority, that CDA immunity should be denied because Xcentric "directed, specially ordered or commissioned the Author [DuPont] to prepare the two works, [therefore] Xcentric should be held responsible for the[ir] creation … ."  Doc. #21 p. 28. The argument appears to be based on Mr. Goren's mistaken assumption that Xcentric claims ownership of the two reports arose from a

*work-for-hire* agreement <u>between Xcentric and Mr. DuPont</u>. Mr. Goren apparently reached this erroneous conclusion after reviewing Xcentric's copyright registration for the works at issue in this case. *See* Doc. #15-2. The registration certificate reflects that at the time Xcentric registered its copyright, it indicated that the work was, in part, made for hire:



Based on that notation, Mr. Goren erroneously concluded that Xcentric must have had (or represented to the Copyright Office that it had) a work for hire agreement *with Mr. DuPont*, showing that Mr. DuPont created the reports about Mr. Goren *at Xcentric's request.*

In fact, the work for hire agreement reflected in the registration relates to <u>Xcentric's staff of employees</u> who review and monitor new reports submitted to the site.  As defined in 17 U.S.C. § 101, a "work made for hire" include "a work prepared by an employee acting within the scope of his or her employment."  As explained in cases such as *GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173, *6 (N.D.Tex. 2009), Xcentric employs a team of "content monitors" "who briefly review each report in order to remove any obviously offensive or illegal material such as child pornography or social security numbers."  These employees pick and choose which content to publish and which content to reject while making minor redactions to ensure the removal of any blatantly unlawful content.   In the process, Xcentric's employees have created a valuable

compilation of more than 1.6 million individual reports and tens of millions of rebuttals/ comments which generally forms Xcentric's overall database of reports.  This is why Xcentric's registration certificate accurately reflects the presence of a work-for-hire agreement; because Xcentric's staff members are W-2 employees acting within the scope of their employment.

Of course, there is nothing inconsistent with a website owner claiming CDA immunity while also screening/selecting which user-generated content to publish.  This is precisely the type of "editorial" function Congress intended to encourage with the CDA; "In some sort of tacit *quid pro quo* arrangement with the service provider community, Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted."  *Blumenthal v. Drudge*, 992 F.Supp. 44, 52 (D.D.C. 1998); *see also Zeran*, 129 F.3d at 330 (concurring; "In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."); *Barrett v. Rosenthal*, 40 Cal.4th 33, 53, 146 P.3d 510, 522 (Cal. 2006) (noting, "Both the terms of section 230(c)(1) and the comments of Representative Cox reflect the intent to promote active screening by service providers of online content provided by others.")

For these reasons, as explained in Xcentric's Motion, the third, fourth and fifth causes of action in the First Amended Complaint should be dismissed.  To the extent they are premised on Xcentric's "publication" of the two reports about Mr. Goren, the claims are barred by the CDA.

## II.    Plaintiffs Lack Standing To Sue For Copyright Infringement.

Plaintiffs' copyright infringement claims must fail because Mr. Goren's efforts notwithstanding, they do not own any exclusive rights in the two reports at issue.

Mr. DuPont owned the copyright in the works upon writing them. "Copyright in a work ... vests initially in the author or authors of the work." 17 U.S.C. § 201(a). He transferred his copyrights to Xcentric through an exclusive license. See Doc. #15 ¶ 6; Doc. #15-1 § 6. No consideration was required to support the license, despite Plaintiffs' contentions. *See* Doc. #13 ¶¶ 28 & 60 (alleging lack of consideration); Doc. #21 pp. 2 & 3 (same). "Under the current [Copyright] Act, exclusive licenses are treated like assignments in that they constitute a conveyance of a property right that can be accomplished by gift no less than by sale." Nimmer on Copyright § 10.02[B][5], at 10-28.1 to 10-28.2 (2010 ed.) ("Nimmer").

> Defendant cites no authority for the proposition that an assignment of copyright rights must be supported by consideration. In fact, the Copyright Act itself includes no such requirement, *see* 17 U.S.C. § 204(a) (requiring only that a transfer of copyright ownership be "in writing and signed by the owner of the rights conveyed"), and the courts have not read such a requirement into the statute, *see, e.g., Gardner v. Nike, Inc.*, 110 F. Supp. 2d 1282, 1285-86 (C.D. Cal. 2000).

*Dahlen v. Michigan Licensed Beverage Ass'n*, 132 F. Supp. 2d 574, 580 (E.D. Mich. 2001).

Each of the exclusive rights of a copyright owner enumerated at 17 U.S.C. § 106—to copy (reproduce) a work, prepare derivative works, and to distribute, perform, or display the work—were all conveyed in Mr. DuPont's exclusive license. See Doc. #14 p. 12; Doc. #15 ¶ 6; Doc. #15-1 § 6. Because the license assigned the entire copyright in each work to Xcentric, he parted with all legal title, extinguishing his standing to sue over any later acts of infringement.

> Once the copyright owner grants an exclusive license of particular rights, only the exclusive licensee, and not his grantor, may sue for later-occuring infringements of such rights. Indeed, the licensor may be liable to the exclusive licensee for copyright infringement... *[A]n assignor of the entire copyright has no standing to sue for acts of infringement that occurred after execution of the assignment.*

Nimmer § 12.02[B], at 12-58 to 12-59 (emphasis added).

Mr. DuPont had no standing to sue anyone for copyright infringement—least of all Xcentric, since his license transferred the entirety of his copyright to Xcentric. As a result, he could not thereafter have conveyed any right to sue to the other Plaintiffs, so they cannot overcome Xcentric's exclusive license through a later assignment. No one may convey any more of a copyright than they own. *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007), *cert. denied*, 555 U.S. 822 (2008). By the time of the purported assignment to Goren, DuPont had no copyright left to assign. In addition, later conflicting transfers fail under 17 U.S.C. § 205, when made with notice of an earlier recorded transfer. *See* Doc. #14 pp. 14-16.

Again, it is undisputed that Xcentric owns a *registered* copyright in both disputed works as evidenced by the '670 registration certificate.  Doc. #15-2.  Xcentric's rights prevail against any subsequent conflicting transfer pursuant to 17 U.S.C. § 205(d), which provides:

> (d) **Priority Between Conflicting Transfers.** — As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice under subsection (c), within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer.  **Otherwise the later transfer prevails** if recorded first in such manner, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, **and without notice of the earlier transfer**.

17 U.S.C. § 205(d) (emphasis added).

Under Section 205(d), a later transferee (Mr. Goren) can only prevail against an earlier license to Xcentric when he receives the license *without notice of the earlier transfer*. As explained in the Motion, Mr. Goren had both actual *and* constructive notice of the transfer to Xcentric. Xcentric's registration provided constructive notice of the transfer, and each report contained on Xcentric's website includes copyright management information, warning readers that Xcentric holds an exclusive license to each report.   For either or both of those reasons

(which Mr. Goren does not dispute) it is impossible for Mr. Goren to assert that he lacked notice of the earlier transfer to Xcentric.  Even assuming the state court could legally appoint Mr. Goren to act as an "attorney in fact" for Mr. DuPont, his subsequent efforts to create a conflicting license are defeated by Section 205(d).

To the extent Mr. Goren responds to this argument at all, he only raises two points, neither of which are helpful.

First, Mr. Goren argues that Xcentric's copyright registration is "unenforceable" because it was obtained by fraud; i.e., "because it is predicated on a false representation of ownership under a Work Made for Hire contract." Doc. #21 p. 20.  That is both factually untrue and legally irrelevant. Xcentric's registration certificate is entitled to a presumption of validity pursuant to 17 U.S.C. § 410(c).  That registration gave Mr. Goren constructive notice of Xcentric's rights.  *See Latin Am. Music Co., Inc. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 40–42 (1st Cir. 2007) (expressly holding that an earlier copyright registration provides constructive notice sufficient to defeat a later conflicting transfer under 17 U.S.C. § 205(d) and affirming "the district court's ruling that registration of a copyright constitutes notice for purpose of § 205(d)"); *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir. 1997) (agreeing, "A copyright registration certificate issued by and filed with the Copyright Office thus serves to put the world on constructive notice as to the ownership of the copyright and of the facts stated in the registration certificate."). Notice of Xcentric's copyright disqualifies Mr. Goren from attempting to receive a subsequent conflicting transfer of the same rights.  17 U.S.C. § 205(d).

Mr. Goren's attempt to attack the validity of Xcentric's registration is also misplaced. Fraud on the Copyright Office *is* an affirmative defense to an infringement claim, but Xcentric is not suing for infringement, and the defense requires <u>evidence</u> that "the errors or failures [in the registration] (1) are knowing; (2) harmed or prejudiced the defendant in some way or affected the validity of the copyright; and (3) may have caused the Copyright Office to reject the application." *Franklin v. Ciroli*, 865 F.Supp. 940, 943 (D. Mass. 1994) (citing authority).

> A party seeking to establish a fraud on the Copyright Office, and thereby rebut the presumption of copyright validity, bears a heavy burden. ... The party asserting the fraud must establish that the application for copyright registration is factually inaccurate, that the inaccuracies were willful or deliberate, and that the Copyright Office relied on those misrepresentations.

*Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000) (citations omitted).

Mr. Goren offers no evidence (beyond his own confusion over the "work for hire" issue) that Xcentric made any misrepresentations to the Copyright Office, material or otherwise. He has not defeated the presumption that Xcentric's registration is valid. Further, Mr. Goren has not denied having actual knowledge of Xcentric's rights by virtue of the copyright footer present at the bottom of each report on the site. Mr. Goren's efforts to obtain a subsequent transfer of rights fails under 17 U.S.C. § 205(d). Even if Mr. DuPont himself personally executed an assignment of copyrights to Mr. Goren, it would have no effect. It is undisputed that Mr. Goren has notice of the earlier transfer of rights to Xcentric, so any conflicting transfer to him fails.

## III.    Plaintffs' Chapter 93A Claim Is Not Sufficiently Pleaded.

Plaintiffs' memorandum fails to support their Mass. G. L. c. 93A ("Chapter 93A") cause of action, which is not sufficiently pleaded to withstand Xcentric's Motion. The complaint mentions only two allegedly unfair or deceptive acts or practices: publishing or displaying the

works "under color of [Xcentric's] exclusive ownership of each such work," Doc. #13 ¶ 85, and asserting immunity under 47 U.S.C. § 230, *id.* ¶ 86. Neither of those acts rises to the level of wrongfulness required to state a Chapter 93A claim. As Xcentric noted, Plaintiffs' allegation concerning publishing or displaying the works is subject to partial dismissal to the extent that it is just a defamation claim barred by the CDA. Doc. #14 p. 6. "[W]here allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under G. L. c. 93A." *Dulgarian v. Stone*, 420 Mass. 843, 853 (1995).

The balance of the allegation in Paragraph 85 of the complaint should also be dismissed as preempted. "Federal copyright law preempts rights under state law when they are the equivalent of those granted under the Copyright Act." *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 44 (1st Cir. 2003) (citing 17 U.S.C. § 301(a); finding Chapter 93A claim preempted). The Chapter 93A allegations add nothing substantive to the complaint beyond a plea for trebled damages. Doc. #13 p. 18 (prayer for relief no. 6). The state claim is preempted because it is based on the same acts pleaded in the copyright claims. For Xcentric's claim of ownership to be improper, one of the Plaintiffs would need to be the copyright owner. "Because the plaintiff does not allege any fiduciary relationship with any defendant, [Xcentric's] actions may be unfair under G.L. c. 93A only if [a plaintiff] had a right or entitlement equivalent to copyright, so the unfairness claim under c. 93A is preempted under the Copyright Act." *Curtis v. Herb Chambers I-95, Inc.*, 458 Mass. 674, 682 (2011). *See also id.* at 681 (dismissing tortious interference claim as preempted because plaintiff could "prevail on this claim only if he held such a right or entitlement equivalent to copyright").

Moreover, asserting ownership was honest.  It is not unfair or deceptive of an exclusive licensee to assert ownership of copyright, when that is precisely what the law provides.  The Copyright Act defines "'transfer of copyright ownership' to include exclusive licenses[.]" *John G. Danielson, Inc. v. Winchester-Conant Props., Inc*., 186 F. Supp. 2d 1, 46 (D. Mass. 2002) (quoting 17 U.S.C. § 101), *aff'd*, 322 F.3d 26, 31 (1st Cir. 2003) (remanding on other grounds).

Likewise, it was honest for Xcentric to claim immunity under the CDA.  "[T]his very issue has been litigated by several district courts to date, where nearly identical allegations against Xcentric … based on Ripoff Report postings have been barred under the CDA." *Asia Econ. Inst., LLC v. Xcentric Ventures, LLC*, 2011 WL 2469822 (C.D. Cal. 2011) (finding Xcentric entitled to CDA immunity).  *See* Doc. #14 p. 5 (listing other cases reaching the same conclusion).  Xcentric could not have acted unfairly or deceptively in asserting the same in response to Goren's demands; *see also* Doc. #15 ¶ 22; Doc. #15-7 (email by Xcentric's counsel to Goren citing cases and stating, "We have litigated this issue many times and the courts have consistently agreed with our position."). Indeed, as noted in the Motion, a response to a pre-litigation demand letter is absolutely privileged. *See Doe v. Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137 (Mass. App. Ct. 1996).  "[C]hapter 93A 'has never been read so broadly as to establish an independent remedy for unfair or deceptive dealings in the context of litigation, with the statutory exception as to those engaged in the business of insurance.'" *Americus Mortg. Corp. v. Mark*, Civ. A. No. 12-10158-GAO, 2013 U.S. Dist. LEXIS 84658, *29 (D. Mass. June 17, 2013) (quoting *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457 (2004)).  Xcentric cannot be held liable for its honest statements about the law, even if Goren finds the law unpalatable.

**CONCLUSION**

None of the Plaintiffs owns the copyright in the works at issue, so they lack standing to sue Xcentric for infringement. The other three counts are barred by the CDA and are otherwise subject to dismissal, for the reasons set forth above. Therefore, and for the reasons previously stated in Xcentric's Motion, the First Amended Complaint should be dismissed.

Respectfully submitted,

BOOTH SWEET LLP

November 20, 2013

/s/ Dan Booth
Daniel G. Booth (BBO# 672090)
BOOTH SWEET LLP
32R Essex Street #1A
Cambridge, Massachusetts 02139
(617) 250-8602
dbooth@boothsweet.com

JABURG & WILK, P.C.

Maria Crimi Speth (admitted *pro hac vice*)
3200 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 248-1000
mcs@jaburgwilk.com

*Counsel for Defendant Xcentric Ventures LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of November, 2013, I electronically filed the foregoing Defendant's Reply in Support of Motion to Dismiss First Amended Complaint by using the Court's ECF system, which will send notification of such filing to, and provide service upon, Plaintiffs' attorney of record.

/s/ Dan Booth