UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SMALL JUSTICE LLC, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> XCENTRIC VENTURES LLC, ) <br> ) <br> Defendant. ) | Civil Action No. 13-cv-11701 |

MEMORANDUM AND ORDER

CASPER, J.                                                                                                                  March 24, 2014

I. Introduction

Plaintiffs Small Justice LLC ("Small Justice"), Richard A. Goren ("Goren") and Christian Dupont d/b/a Arabianights-Boston Massachusetts ("Dupont") (collectively, the "Plaintiffs") bring this action against Xcentric Ventures LLC ("Xcentric" or the "Defendant") arising from two posts made by Dupont on XCentric's website. Xcentric has moved to dismiss Counts III (libel), IV (intentional interference with prospective contractual relations) and V (violations of Mass. Gen. L. c. 93A) of the First Amended Complaint ("Am. Compl.") pursuant to Fed. R. Civ. P. 12(b)(6). Xcentric also seeks dismissal without prejudice of Count I (declaratory judgment as to ownership of copyright) and Count II (copyright infringement) for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). The Plaintiffs have now moved pursuant to Fed. R. Civ. P. 12(c) for partial Judgment on the Pleadings on two of Xcentric's affirmative defenses: copyright ownership and immunity. For the reasons stated

below, (1) the Defendant's motion to dismiss, D. 14, is DENIED as to the copyright claims, but is ALLOWED as to the libel and interference claims and is ALLOWED in part and DENIED in part as to the c. 93A claim; and (4) the Plaintiffs' motion for judgment on the pleadings, D. 20, is DENIED.

## II.     Factual Allegations and Procedural History

Unless otherwise noted, this summary is based upon the factual allegations in the Amended Complaint. Xcentric, an Arizona company, operates a website called the Ripoff Report which invites registered users to post complaints, called "reports," about companies or individuals. Am. Compl. ¶¶ 7, 8. On January 31, 2012, Dupont posted an allegedly defamatory report about Goren's conduct as an attorney and misconduct outside of his professional activities. Id. ¶¶ 11, 12. On February 2, 2012, Dupont posted a second report echoing these allegations. Id. ¶ 16, 17. On March 7, 2012, Xcentric obtained a registration of copyright from the United States Copyright Office entitled "Group Registration for an automated database titled Ripoff Reports from January 1, 2012 to March 7, 2012 . . . ." Gringras Aff. Exh. B, D. 15-2.

In November 2012, Goren sued Dupont for libel and interference with advantageous relations in Suffolk Superior Court. Am. Compl. ¶ 40. On February 28, 2013, the Superior Court entered a default based upon Dupont's failure to appear. Goren Second Aff. Exh. A-2, D. 29-2. On March 20, 2013, the Superior Court entered a judgment permanently enjoining Dupont from publishing or republishing any of the January 2012 Report. Goren Second Aff. Exh. A-3, D. 29-3 at 2. Upon Goren's motion, on May 8, 2013, the Superior Court amended its judgment to transfer ownership of the copyright of the January 2012 Report from Dupont to Goren. Goren Second Aff. Exh. A-4, D. 29-4 at 2. That order also appointed Goren as attorney-in-fact for Dupont, with the power to execute any assignment of the copyright in the January 2012 Report. Id. at 3.

2

On May 14, 2013, Goren served the Superior Court judgment on Xcentric and demanded that Xcentric remove the January 2012 Report from the Ripoff Report website, repeating his demand on June 25, 2013. Am. Compl. ¶¶ 49, 50. On June 27, 2013, Xcentric replied to Goren's demand, asserting immunity to defamation claims as an internet service provider under the Communications Decency Act, 47 U.S.C. § 230. Id. ¶ 51.

The Superior Court, at Goren's subsequent request, amended its judgment again, this time to encompass Dupont's February 2012 Report. Am. Compl. ¶ 53. On August 16, 2013, the Superior Court also ordered that "all rights in and to ownership of the copyright" by Dupont in the Reports "are hereby transferred to . . . Goren, meaning and intending to convey, transfer and assign . . . full and exclusive ownership of copyright in and to each work so as to qualify as a transfer of ownership under . . . 17 U.S.C. §204." Am. Compl. Exh. C, D. 13-3 at 3. Shortly thereafter, Goren served Xcentric with the Superior Court's August 16, 2013 Order and demanded that Xcentric remove the February 2012 Report from its website. Am. Compl. ¶ 54. On the same day, Goren, acting as attorney-in-fact for Dupont, executed a conveyance of the copyrights in the Reports from Dupont to himself. Goren Aff. Exh. 1, D. 20-1. He subsequently assigned his copyright ownership to Small Justice. Id.

On July 16, 2013, Goren and Small Justice initiated this lawsuit, suing Xcentric for copyright infringement. D. 1. Goren and Small Justice then amended their Complaint, adding Dupont as a plaintiff and stating five causes of action: declaratory judgment as to ownership of the copyrights in the Reports (Count I); copyright infringement (Count II); libel (Count III); intentional interference with prospective contractual relations (Count IV); and violations of Mass. Gen. L. c. 93A (Count V). D. 13. Xcentric has now moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P 12(b)(1) and (6), D. 14, and the Plaintiffs have moved for

judgment on the pleadings pursuant Fed. R. Civ. P. 12(c). D. 20. After a hearing on both motions, the Court took the matter under advisement. D. 34.

## III. Xcentric's Motion to Dismiss Copyright Claims

### A. Standard of Review

Xcentric moves to dismiss Counts I and II, pertaining to copyright infringement, for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). For the Plaintiffs to establish copyright infringement, they must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Motta v. Samuel Weiser, Inc., 768 F.2d 481, 483 (1st Cir.), cert. denied, 474 U.S. 1033 (1985). Pursuant to 17 U.S.C. § 501(b), only "the legal or beneficial owner of an exclusive right under copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." Thus, only the author of a copyrighted work or one who establishes ownership through a valid chain of title has standing to sue for copyright infringement. Motta, 768 F.2d at 484. "Absent this showing, a plaintiff does not have standing to bring an action under the Copyright Act." Id. If the Plaintiffs lack standing, this Court also lacks subject matter jurisdiction. See United States v. Union Bank for Sav. & Inv., 487 F.3d 8, 22 (1st Cir. 2007).

When considering a 12(b)(1) motion on the "sufficiency" of the "jurisdictionally-significant facts," the Court "must credit the plaintiff's well-pled factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw[ing] all reasonable inferences from them in [plaintiff's] favor." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). If the Defendants are instead are challenging "the accuracy (rather than the sufficiency) of the jurisdictional facts

4

asserted by the plaintiff," then "plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Id.; see id. at 263 n. 3 (noting that "there is an exception to this praxis for cases in which the jurisdictional facts, though genuinely disputed, are inextricably intertwined with the merits of the case. In that event, the court may defer resolution of the jurisdictional issue until the time of trial").

### B. <u>Copyright Conveyance from Dupont to Xcentric</u>

The Plaintiffs allege that Small Justice, as the assignee of Goren, owns the copyrights in the Reports and therefore Xcentric's continued display of the Reports constitutes copyright infringement. Am. Compl. ¶¶ 64-70. Goren purportedly acquired the copyrights as a result of the Superior Court orders transferring ownership from Dupont and the assignments made by him, as attorney in fact for Dupont, to himself. Am. Compl. ¶¶ 53, 55; Am. Compl. Exh. C, D. 13-3; Goren Aff. Exh. 1, D. 20-1. Xcentric contends that it holds a valid Certificate of Registration obtained from the United States Copyright Office establishing that it has exclusive rights to the Reports. Def. Mem., D. 14 at 13; Gingras Aff. Exh. B., D. 15-2. Xcentric argues that, because its ownership interest was registered before Goren allegedly acquired his conflicting transfer, Xcentric's interest prevails. Def. Mem., D. 14 at 15. For the reasons stated below, both parties' motions, as they pertain to the copyright claims, are denied.

Before Xcentric posted Dupont's Reports, Dupont had to complete a multi-step process. Am Compl. ¶ 9, 10. On the last screen prior to submission, Dupont was presented with a box with a scroll bar running down its side, entitled "Terms and Conditions." Id. Beneath the "Terms and Conditions" header was a subheading stating "1. Ripoff Report Membership Terms

& Conditions." Am. Compl. Exh. A and B, D. 13-1 and 13-2. A portion of the information contained beneath this subheading was visible on the screen, but no additional terms were visible to a user unless the user scrolled through them. One of the terms not visible on the screen was paragraph 6 entitled "Proprietary Rights/Grant of Exclusive Rights." Id. That section read:

> By posting information or content to any public area of www.RipoffReport.com, you automatically grant, and you represent and warrant that you have the right to grant, to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing.

Am. Compl. Exh. B., D. 13-2 at 2; Gingras Aff. ¶ 6.

Beneath the scrollable Terms and Conditions (the "TAC") was a check box which Dupont had to check before his Reports were posted. Am. Compl. ¶ 10. The text next to the check box stated: "By posting this report, I attest this report/rebuttal is valid. I am giving Rip-off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request. . . ." Id. ¶ 10; Am. Compl. Exh. A, D. 13-1. XCentric points out that users who do not agree to these terms are prohibited from posting any content on its website. Gingras Aff. ¶ 6. There was no explicit requirement that users read Xcentric's TAC nor were users required to electronically check a box indicating that they had done so. Am. Compl. ¶ 10; Am. Compl. Exh. A and B, D. 13-1 and 13-2. Without that express assent, Plaintiffs argue, Dupont retained copyrights in the Reports. Pl. Mem., D. 21 at 16.

Whether paragraph 6 of the TAC, along with the language next to the check box, was sufficient to transfer the copyrights in the Reports from Dupont to Xcentric depends on whether it was reasonable to expect that Dupont would have understood he was conveying those rights to

6

Xcentric.[1] Specht v. Netscape Comm'ns Corp., 306 F.3d 17, 31 (2d Cir. 2002) (opinion by Sotomayor, J.) (applying test of whether "a reasonably prudent offeree in these circumstances would have known of the existence of license terms"); see Craigslist Inc. v. 3Taps Inc., 942 F. Supp. 2d 962, 973 (N.D. Cal. 2013) ("it is reasonable to infer that a Craigslist user would understand that this 'confirmation' effected a transfer of rights" where users were confronted with notice that clicking "continue" confirmed Craigslist as the "exclusive licensee of this content"). Copyright transfer requires only a simple writing signed by the copyright owner. 17 U.S.C. § 204(a). A transfer of copyright ownership is not valid unless in writing and signed by the owner of the rights conveyed, but "[n]o magic words must be included in the document" which "doesn't have to be the Magna Carta; a one-line pro forma statement will do."[2] 3Taps, 942 F. Supp. 2d at 973 (quoting Radio Television Espanola S.A. v. New World Entm't, Ltd., 183 F.3d 922, 927 (9th Cir. 1999)).

In Specht, the plaintiffs downloaded Netscape's Communicator software from Netscape's website. Id. at 21. Before doing so, scrollable text of the license agreement was displayed to the plaintiffs, and they could not complete installation until they had clicked on a "yes" button to indicate their assent to the license terms, including a binding arbitration clause. Id. at 22. The Second Circuit held that the arbitration clause was not enforceable, however, because it was not

---

[1] The grant of an exclusive license is tantamount to the transfer of copyright ownership. 17 U.S.C. § 101 (defining "transfer of copyright ownership" to include an "exclusive license").

[2] The E-Sign Act, 15 U.S.C. § 7001, recognizes that the click of a button online can replace an actual signature. "Notwithstanding any statute, regulation or other rule of law . . ., with respect to any transaction in or affecting interstate or foreign commerce -- (1) a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form; and (2) a contract relating to such transaction may not be denied legal effect, validity or enforceability solely because an electronic signature or electronic record was used in its formation." Id. at § 7001(a).

7

reasonable to hold users to the terms of another computer program the plaintiffs downloaded in connection with, and prior to, Communicator. Id. at 30. That program, called SmartDownload, had no such evident license terms. Id. at 23. SmartDownload's license terms were visible only if the plaintiffs scrolled down past the "Download" button that initiated installation of the SmartDownload software. Id. Additionally, even if a user had scrolled down, he or she would have had to click on an invitation to review the terms, then on another link to the full text of the license agreement. Id. at 23-24.

The Plaintiffs seek to invoke federal jurisdiction, and, in the face of a Rule 12(b)(1) challenge, they bear the burden of establishing standing. Conservation Law Found., Inc. v. United States Envtl. Prot. Agency, No. 10-11455, 2013 WL 2581218, at * 5 (D. Mass. Aug. 29, 2013); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995); Cummings v. Pearson Educ., Inc., No. Civ. A. 03-12183, 2004 WL 2830702, at * 1 (D. Mass. Dec. 6, 2004).

However, whether the Court considers XCentric's Rule 12(b)(1) motion to be challenging the sufficiency or the adequacy of the Plaintiffs' jurisdictional averments, the Court cannot resolve the issue of the ownership of the copyrights on the present record. Although the process by which users posted to the Ripoff Report appears to be similar to the Communicator software context in Specht, the Court cannot say, on this record now before it, what a reasonably prudent offeree in Dupont's position would have concluded about license. See Valentin, 254 F.3d 363 n. 3 (noting that the court may defer resolution of the jurisdictional issue where facts bearing upon that issue are "genuinely disputed, [but] are inextricably intertwined with the merits of the case"). Accordingly, the Court DENIES Defendant's motion to dismiss Claims I and II without

prejudice and DENIES the Plaintiffs' motion for Judgment on the Pleadings as it relates to Xcentric's affirmative defense of copyright ownership.[3]

IV. **Xcentric's Motion to Dismiss Claims for Libel and Intentional Interference with Prospective Contractual Relations**

   A. <u>**Standard of Review**</u>

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 1997).[4] The plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). The Court will dismiss for failure to state a claim if the pleadings lack "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable theory." <u>Berner v. Delahunty</u>, 129 F.3d 20, 25 (1st Cir. 1997), cert. denied, 523 U.S. 1023 (1998) (quoting <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir. 1988)). The Plaintiffs' complaint must contain sufficient facts that, accepted as true, would allow this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Aside from the facts set forth in the complaint, exhibits attached to the complaint are properly considered part of the pleading for purpose of Rule

---

[3] In light of this ruling, the Court need not reach the Plaintiffs' argument that Xcentric's copyright registration of a compilation was insufficient to register the component works as well because the registration omitted the names of the individual authors. D. 28 at 8. For the same reason, the Court also does not need to reach whether the Orders of the Superior Court and the subsequent assignments among the Plaintiffs are valid and enforceable transfers of the copyrights in the Reports. Am. Compl. ¶¶ 53-56.

[4] The Court may also consider documents the authenticity of which is undisputed, documents central to the Plaintiffs' claims and documents referred to in the Amended Complaint. <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).

12(b)(6).  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir.), cert. denied, 555 U.S. 995 (2008).  In addition, "when a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."  Id. (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (internal quotation marks omitted).

### B. **Applicability of the Communications Decency Act, 47 U.S.C. § 230**

The Plaintiffs allege that Xcentric's online publication of Dupont's defamatory posts constitutes libel.  Am. Compl. ¶ 72.  Cognizant of Xcentric's contention that it is immune to defamation claims by virtue of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230, the Plaintiffs contend that the such statutory immunity is not available to Xcentric because of Xcentric's asserted ownership of the copyrights in the Reports.  Id.  The Plaintiffs also aver that Xcentric has "intentionally caused these two defamatory *per se* publications to be prominently and frequently featured on Google[] and other search engines . . . ."  Am. Compl. ¶ 73.  Specifically, according to the Plaintiffs, Xcentric has caused the Reports "to be indexed by Google and other search engines so as to maximize the number of hits or page views by search engine users" through the use of "generally accepted internet industry-standard protocols, including without limitation its uses of robots meta tag and so-called serving directives."  Id. ¶ 37.  For the reasons stated below, this Court concludes that CDA immunity applies and shields Xcentric from all claims based on the Reports.

#### 1. *CDA Immunity and Copyright Ownership*

Section 230 of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another

information content provider." 47 U.S.C. § 230(c)(1). To avail itself of such immunity, the CDA imposes three requirements: (1) Xcentric must be a provider or user of an interactive computer service (also called an "interactive service provider" or an "ISP"); (2) the Plaintiffs' claim is based on information provided by another information content provider; and (3) the claim would treat Xcentric as the publisher or speaker of that information. Universal Comm'n Sys. v. Lycos, 478 F.3d 413, 418 (1st Cir. 2007).

The First Circuit has interpreted the CDA's immunity broadly in light of the policy concerns Congress sought to address with the statute. Id. at 419 (stating that, like other courts, "we too find that Section 230 immunity should be broadly construed"). Specifically, the CDA implements Congress's "policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." Id. at 418, quoting Zeran v. Am. Online, Inc., 129 F.3d 327, 330-331 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998) (alterations in original). The First Circuit credited Congress's concerns that intermediary tort liability would have a chilling effect upon online speech, that the burden of separating lawful from unlawful speech was too great, and that the actions of intermediaries who choose to actively screen content should be shielded from liability. Id. at 418-19.

The issue before this Court is whether the second requirement imposed by the CDA – that the information is provided by "another information content provider" – is met. Section 230 defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). For CDA immunity to apply, the postings "that form[] the basis for the state law claim[s] [must have] been provided by '*another*

11

information content provider.'" Lycos, 478 F.3d at 419 (emphasis in original). Importantly, "an interactive computer service provider remains liable for its own speech." Id. The Plaintiffs contend that Xcentric's asserted copyright ownership in the Reports transforms it from an intermediary to the provider of the disputed content. Am. Compl., ¶¶ 72-74, 78; Pl. Mem., D. 21 at 3-4, 25-28. In other words, according to the Plaintiffs, Xcentric adopted the Reports as its own speech, subjecting it to liability, because it holds itself out as the copyright owner. Id.

This Court rejects the argument that an ISP becomes an information content provider when, assuming *arguendo*, it receives an exclusive license to the content posted by a third party. The Plaintiffs cite no authority that has held that an ISP adopts content by virtue of its copyright ownership. Courts that have addressed the adoption issue have held that an ISP is not a content provider unless it specifically encourages the development of the offensive content. Fed. Trade Comm'n v. Accusearch Inc., 570 F.3d 1187, 1201 (10th Cir. 2009) (holding immunity unavailable where defendant paid researchers to acquire confidential content); Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1165-66 (9th Cir. 2008) (withholding CDA immunity where website induced users to create illegal housing preferences based on protected characteristics by requiring answers to its own questionnaire); Jones v. Dirty World Ent. Recordings, LLC, 840 F. Supp. 2d 1008, 1011-12 (E.D. Ky. 2012) (deeming website a content provider where it specifically encouraged defamatory content by, *inter alia*, adding its own comments to postings); see Parisi v. Sinclair, 774 F. Supp. 2d 310, 316 (D.C. 2011) (declining to withhold CDA immunity because bookseller merely reposted defamatory promotional statements and stating that "it would be contrary to the purpose of the CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet by establishing immunity for internet publication of third-party content[,] to require a fact-based

analysis of if and when a defendant adopted particular statements and revoke immunity on that basis") (internal citation and quotation marks omitted). Here, Xcentric's acquisition of an exclusive license to the content (if the record ultimately shows that it did acquire such a license) is an insufficient level of involvement in the development of the content to nullify CDA immunity.

2. *CDA Immunity and Alleged Re-publication on Search Engines*

The Plaintiffs further attempt to circumvent the CDA by arguing that Xcentric surrenders its immunity by "instruct[ing] search engines to make copies of the two works under color of Xcentric's claimed exclusive ownership of the works and also authoriz[ing] Google and the other search engines to display those cached copies."[5] D. 28 at 11. The Plaintiffs acknowledge that "Xcentric's instructions to the search engines are designed to maximize the number of times each of the two works is listed on Google's index so as to maximize the number of hits or page views by search engine users." Pl. Mem., D. 21 at 8. The Plaintiffs aver that by instructing Google to use, or at least by not precluding Google from using, its automated program to acquire cached copies of the Reports, Xcentric adopts the content of the Reports as its own and causes it to be republished on Google's website. D. 21 at 7-9.

As discussed above, the CDA grants immunity to ISPs that passively display content created by third parties, but ISPs are subject to liability for content created by them. See Lycos, 478 F.3d at 419. This Court concludes that the alleged conduct does not rise to the level of the

---

[5] The Plaintiffs cite Field v. Google, Inc., 412 F. Supp. 2d 1106 (D. Nev. 2006), to explain the technology by which Google acquires cached copies of the Reports. Google uses an automated program to "crawl across the Internet" and to locate, analyze and catalog web pages, thereby making them searchable to a user of the Google search engine. Id. at 1110. "As part of this process, Google . . . stores the HTML code from those pages in a temporary repository called a cache. Once Google indexes and stores a [w]eb page in the cache, it can include that page . . . in the search results it displays to users in response to their queries." Id. at 1110-11.

"creation or development of information" that would render Xcentric an "information content provider" under the CDA. 47 U.S.C. § 230(f)(3). The Plaintiffs do not allege that Xcentric augments or changes the content of the Reports in any way before they are cached on Google's servers. See Roommates, 521 F.3d at 1174-75 (stating that CDA immunity is lost only where "it is very clear that the website directly participates in developing the alleged illegality" and noting that tacit assent to the conduct of third parties is not sufficient to strip immunity). The Plaintiffs also appear to concede that Xcentric's alleged actions are undertaken with the goal of maximizing the number of times the Ripoff Report appears among Google's search results. However, merely endeavoring to increase the prominence of Xcentric's site among Google's search results does not make Xcentric an information content provider under the CDA. See Asia Econ. Inst. v. Xcentric Ventures LLC, No. CV-10-01369 SVW PJWX, 2011 WL 2469822 at *6 (C.D. Cal. May 4, 2011) (holding that CDA immunity applied where defendant added indexing tags to increase the prominence of its web pages in internet searches because "[i]ncreasing the visibility of a statement is not tantamount to altering its message").

Because immunity under the CDA shields Xcentric from claims based on its publication of the Reports, the Plaintiffs' claims for libel and tortious interference are barred. Therefore Xcentric's motion to dismiss Claims III and IV is ALLOWED and the Plaintiffs' motion for judgment on the pleadings as it relates to Xcentric's assertion of CDA immunity is DENIED.

### V. XCentric's Motion to Dismiss the Chapter 93A Claim

Mass. Gen. L. c. 93A § 11 provides a private cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice

declared unlawful by section two . . . ." The referenced section two broadly proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Id. § 2(a).

The Plaintiffs' allegations that Xcentric violated c. 93A boil down to three claims: (1) that Xcentric's continued display of the Reports, coupled with its asserted copyright ownership in the Reports, constitute unfair and deceptive business practices, Am. Compl. ¶ 85; (2) that Xcentric's assertions of CDA immunity prior to the commencement of this suit, both in its e-mail communications with Goren and in its refusal to comply with the Superior Court injunction, were unfair and deceptive, Am. Compl. ¶¶ 49-51, 86; Gingras Aff. Exh. B., D. 15-7; and (3) that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based Corporate Advisory Program ("CAP") and VIP Arbitration program is oppressive and unethical. Pl. Mem., D. 21 at 22; Am. Compl. ¶¶ 33-35. According to the Amended Complaint, Xcentric directs advertisements to injured parties offering to help them achieve positive search engine listings when they pay to become members of the CAP. Am. Compl. ¶ 34. The VIP Arbitration program invites victims of defamatory reports to pay to submit the matter to Xcentric's arbitration process. Id. ¶ 35. Though Xcentric will not remove the offending reports as a result of such process, redaction of falsehoods appears to be a possible outcome. Id. For the reasons stated below, this Court dismisses the first two bases of the Plaintiffs' c. 93A claim, but finds the remaining portion of the c. 93A claim is sufficiently pled.

As to Xcentric's continued display of the Reports, its refusal to strike the Reports from the Ripoff Report website was within its discretion as an ISP under the CDA. See Lycos, 478 F.3d at 422 (where the "cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service provider's decisions

15

with respect to that posting, but also for its inherent decisions on how to treat postings generally"). The Plaintiffs cannot attempt an end run around the CDA through the use of c. 93A. See Dulgarian v. Stone, 420 Mass. 843, 852 (1995) (holding that "where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under G.L. c.93A"). The Plaintiffs' suggestion that Xcentric's copyrights in the Reports changes this result is without merit. As discussed above, CDA immunity still protects ISPs who obtain exclusive licenses to the material posted on their sites.

Similarly, this Court holds that the Plaintiffs have failed to plead sufficiently a c. 93A violation predicated on Xcentric's invocation of CDA immunity. The Plaintiffs insist that they "do not assail Xcentric for taking an aggressive litigation position" but that Xcentric violated c. 93A through its "knowingly false and/or deceptive representation that it was not the party responsible for publishing the libel." Pl. Mem., D. 21 at 23. For a c. 93A claim to proceed, litigation tactics must smack of bad faith. See Trenwick Am. Reins. Corp. v. IRC, Inc., 764 F. Supp. 2d, 274, 307 (D. Mass. 2011) ("While there may be debate concerning whether litigation tactics alone can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct"). Xcentric is merely the ISP here, not the information content provider, regardless of whether it holds the copyrights in the Reports. Its meritorious assertion of CDA immunity cannot form the basis for a c. 93A claim.

The Plaintiffs' final portion of the c. 93A claim, premised on Xcentric's CAP and VIP Arbitration services, may proceed. The Plaintiffs argue that it is unfair for Xcentric to refuse to take down the defamatory Reports while simultaneously advertising services by which Goren can pay Xcentric to restore his reputation. Pl. Mem., D. 21 at 22; Am. Compl. ¶¶ 33-35. A trade

16

practice or act violates c. 93A if "it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to competitors or other business people." Morrison v. Toys "R" Us, Inc., 441 Mass. 441, 457 (2004) (quoting Heller Fin. v. Ins. Co. of N. Am., 410 Mass. 400, 408 (1991)). This definition of prohibited conduct is very broad, and privity is not required by c. 93A "so long as the parties are engaged in more than a minor or insignificant business relationship." Standard Register, Co. v. Bolton-Emerson, Inc., 38 Mass. App. Ct. 545, 551 (1995). The First Circuit has observed that "[w]hat, specifically, constitutes a 'minor or insignificant business relationship' has not been fully fleshed out in the Massachusetts courts, but it has been described as requiring that 'there must be exist some commercial relationship between the parties or the plaintiffs must demonstrate the defendants' actions interfered with trade or commerce.'" In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 193 (1st Cir. 2009) (quoting Spencer v. Doyle, 50 Mass. App. Ct. 6, 12 (2000)). Here, the Plaintiffs have sufficiently alleged that Xcentric's acts are within the "penumbra" of "unfairness," or they are "immoral, unethical, oppressive or unscrupulous," or they interfered with trade or commerce.

Xcentric's motion to dismiss the Plaintiffs' c. 93A claim with respect to (1) Xcentric's continued display of the Reports; and (2) Xcentric's assertion of CDA immunity is ALLOWED and the remainder of Xcentric's motion with respect to the c. 93A claims is DENIED.

**VI. Conclusion**

For the foregoing reasons, Xcentric's Motion to Dismiss, D. 14, is ALLOWED in part and DENIED in part. The Plaintiffs' cross motion for partial Judgment on the Pleadings, D. 20, is DENIED.

**So Ordered.** /s/ Denise J. Casper
United States District Judge