# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT dba ARABIANIGHTS-BOSTON MASSACHUSETTS, | Civil Action No. 1:13-cv-11701-DJC |
| Plaintiffs, | |
| v. | **DEFENDANT XCENTRIC VENTURES, LLC'S MOTION FOR SUMMARY JUDGMENT** |
| XCENTRIC VENTURES LLC, | |
| Defendant. | |
| XCENTRIC VENTURES LLC, | |
| Counterclaimant, | |
| v. | |
| CHRISTIAN DUPONT, | |
| Counterdefendant. | |

Pursuant to Federal Rule of Civil Procedure 56, Defendant Xcentric Ventures, LLC ("Xcentric" or "Defendant"), through counsel, hereby moves for summary judgment on the remaining claims against it on grounds that (1) the alleged copyright transfer was barred as an involuntary transfer, (2) by posting on the website, the author of the post gave Defendant an exclusive license and irrevocable right to use the post, and (3) the Communications Decency Act protects Defendant from liability for editorial decisions. This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

On January 31 and February 2, 2012, an individual using the name "Arabianights-Boston, Massachusetts"—allegedly Plaintiff Christian DuPont—posted complaints about Plaintiff Richard Goren on Ripoff Report (the "January 31 Post" and the "February 2 Post"). (Statement of Facts ("SOF") ¶¶ 11-12).[1] Prior to posting on Ripoff Report, DuPont had to first create an account, where he was asked to submit his personal information and create a handle, or pseudonym. (*Id.* ¶¶ 6 & 11). The author of the post chose the handle, "Arabianights." (*Id.* ¶ 11). After creating an account but before posting his report, DuPont encountered a page captioned "Submit your Report," underneath which appeared the title "Terms and Conditions." (*Id.* ¶¶ 7 & 11). Under the title Terms and Conditions appeared a scrollable list of terms and conditions, which was evident by the fact that the immediately viewable portion included an incomplete mailing address. (*Id.* ¶ 7). The Terms and Conditions include provisions that state the poster, *inter alia*, affirms the report is truthful and valid, grants Ripoff Report an exclusive license over all posts, and informs the poster that the post will not be removed. (*Id.* ¶ 8).

Below the box that contained the Terms and Conditions, a checkable box/radio button sits next to a short paragraph of similar terms that read as follows:

> By posting this report/rebuttal, I attest this report is valid. I am giving Rip-off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting this report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Ripoff Report arising out of this posting or the report to which this posting relates.

(*Id.* ¶ 9). DuPont was required to physically check the box, acknowledging agreement to these terms, before he could proceed. (*Id.* ¶¶ 9 & 11). Once DuPont physically checked the box, he was then able to post his complaints on Ripoff Report. (*Id.*).

---

[1] Although the exact identity of the poster is uncertain, for purposes of this motion, the poster will be referred to hereafter as Plaintiff DuPont, who is judicially estopped from denying that he is the author.

In response to Mr. DuPont's posts, Plaintiff Richard Goren filed a lawsuit in November 2012 in the Superior Court of Suffolk County (the "Superior Court Action") against Mr. DuPont and "John Doe dba Arabianights-Boston, Massachusetts" alleging libel and intentional interference with prospective contractual relations, seeking damages and injunctive relief. (*Id.* ¶ 13). According to the Superior Court Complaint, Plaintiff Goren, an attorney, had previously filed a lawsuit against Mr. DuPont on behalf of a client in 2011, alleging fraud and unfair business practices. (*Id.* ¶ 14). That 2011 case allegedly resulted in a sizable judgment against DuPont, including attorneys' fees. (*Id.*). Goren's Superior Court Complaint claimed that DuPont's posts on Ripoff Report appeared shortly after that judgment was awarded. (*Id.* ¶ 15). When DuPont failed to appear in the Superior Court Action, the Superior Court granted a default judgment in favor of Goren. (*Id.* ¶ 16). Goren then asked the Superior Court to transfer all copyrights in the January 31 Post and appoint him as DuPont's attorney-in-fact for the purpose of effecting the court's Default Judgment. (*Id.* ¶¶ 17-20). The Superior Court acquiesced. (*Id.* ¶ 21). Goren used these "powers" to purportedly transfer the copyrights to Small Justice, LLC. (*Id.* ¶ 22). Soon thereafter, Goren filed the current lawsuit against Xcentric. (*Id.* ¶ 24).

After filing the current lawsuit, Goren returned to the Superior Court and asked the Court to amend its Default Judgment to include the February 2 Post, which he had overlooked. (*Id.* ¶ 25). In his request, Goren explained his motivation for seeking a transfer of copyrights: "the Ripoff Report cannot be sued for libel or defamation published on its website by third parties but is not immune from copyright infringement." (*Id.*). Still unopposed, the Superior Court again acquiesced to Goren's request, reappointing Goren as DuPont's attorney-in-fact and purporting to transfer copyrights in both posts to Goren. (*Id.* ¶ 26). Goren again "transferred" these copyrights to Small Justice, LLC. (*Id.* ¶ 27). Then, Goren amended his Complaint in the current action to add his former adversary, Christian DuPont, as his co-Plaintiff. (*Id.* ¶ 28).

The Plaintiffs' claims included five counts. (*Id.*). In response to Xcentric's Motion to Dismiss, this Court dismissed Plaintiffs' COUNT III and COUNT IV for libel and intentional interference, respectively. (*Id.* ¶ 29). The Court allowed Plaintiffs' claims regarding copyright

ownership and infringement (<u>COUNT I</u> and <u>COUNT II</u>) to survive. (*Id.*). The Court partially dismissed <u>COUNT V</u> for Mass. G.L. c. 93A, unfair and deceptive practices, only leaving intact the claim that "Xcentric's solicitation of victims of defamatory reports to participate in its fee-based Corporate Advisory (sic) Program ("CAP") and VIP Arbitration program is oppressive and unethical." (*Id.*). Thus, the only remaining claims are for copyright infringement and one purported allegation under Chapter 93A.

## II.   SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is the "principal tool by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## III.   AS A MATTER OF LAW, DEFENDANT XCENTRIC VENTURES, LLC IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR.

### A.   Plaintiffs' Copyright Claims Cannot Survive a Motion for Summary Judgment Because the Alleged Transfer of Copyrights on Which Their Claims Are Based Was Involuntary.

The process through which Mr. Goren claims to have acquired his rights—by virtue of a default judgment entered in a state-court proceeding filed against the purported author—is expressly barred by Section 201(e) of the Copyright Act. *See* 17 U.S.C. § 201(e). Mr. Goren's alleged copyright ownership arises from a default judgment entered in a state-court proceeding

styled *Richard A. Goren v. John Doe and Steven DuPont*, Case #2012-4121-H. (SOF ¶¶ 13 & 16). According to the Judgment and Permanent Injunction entered in that matter on August 16, 2013, the state court entered a default judgment purporting to transfer to Mr. Goren

> all rights in and to ownership of the copyright by the author Christian DuPont dba Arabianights-Boston Massachusetts, aka Steven DuPont aka Steven Christian DuPont of both [the January 31 Post] and [the February 2 Post] posted on the Ripoff Report website . . . so as to qualify as a transfer of ownership under 17 U.S.C. § 201(d) and/or under 17 U.S.C. § 204.

(SOF ¶ 26). However, this purported transfer was invalid as a matter of law pursuant to 17 U.S.C. § 201(e), which provides:

> **(e) Involuntary Transfer.**— When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, <u>no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title,</u> except as provided under title 11 [the U.S. Bankruptcy Code].

(emphasis added). Thus, Plaintiff Goren could not possibly hold any rights to the reports at issue.

Section 201(e) expressly prohibits state courts from imposing an involuntary transfer of a copyright in the manner attempted by Mr. Goren. Indeed, Section 201(e) was adopted to prevent exactly the result Mr. Goren is seeking here—involuntary seizure of a copyright to suppress unpleasant or controversial speech; "Section 201(e) was originally intended to prevent the Soviet Union from squelching dissidents by confiscating their copyrights, but the plain language of the section prohibits involuntary transfer by any government action." *Rodrigue v. Rodrigue*, 55 F. Supp. 2d 534, 542 (E.D. La. 1999) (emphasis added) (citing Francis M. Nevins, Jr., *When an Author's Marriage Dies; The Copyright-Divorce Connection,* 37 J. Copr. Soc'y U.S.A. 382, 383–84 (1990); 1 Melville Nimmer and David Nimmer, *Nimmer on Copyright* §§ 6A.03[C][2][b] & 10.04), *rev'd on other grounds*, 218 F.3d 432 (5th Cir. 2000).

Both the language and the logic of Section 201(e) are clear—state courts simply do not have authority to issue judgments/orders that involuntarily divest copyright owners of their

exclusive rights. But for Section 201(e), an errant local court default judgment could effectively be used to seize control over and thereby censor virtually any/all online speech. As noted in *Rodrigue*, this was in fact the core concern Congress intended to prevent when it adopted Section 201(e):

> The purpose of this subsection is to reaffirm the basic principle that the United States copyright of an individual author shall be secured to that author, and cannot be taken away by *any involuntary transfer*. It is the intent of the subsection that the author be entitled, despite any purported expropriation or involuntary transfer, to continue exercising all rights under the United States statute, and that the governmental body or organization may not *enforce or exercise any rights* under this title in that situation.

*Rodrigue*, 55 F. Supp. 2d at 542 (emphasis in original) (quoting 1978 Acts. Senate Report No. 95–989 and House Report No. 95–595; 1978 U.S. Code Cong. and Adm. News, p. 5787).

Moreover, although a defaulting party is deemed to admit factual allegations in a complaint, a defaulting party does not admit conclusions of law. *See Eagle Fund, Ltd. v. Sarkans*, 63 Mass. App. Ct. 79, 82, 823 N.E.2d 783, 786 n.8 (2005) (citing *Productora e Importadora de Papel, S.A. de C.V. v. Fleming*, 376 Mass. 826, 834–835, 383 N.E.2d 1129 (1978)). Goren filed a notice of waiver of a financial recovery and a request for an involuntary transfer of copyrights. (SOF ¶ 17). Goren now contends this was not involuntary because DuPont had notice that Goren was seeking the transfer and did not oppose his request. (*Id*.). That DuPont was unable to defend himself in the state court case does not make the transfer any less involuntary. Although the state court was permitted to find that Plaintiff DuPont admitted to posting the alleged defamatory statements, the court could not find—nor can this Court—that DuPont voluntarily transferred copyrights to Goren by nature of DuPont's default.

In sum, Section 201(e) expressly and unequivocally prevents this Court from giving effect to the involuntary transfer purportedly ordered by the state court's default judgment. The state court could neither transfer the copyrights to Goren nor grant Goren the right to transfer the copyrights to himself. Because this purported transfer was not effective, it conveyed no

ownership rights to Mr. Goren. As such, neither Mr. Goren nor his assignee, Small Justice, have any rights, exclusive or otherwise, in the January 31 Post (Report #831689) or the February 2 Post (Report #833025), and thus have no standing to pursue this action for infringement.

Therefore, Xcentric is entitled to judgment as a matter of law as to Goren's and Small Justice's copyright claims.

> **B.      Plaintiffs' Copyright Claims Cannot Survive a Motion for Summary Judgment Because Dupont Agreed to Terms and Conditions and Granted an Irrevocable Right to Use the Posts.**

DuPont, as will be demonstrated below, was subject to the Terms and Conditions of the website. Those Terms and Conditions granted Xcentric an exclusive, irrevocable license to use his comments. Any claim DuPont had or has to the copyrights was subject to those Terms and Conditions. Therefore, any purported transfer to Goren would also be limited by those Terms and Conditions. As such, none of the Plaintiffs' copyright claims can survive a motion for summary judgment.

Courts generally classify the implementation of online terms and conditions into two categories: "clickwrap agreements" and "browsewrap agreements." Clickwrap Agreements exist where the website operator requires users to manifest some assent to the Terms and Conditions as a condition of interacting with the website, such as requiring the visitor to click a radio button agreeing to terms of service in order to proceed. *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011). Browsewrap agreements exist where the website operator seeks to bind visitors of the site by posting Terms and Conditions somewhere on the site. *Id.*

Clickwrap agreements, where a party manifests his or her assent to the terms, are almost uniformly enforced. *See Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 576, 987 N.E.2d 604, 613 (2013); *Hughes v. McMenamon*, 204 F. Supp. 2d 178, 181 (D. Mass. 2002); *see also* Nathan J. Davis, *Presumed Assent: The Judicial Acceptance of Clickwrap*, 22 Berkeley Tech. L.J. 577, 582 (2007) (compiling cases and stating that courts "have enforced the vast majority of clickwrap cases that have come before them"). Clickwrap agreements have been held valid even when all the terms were not immediately visible because they were contained in a scroll box or

because they were only accessible by clicking on a link. *See, e.g., Novak v. Overture Svcs., Inc.*, 309 F. Supp. 2d 446, 451 (E.D.N.Y. 2004) (scroll box); *Forrest v. Verizon Commc'ns Inc.*, 805 A.2d 1007, 1010 (D.C. 2002) (scroll box); *Hubbert v. Dell Corp.*, 359 Ill. App. 3d 976, 835 N.E.2d 113, 120 (2005) (link); *Cohn v. TrueBeginnings, LLC*, B190423, 2007 WL 2181897, at *3 (Cal. Ct. App. July 31, 2007) (link).

Alternatively, since a browsewrap agreement does not require any affirmative action on the part of the website user (other than mere browsing), "the determination of the validity of a browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Van Tassell v. United Marketing Group*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011) (citing *Southwest Airlines v. BoardFirst, L.L.C.*, 2007 WL 4823761, at *5 (N.D. Tex. Sept. 12, 2007)); *see also* Mark A. Lemley, *Terms of Use*, 90 Minn. L. Rev. 459, 477 (2006) ("Courts may be willing to overlook the utter absence of assent only when there are reasons to believe that the [visitor] is aware of the [website operator's] terms.").

The *Van Tassell* Court cites to *Specht v. Netscape Commc'ns Corp.*—which Plaintiffs relied on in their Opposition to Motion to Dismiss—as "[t]he seminal browsewrap case." *Van Tassell*, 795 F. Supp. 2d at 791. In *Specht*, the Second Circuit addressed whether terms and conditions applied to website visitors who had downloaded software from the site. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 20 (2d Cir. 2002). The court held that a reasonably prudent internet user would not have actual or constructive knowledge of the terms and conditions where the terms at issue were only viewable when the visitor scrolled down past the operative "Download" button, and there was no other requirement to manifest assent to the terms. *Id.* at 35. Because a visitor of the website could visit the site and download the software without ever encountering so much as a reference to the terms and conditions, the court found insufficient notice and, therefore, refused to enforce the agreement. *Id.*

The *Van Tassell* Court thereafter reviewed two other cases where browsewrap agreements were enforced because the existence of the terms was conspicuous and, thus, placed the visitor on sufficient notice. 795 F. Supp. 2d at 791–92 (discussing *Hubbert v. Dell Corp.*, 359

8

Ill. App. 3d 976, 835 N.E.2d 113, 120 (2005) (terms visibly referenced throughout order process, link to terms available on various pages on the site, and included statement that all sales were subject to the terms) and *PDC Laboratories, Inc. v. Hach Co.*, 2009 WL 2605270, at *2 (C.D. Ill. 2009) (links to terms available on multiple web pages throughout order process and the final step of the order process read "Review Terms, add any comments, and submit order", which was followed by a hyperlink to the terms).

<b>1.    Xcentric's Terms and Conditions were implemented by "clickwrap" and should therefore be enforced as such.</b>

Xcentric's implementation of its Terms and Conditions fall within the "clickwrap" designation because the author is required to affirmatively click on the radio button before he or she can proceed.

The phrase "Terms and Conditions" was prominently displayed as a title prior to Plaintiff DuPont being able to post on Ripoff Report. (SOF ¶ 7). Under that title was a scrollable box that contained all the terms. (*Id.*). Despite Plaintiff Goren's claims to the contrary, displaying such terms in a scrollable box does not render them unenforceable. Moreover, it was readily apparent that there were additional terms to scroll through because the visible portion included an incomplete mailing address, indicating there was additional material below. (*Id.*). And, indeed, a scrollable box makes the terms even more visible and accessible than simply providing a link to the terms, which, as demonstrated above, courts have also found acceptable.

Before DuPont could select the appropriate button to post his report, he had to check the radio button above, manifesting his assent to the Terms and Conditions. (*Id.* ¶¶ 9 & 11-12). This page, with Terms and Conditions as a title, was the last step in the process of posting a report on the website. (*Id.* ¶ 7). So any argument that the poster might have confused the Terms and Conditions as relating to anything other than posting on Ripoff Report is untenable. And, as indicated, the Terms and Conditions were available to the poster for review before the comments were posted on the site. (*Id.*). Plaintiffs' claim that there was no meaningful opportunity to

9

review the Terms & Conditions is, quite simply, a farce, designed only to keep the unfounded claims alive.

Plaintiff DuPont was presented with the Terms and Conditions, and he was required to manifest his assent to those Terms and Conditions. (*Id*. ¶¶ 9 & 11-12). He could not have posted on the site if he did not manifest the required assent. (*Id.* ¶ 9). Those Terms and Conditions state that the poster grants an "irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing." (*Id.* ¶ 8). He therefore assented to the exclusive license, and he cannot now claim he was unaware of the terms or that he had no meaningful opportunity to review them.

Xcentric is therefore entitled to summary judgment on Plaintiffs' copyright claims because DuPont expressly agreed to the Terms and Conditions on Ripoff Report.

### 2. Plaintiff DuPont had notice of the Terms and Conditions and acknowledged their existence.

Even if the Court finds that a question exists about DuPont's manifestation of assent, the agreement should be enforced because the terms were so apparent and required acknowledgment of their existence by virtue of the mandatory radio button.

The phrase "Terms and Conditions" has burrowed its way into the American lexicon as a symptom of our commercialized society. The phrase is therefore well-recognized among lay as well as legally trained individuals. A layperson might define Terms and Conditions as the rules that govern some transaction—for instance when entering a contest or lottery. In exchange for the right to play, the individual is subject to these rules. The layperson's understanding of Terms and Conditions would recognize that if the individual wants something where Terms and Conditions exist, his or her right to participate is inevitably limited in some way—i.e., in a *quid pro quo*. Thus, if a layperson desires to post something on an online message board and he or she encounters the phrase "Terms and Conditions," that individual would not be surprised to later

10297-10297-00087\AKH\AKH\1373341.2

find that he or she is bound by those terms. Whether or not the Terms and Conditions are read, the layperson would have notice of their existence and would recognize the significance of the language as a limitation on his or her right to participate.

In the process of posting his reports, Plaintiff DuPont encountered a page with a title Terms and Conditions. (*Id*. ¶¶ 7 & 11). The terms were immediately available in a scrollable box. (*Id.*). And these terms and the radio button were located above the operative "Continue" button that DuPont would eventually use to post his report. (*Id*. ¶ 9). Unlike in *Specht v. Netscape Commc'ns Corp.*, where the terms were hidden below the operative "Download" button and the visitor might never encounter the terms, it would be impossible for DuPont—or any poster for that matter—to fail to encounter the Terms and Conditions on Ripoff Report. Beyond the obvious presentation of the Terms and Conditions, DuPont had to click on the radio button before continuing. If the Court remains unconvinced that the radio button manifested DuPont's assent to the terms, his clicking of the radio button at the very least demonstrated his acknowledgment that the terms existed. Plaintiffs' claim that a reasonable visitor would not have adequate notice of the Terms and Conditions is a mere ploy to create a material factual issue in order to survive and circumvent the mandates of the Communications Decency Act, as further addressed *infra*.

Even apart from the Terms and Conditions, Plaintiff DuPont physically placed the material on the website. His physical act of placing the material on the site was enough to create an express license. If he did not want the post on Ripoff Report, he would not have posted it. By the time someone becomes familiar enough with the website to decide to post, they have inevitably been exposed to the Terms and Conditions multiple times. And if the poster ever needed to review these terms or if a visitor simply wanted to peruse them, Xcentric includes a prominent bank of its most important links on the bottom of every page on the site. (*Id*. ¶ 8). One of the links directs the visitor to those terms, which are available to the general public seven days a week, 24 hours a day. (*Id.*). The fact that DuPont had further and more substantial notice of these policies—through the presented Terms and Conditions, the short paragraph, and the

11

requirement to affirmatively check the radio button before posting—concretely demonstrates that he had sufficient notice and knowledge of the Terms and Conditions and thereby granted an exclusive license to Xcentric. As such, Plaintiffs cannot sustain their claims to the copyrights.

Based on the foregoing, Xcentric is entitled to summary judgment on Plaintiff DuPont's copyright claims because DuPont had actual and constructive knowledge of the Terms and Conditions on Ripoff Report, and Xcentric therefore holds an exclusive license to continue posting the reports at issue.

### 3. Plaintiff DuPont granted an irrevocable right to post his comments on Ripoff Report.

In addition to agreeing to the full Terms and Conditions, Dupont manifested an express intent to give Ripoff Report an irrevocable right to post his report. Before DuPont was able to submit the posts to Ripoff Report, he was required to click on a box directly adjacent to an additional short paragraph of terms. (SOF ¶¶ 9 & 11). The short paragraph is essentially a pared-down version of the Terms and Conditions, highlighting the most salient terms:

> By posting this report/rebuttal, I attest this report is valid. <u>I am giving Rip-off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request</u>. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting this report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Ripoff Report arising out of this posting or the report to which this posting relates.

(SOF ¶ 9) (emphasis added).

The poster has to physically check the box next to this short paragraph in acknowledgment before being allowed to post the comment on the site. (*Id.*) If the poster did not click on the box next to this paragraph, the comments would not be posted. (*Id.*) Even if Plaintiffs can somehow persuade the Court to find material factual issues regarding being bound to the Terms and Conditions, there can be no dispute regarding the clarity and apparentness of the shorter paragraph granting irrevocable rights to post the report. Indeed, Plaintiff previously admitted that "[t]here was no box for the Author to check or click "yes" and thereby specify his

consent to be bound by anything other than [the short paragraph]." (Pl's Combined Memo in Opp. to MTD, Document 21, p. 16) (emphasis added). Thus, the terms in the short paragraph were incontrovertibly in effect, and Xcentric retains an irrevocable right to post the report.

Based on the foregoing, Xcentric is entitled to summary judgment on Plaintiff DuPont's copyright claims because DuPont granted Xcentric an irrevocable right to post the report on its site.

### 4. Goren's Rights Are Subject to DuPont's Rights.

Because Plaintiffs Goren and Small Justice purportedly obtained their rights from DuPont, they cannot have any greater rights than DuPont. A party can only transfer an asset to the extent that he or she has ownership in the property. *See, e.g.*, *United States v. Craft*, 535 U.S. 274, 278, 122 S. Ct. 1414, 1420, 152 L. Ed. 2d 437 (2002); *Triangle Ctr., Inc. v. Dep't of Pub. Works*, 386 Mass. 858, 866, 438 N.E.2d 798, 803 (1982). A seller can only sell his or her bundle of rights in property. *Id.* And the buyer can only buy the bundle of rights that the seller owns. *Id.* The buyer's ownership is thus subject to any encumbrances or competing claims that were attached to the seller's ownership. *Id.* Thus, Plaintiff DuPont could only validly transfer to Plaintiff Goren the interest the he retained in the copyright. Because Plaintiff DuPont granted an irrevocable, perpetual, and exclusive license to Xcentric to use his post, he had no remaining rights to transfer to Plaintiff Goren, whether voluntary or involuntary. *See* 17 U.S.C. § 101 (defining an exclusive license as a "transfer of copyright ownership").

Assuming *arguendo*, that Plaintiff DuPont retained some copyrights in the posts and could validly transfer those copyrights to Plaintiff Goren, Plaintiff DuPont could only transfer the bundle of rights that he held in the copyrights at the time of transfer. *See, e.g.*, *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 174, 105 S. Ct. 638, 650 (1985) ("[T]hose terms are therefore excluded from the bundle of rights that the author may seek to resell unimpeded by any ill-advised prior commitment."). So, even if Plaintiff Goren could somehow evade the requirements of 17 U.S.C. § 201(e), by obtaining an involuntary transfer of DuPont's copyrights by default, Plaintiff Goren could not thereby obtain greater copyrights than those held by DuPont. In that

case, Goren would be left with copyrights subject to Xcentric's right to use them. And by nature of those rights being irrevocable, Goren could not demand that the post be removed or, alternatively, sustain a lawsuit for violation of those copyrights.

      **C.**      **Xcentric Is Entitled to Summary Judgment on Plaintiffs' Chapter 93A Claim for Unfair Business Practices Because the Communications Decency Act Immunizes Xcentric from Liability.**

            **1.**      **The CDA bars treatment of Xcentric as the speaker or publisher for exercising traditional editorial functions.**

The Communications Decency Act (the "CDA") bars courts from treating Xcentric as the speaker or publisher of third-party content and for exercising editorial control over such content. *See* 47 U.S.C. § 230; *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007). In relevant part, the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The CDA further clarifies that "[n]o cause of action may be brought and no liability may be imposed under <u>any</u> State or local law that is inconsistent with this section." *Id.* § 230(e)(3) (emphasis added).

The CDA provides website operators and users with "broad immunity" against state-law claims as long as three points are established: "(1) [defendant] is a 'provider or user of an interactive computer service'; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [defendant] 'as the publisher or speaker' of that information." *Lycos, Inc.*, 478 F.3d at 418. Based on these simple and clear standards, every state and federal court that has considered the merits of a state-law claim against Ripoff Report has agreed—*without exception*—that Xcentric is entitled to CDA immunity for statements posted on the site by third parties. *See, e.g.*, *Asia Econ. Inst., LLC v. Xcentric Ventures, LLC*, 2011 WL 2469822 (C.D. Cal. 2011)(citing *GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173 (N.D. Tex. 2009) (finding Xcentric entitled to CDA immunity); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273 (N.Y. App. Div. 2008) (same); *Whitney Information Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095 (M.D. Fla.

2008) (same); *Global Royalties v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) (same, and explaining, "Unless Congress amends the statute, it is legally (although perhaps not ethically) beside the point whether [Xcentric] refuse[s] to remove the material, or how they might use it to their advantage.") (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003)); *see also Giordano v. Romeo*, 76 So. 3d 1100, 1102 (Fla. 3d Dist. 2011) (agreeing, "the law on this issue is clear. Xcentric enjoys complete immunity [under the CDA] from any action brought against it as a result of the postings of third party users of its website.").

Xcentric exercises its editorial function by having a general policy of not removing posts. However, in recognition that sometimes this system can be abused, Xcentric developed its remedial services. (SOF ¶ 10). Companies that are the subject of complaints on Ripoff Report are able to contest those complaints in a number of ways. (*Id.*). One way to contest a complaint is to post a rebuttal, which is entirely free. (*Id.*). If Plaintiff Goren wishes to address the complaints made about him, he may do so at no cost at all.

If a company feels a post about it contains false statements of fact, the company has the option to utilize Xcentric's arbitration program. (*Id.*). In the arbitration program, both the poster and the subject are able to present evidence to an independent arbitrator as to the veracity of the complaint. (*Id.*). Xcentric's independent arbitrator panel currently consists of a retired Arizona Court of Appeals judge and an arbitrator with over twenty-five years of experience with the AAA. (*Id.*). If the arbitrator determines the post contains false statements of fact, Xcentric will redact those portions of the post—though opinions and true statements will remain. (*Id.*). Xcentric, like any other business, charges a fee for this service. (*Id.*). Xcentric charges $2,000; it pays $1,000 of those funds to the independent arbitrator and uses the remaining funds to administer the program. (*Id.*). Thus far, Xcentric's monetary investment into the arbitration program exceeds the income from the program. (*Id.*). Xcentric simply could not afford to provide this option if it was unable to recuperate its costs. (*Id.*).

15

Another option offered by Xcentric is the Consumer Advocacy Program ("CAP"). CAP requires the subject company to commit to customer satisfaction (the "Pledge"), to bear responsibility for complaints, and to actively, often with the assistance of Xcentric, remediate the consumer's concerns. (*Id*.). CAP also requires Xcentric's staff to monitor new posts about the company. (*Id*.). A company's failure to honor the Pledge is grounds for termination from CAP. (*Id*.). Upon joining CAP, Xcentric creates a report about the company and adds it to the original complaint, advising of the Pledge. (*Id*.). Like the arbitration program, because CAP requires engagement of Xcentric staff and outside services, Xcentric charges a fee for its services. (*Id*.).

Xcentric cannot afford to staff the army it would require to actively address every consumer concern on behalf of post subjects. But Xcentric <u>is</u> able to provide remedial services, both for free and for a fee. Xcentric only charges a fee for the services that require engagement of Xcentric staff. If providing these possible remedies thereby subjected Xcentric to liability where it otherwise would be immune, Xcentric's only alternative would be to take a hands-off approach and simply not provide the remedial services at all. In that case, aggrieved individuals and entities would be worse off, with no option available to address the veracity of posts or to actively address their customers' concerns.

### 2.      Xcentric's remedial services cannot give rise to liability.

Mass. Gen. L. c. 93A ("Chapter 93A") § 2(a) states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct or any trade or commerce are hereby declared unlawful." Chapter 93A authorizes a private cause of action under Section 11. *See* M.G.L c. 93A § 11. Whether conduct violates Chapter 93A is "a legal, not a factual determination." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 57 (1st Cir. 2007) (citing *R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.,* 435 Mass. 66, 754 N.E.2d 668, 675–76 (2001)). Conduct has been labeled an "unfair practice" under Chapter 93A if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Id*. (citing *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 806 N.E.2d 388, 392 (2004)).

16

Plaintiffs' surviving Chapter 93A claim is grounded in the idea "that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based Corporate [Advocacy] Program ("CAP") and VIP Arbitration program is oppressive and unethical." (ME Order dated March 24, 2014 ("Order"), p. 15). As this Court correctly noted, "[t]he Plaintiffs cannot attempt an end run around the CDA through the use of c. 93A." (*Id.*, p.16) (citing *Dulgarian v. Stone*, 420 Mass. 843, 852 (1995)). And Plaintiffs' use of Chapter 93A, as with all other of Plaintiffs' claims, is precisely that—an attempted end run around the CDA.

To illustrate why the Chapter 93A claim is barred by the CDA, it is appropriate to consider whether the provision of identical services by a third party could subject the third party to liability. If not, the only difference is that Xcentric exercises editorial control and "publishes" the material. In other words, once the mandates of the CDA are applied, it is impossible for any reasonable fact finder to determine that Xcentric violated Chapter 93A. If the American Arbitration Association solicited business owners to arbitrate the veracity of posts about them on Ripoff Report and offered identical services as those offered by Xcentric, no one would argue that such program is an unfair or deceptive practice. Arbitration of factual issues is a legitimate service provided by numerous private organizations and by the Court itself. Each of those private organizations and the Court charge a fee for those services. There is nothing unfair or deceptive about providing an arbitration service. Xcentric provides the same service. The only difference is that Xcentric exercises editorial control over the content at issue. As the D.C. Circuit recently held, to hold a website operator liable merely because it *can* control the contents of its site "would put Section 230 at war with itself." *Klayman v. Zuckerberg*, No. 13-7017, slip op. at 7 (D.C. Cir. June 13, 2014). "State law cannot predicate liability for publishing decisions on the mere existence of the very relationship that Congress immunized from suit." *Id*. at 10.

Similarly, CAP is designed to help businesses that commit to improving their practices to improve or repair their online reputation. There are countless companies that provide services to repair or improve online reputations. There is nothing inherently unfair or unethical about such a service. Xcentric's remedial options serve to simultaneously police the site and to allow subject

17

businesses to repair relations with aggrieved consumers. To find such a service unfair or unethical is to treat Xcentric as the speaker or publisher of the third-party provided content, because Xcentric's control of that content is the only difference between it and other companies that provide online reputation services. The CDA does not allow such treatment. Xcentric did not create the third-party posts at issue; Plaintiff DuPont created the posts. Xcentric simply provides programs to help businesses address disputed posts. To assess liability against Xcentric based on provision of these services is precisely what Congress sought to avoid through the CDA.

Congress created the CDA to specifically overrule a New York state court decision that created a particularly "perverse" rule: if a website operator did nothing to review, screen, or block offensive material posted by third parties, then the website operator could not face liability for any user-generated material posted on its site. *See Zeran v. America Online, Inc*., 129 F.3d 327, 331 (4th Cir. 1997) (referencing *Stratton Oakmont, Inc. v. Prodigy Servs. Co*., 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995)). On the other hand, if a website operator took an active role in screening or blocking offensive material, then the operator could face unlimited liability for any remaining user-generated content that it did *not* block. *Id.* (explaining that under the holding of *Stratton Oakmont*, "computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher.").

Congress quickly realized the *Stratton Oakmont* decision created a dangerous incentive for website operators to take a "hands-off" approach to monitoring third-party content—refusing to screen any user-generated material because any website that did could be sued for whatever material remained while sites that performed no screening at all would remain entirely immune. This counter-intuitive result was the primary reason the CDA was enacted:

> Congress was concerned with the impact such a holding would have on the control of material inappropriate for minors. <u>If efforts to review and omit third-party defamatory, obscene or inappropriate material make a computer service provider or user liable for [any remaining] posted speech, then website operators and Internet service providers are likely to abandon efforts to eliminate such material from their site.</u>

18

*Batzel v. Smith*, 333 F.3d 1018, 1029 (9th Cir. 2003) (emphasis added).

With these concerns in mind, the CDA was enacted to both "further [the] First Amendment," *Id.* at 1028, and to encourage website hosts like Xcentric to take an active role in reviewing, selecting, editing, and (where appropriate) blocking and/or removing third party material without fear of incurring liability for their editorial actions. *Blumenthal v. Drudge*, 992 F.Supp. 44, 52 (D.D.C. 1998. The CDA accomplishes these goals by providing broad federal immunity to website hosts for any claims arising from third-party postings. *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (explaining that [t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'") (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006)). Under the CDA, as long as the offensive material was provided by a third party and was not materially altered by the website, the site is completely immune from any claims based on that content.

Because Xcentric cannot afford to actively police every inch of its site, it has developed the most efficient method of doing so: it has implemented tools that allow subject businesses to do the policing themselves, to whatever degree the businesses deem necessary. If Xcentric were subjected to liability by providing aggrieved businesses more intensive methods of addressing offending comments, Xcentric would be incentivized to step back and take a more hands-off approach. In that case, subject businesses would be worse off. And consumers would be worse off because the businesses would have no way to address their specific concerns. Imputing liability to Xcentric for this method of policing its site is precisely the type of "end run around the CDA" that Congress attempted to avoid.

Therefore, Xcentric is entitled to judgment as a matter of law regarding Plaintiffs' Chapter 93A claims because Xcentric cannot be treated as a speaker or publisher of Plaintiff DuPont's posts under the CDA.

## IV.    CONCLUSION

For all the foregoing reasons, Defendant Xcentric Ventures, LLC respectfully requests that this Court grant it summary judgment as to the remaining claims against it.

DATED this 13th day of June, 2014.

> Daniel G. Booth (BBO# 672090)
> BOOTH SWEET LLP
> 32R Essex Street, Suite 1
> Cambridge, MA 02139
> Telephone: (617) 250-8602
> Facsimile: (617) 250-8883
> dbooth@boothsweet.com
>
>
>  /s/ Maria Crimi Speth
> Maria Crimi Speth (admitted *pro hac vice*)
>
> JABURG & WILK, P.C.
> 3200 N. Central Avenue, 20th Floor
> Phoenix, AZ 85012
> mcs@jaburgwilk.com
>
> *Counsel for Defendant Xcentric Ventures, LLC*

### CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

The undersigned counsel hereby certifies that on this June 13, 2013, I attempted in good faith to resolve or narrow the issues addressed in the foregoing motion by conferring by telephone and e-mail with Plaintiff Richard A. Goren personally and in his capacity as counsel of record for Plaintiffs.

 /s/ Maria Crimi Speth

### CERTIFICATE OF SERVICE

I, Maria Crimi Speth, hereby certify that I electronically filed the foregoing Motion for Summary Judgment by using the Court's ECF system on this June 13, 2013, thereby causing a true copy of said document to be served electronically upon Plaintiff Richard A. Goren personally and in his capacity as counsel of record for Plaintiffs.

 /s/ Maria Crimi Speth