UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                             )
SMALL JUSTICE LLC,           )
RICHARD A. GOREN,        )
and,                             )
CHRISTIAN DUPONT dba    )
ARABIANIGHTS-BOSTON    )
MASSACHUSETTS         )
                             )
Plaintiffs,                 )
                             ) CIVIL ACTION NO. 1:13-cv-11701-DJC
v.                            )
                             )
XCENTRIC VENTURES LLC,  )LEAVE GRANTED 7/24/14
           Defendant.     )
_____)

**MEMORANDUM OF THE PLAINTIFFS IN OPPOSITION
TO DEFENDANT'S JUNE 13, 2014 MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION AND SUMMARY.**

The defendant Xcentric Ventures LLC ("Xcentric") moves for summary judgment seeking dismissal of the "remaining claims against it." (Paper 55 at 1). Xcentric's Motion for Summary Judgment must be denied for the following reasons:

A.  Xcentric has not and cannot meet its burden to establish its affirmative defense that the exclusive rights of copyright were transferred to it by Christian Dupont ("Author");

B.  The contract upon which Xcentric basis its claim of ownership to the copyright is wholly illusory and unenforceable;

C.  Public Policy bars Xcentric from enforcing or maintaining a nonexclusive license to the material in question; and,

D.  Xcentric's conduct and advertising practices constitute unfair and deceptive trade practices in violation of M.G.L. c. 93A.

1

## II.    FACTUAL BACKGROUND.

At all material times Xcentric has been, and is, the owner and operator of the Ripoff Report. (*Pl. SOF* ¶1).  Ripoff Report is "an interactive website" that holds itself out as "an online consumer advocacy forum that allows users to post free complaints called 'reports' about companies and/or individuals who they feel have wronged them in some manner." *Id.* ¶ 2.

Seeking to publish his works on Xcentric's Ripoff Report the Author logged onto Xcentric's website.  *Id.* ¶ 41.  Before posting his work on the Ripoff Report website the Author was required to create a "free account." *Id.* ¶¶41,42.  He registered his name, Christian DuPont, his address in Boston Massachusetts, the Display Name "Arabianights-Boston Massachusetts," an email address, and telephone number.  *Id.* According to Xcentric, verification of the author's email address was a condition precedent to allowing the user/author to proceed. *Id.* ¶¶ 3, 8.

Then before the Christian DuPont could post his work, he was guided through a five step process, consisting of five individual screenshots, Exhibits A, B, C, D and E to Id.  ¶¶ 5, 8-9.  In order to proceed from each step to the next, the Author had to click on a button captioned in bold "**Continue**." The first two screenshots presented a series of blank informational forms.  Step three entitled "**Write Your Report**"[1] was a screenshot in which the Author entered the actual text of his work.  Step four was a screenshot that enabled the Author the option to attach images to his work. Step five, entitled "**Submit your Report**" was a screenshot in which beneath that title appeared another caption "Terms and Conditions" which was above a rectangular box. *Id.*  All that visibly appeared in the box[2] is the following:

---

[1] In their papers plaintiffs present color and emphasis of text as it appears on Xcentric's website.

[2] Without support in the record, and flying in the face of several affidavits it has filed in this and two other federal court cases, Xcentric argues that because "the visible portion [of the step 5 box as it appeared on an August 29, 2013 screenshot] included an incomplete mailing address… it was readily apparent that [on January 31, and February 2, 2012] there were additional terms to scroll through…".  (Paper 55 at 9).  We also note that without foundation as to his personal knowledge

### 1. Ripoff Report Membership Terms & Conditions

To use this service, you must be at least 14 years old.

www.RipoffReport.com ("ROR") is an online forum created to help keep consumers informed. ROR is operated by Xcentric Ventures, LLC located at:

**Xcentric Ventures, LLC**
Ripoff Report
P.O. Box 310
**Tempe, AZ 85280**
**(602)359-4357**

Id. ¶ 14.

Of course what is visible in an online text box depends on among other things the particular

browser being used and the size of the screen and type of device. *Id.* ¶14.

To proceed the Author then clicked on a box alongside which in its entirety was the following

text:

> By posting this report/rebuttal, I attest this report is valid. I am giving Rip-off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting the report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Rip-off Report arising out of this posting.

*Id.* ¶ 17.

On the right vertical rectangular margin of this step 5 box was a square figure, a so-called scroll

bar. Id. ¶¶15-16.There is no marking or identification of the function as a vertical scroll bar. Id. There is

no direction, explicit prompt or even suggestion to use the scroll bar to view any additional disclosures.

There is no notice regarding "important terms" below. Id. Beneath this step 5 box were two buttons

captioned in bold "**Continue**" and "**Back**." *Id.* ¶14. It is undisputed the Author clicked on the step 5 box

---

Mr. Kunz's affidavit (Paper 56-7, ¶6 and Exhibit 1) purports to attest to screenshot of step 5 where there is an incomplete mailing address as of January and February 2012. Xcentric contends not visible without scrolling was "**Tempe, AZ 85280 (602)359-4357.**"

above and then clicked on the "**Continue**" button.  Pl. SOF ¶¶42, 43.  Beneath the "**Continue**" button

were a number of underlined terms or phrases:

> **(i)**Home**; (ii) File a Report; (iii) Consumer Resources; (iv) Search; (v) Link to Ripoff
> Report; (vi) Privacy Policy; (vii) Terms of Service; (viii) FAQ; (ix) About Us; (x)
> Contact Us; and, (xii) Why Ripoff Report will not release author information!.**

None of these underlined terms or phrases are explicitly labeled as hyperlinks. *Id*. ¶ 18.  The font size of

the underlined terms is not larger than the font size of the words in the box to be checked. *Id*.

It is undisputed that only by using the unlabeled scroll bar and scrolling down is there possible

disclosure of a 12 numbered paragraph document bearing a title: "About us: Terms of Service." *Id*. ¶ 24.

Paragraph 1 of the "Terms of Service" is entitled: "**Ripoff Report Membership Terms &**

**Conditions**" (color and emphasis original). Exhibit A to the First Gingras Aff. Material terms of this

paragraph 1, Ripoff Report Membership Terms and Conditions that are not visible in the step 5 box

without scrolling down include the following:

> This is a legal agreement ("Agreement") between you and Xcentric Ventures, LLC ("Xcentric").
> Please read the Agreement carefully before registering for ROR. By registering for ROR, you
> agree to be bound by the terms and conditions of this Agreement (the "Terms"). If you do not
> agree to the Terms, you are not permitted to use ROR.
> The Terms are subject to change by Xcentric, at any time, without notice, effective upon posting
> of updated Terms on our website….Xcentric reserves the right to immediately suspend or
> terminate your registration with ROR, without notice, upon any breach of this Agreement by you
> which is brought to Xcentric's attention.

Paragraph 2 of Xcentric's Terms of Service is entitled: "**Online Conduct.**"  Material terms of

this paragraph 2 include

> … You will NOT post on ROR any defamatory or illegal material or any material that infringes
> or violates another party's intellectual property rights… By posting information on ROR, you
> warrant and represent that the information is truthful and accurate.
> You will not post, distribute or reproduce in any way any copyrighted material … without
> obtaining the prior written consent of the owner of such … rights or except as otherwise
> permitted by law.

Paragraph 4 is entitled: "**Indemnity.**"

You will defend, indemnify, and hold harmless Xcentric, its officers, directors, employees, agents and third parties, for any losses, costs, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of your use of ROR, including, but not limited to, any breach by you of the terms of this Agreement.

Paragraph 5 is entitled: "**Removal of Information at User's Request.**"

ROR is a permanent record of disputes including disputes which have been fully resolved. In order to maintain a complete record, information posted on ROR will not be removed.  By posting information on ROR, you understand and agree that the material you post will become part of ROR's permanent record and will NOT be removed even at your request.

Paragraph 6 is entitled: "**Proprietary Rights/Grant of Exclusive Rights.**"

By posting information or content to any public area of www.RipoffReport.com, you automatically grant and you represent and warrant that you have the right to grant to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing.

*Id.* at ¶¶ 25-33.

While  on the step 5 screenshot there appears the underlined phrase "**Terms of Service**," an author who does not use the unlabeled scroll bar to find and read the Terms of Service is not informed of Xcentric's request to "please" read the "Agreement" and is not informed of the importance of the "Agreement"  *i.e.*, "[i]f you do not agree to the Terms, you are not permitted to use ROR," or that Xcentric can unilaterally amend the Terms of Service and not just prospectively.  Without scrolling through all the terms an author is not informed that by clicking on the "**Continue**" he is thereby conveying all his exclusive rights under copyright of his work.  *Id.* ¶¶33, 34. While Xcentric represents to authors they have the right to speak anonymously and while on the step 5 screenshot there appears the underlined phrase "**Why Ripoff Report will not release author information!**," an author who does not use the unlabeled scroll bar to find and read the Terms of Service and paragraph 7, is not informed that Xcentric will release "author [identifying] information" to companies who join its Corporate Advocacy Program.  *Id.* at ¶¶35-37.

It is undisputed the plaintiff Christian DuPont had to have checked the step 5 box and then clicked the "Continue" button.  But there is no direction or prompt in the step 5 process to scroll before checking the step 5 box; nor any direction to do so before clicking on the "Continue" button. *Id.* at ¶¶ 19-20. And a user can check the step 5 box and then click on the "Continue" button without scrolling. *Id.*¶ 21.  Xcentric does not have a record of the plaintiff Christian DuPont's electronic checking of the step 5 box or the "continue" button.  *Id.*¶ 43.  Therefore Xcentric has no direct evidence that the plaintiff Christian DuPont had actual notice of Xcentric's twelve paragraph Terms of Service or that that as part of the undisputed five step process he affirmatively accepted and agreed to these Terms of Service. *Id.* at ¶ 44.

On July 3, 2013 and on August 30, 2013, the Author by conveyance in a writing executed under seal a "COPYRIGHT ASSIGNMENT" whereby FOR GOOD AND VALUABLE CONSIDERATION the Author

> irrevocably transfer[red] and assign[ed] to… Goren, his successors and assigns, in perpetuity, all right (whether or not now known), title and interest, throughout the world, including any copyrights and renewals or extensions thereto in and to: [the two works]

*Id.*¶ 62.

Each assignment was acknowledged by a Massachusetts Notary Public. *Id.*  Goren then executed a conveyance in writing of the same exclusive rights to Small Justice LLC. *Id.*¶ 63. The United States Copyright Office has issued a Certificate of Registration to Goren and Small Justice LLC of the January 31, 2012 work. *Id.*¶ 68.  The Copyright Registration specifies that the author's "Transfer Statement" was by "assignment."  *Id.* Goren's August 29, 2013 application for registration of the February 2, 2012 work remains pending. *Id.*¶ 67.

Xcentric holds itself out to Google, Yahoo, Microsoft's Bing and other search engines as the copyright owner of the Work providing notice: "Ripoff Report has an exclusive license to this report. It

may not be copied without the written permission of Ripoff Report." *Id.* ¶71.  For example Google has available for display on its servers a snapshot copy of the Work which is not the same document as originally published on January 31, 2012. *Id.* ¶ 77.  At the bottom of this copy displayed on Google's servers is the copyright notice: "Copyright © 1998-2014, Ripoff Report. All rights reserved." *Id.*

### III.    PROCEDURAL BACKGROUND.

Defendant's current Motion for Summary Judgment follows its prior September 16, 2013 Motion to Dismiss Plaintiffs' claims on the basis of immunity under the Communications Decency Act, 47 U.S.C. § 230 (hereinafter the "CDA") and to dismiss the infringement action and corresponding declaratory judgment action for lack of subject matter jurisdiction.

The Plaintiffs cross moved for partial judgment on the pleadings on Defendant's affirmative defenses of copyright ownership and immunity.  Both motions were supported by affidavits and materials outside the pleadings.  The Court granted in part and denied in part the Defendant's dispositive motion its immunity defense, holding that the CDA barred the libel and tortious interference claims but on the limited record did not preclude Goren from proceeding with discovery on his claim that certain of Defendant's business practices violate the Massachusetts unfair business practices Act.  The Court denied both parties' motions on the defendant's affirmative defense of copyright ownership ruling that the record before it was insufficient to make findings and rulings as to ownership of DuPont's exclusive rights of copyright.

Xcentric then filed its Answer to the First Amended Complaint and a counterclaim against the Author seeking damages for breach of contract and its legal fees for defending this action. Paper 49.[3]TheAuthor answered the counterclaim.[4] Paper 49.  On June 13, 2014, the Defendant filed its Motion for Summary Judgment.[5] Paper 55.

---

[3] References to the documents filed in this case will be to their document number as "Paper."

7

IV.    **ARGUMENT.**

A. *Summary Judgment Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  This means that the party opposing a summary judgment motion has the burden of demonstrating the existence of a triable issue that is both genuine and material to its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).[6]

However, where—as is the case here—the basis for the moving party's motion for summary judgment rests on an affirmative defense,

> in this [First] [C]ircuit, [t]he party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.  Consequently, if the moving party bears the burden of proof because he is a defendant asserting an affirmative defense, he must establish beyond a peradventure all of the essential elements of the…defense to warrant judgment in his favor.

*John Beadette, Inc. v. Sentry, Ins.,* 94 F. Supp. 2d 77 (D. Mass. 1999)(citing *Vargas v. Cummings*, 149 F. 3d 29 (1st Cir. 1998)(internal citations and quotations omitted).

Defendant's Motion for Summary Judgment rests on a requisite finding that the Author transferred to it his exclusive rights of copyright.  As outlined below, the Defendant has not and cannot

---

[4] The counterclaim defendant will file a motion to amend his answer to Xcentric's counterclaim to add the affirmative defense of G.L. c. 93A§9.

[5] In support of its motion, the defendant has filed its statement of material facts ("Def. SOF") and an affidavit from its current COO. The plaintiffs have filed a LR 56.1 response ("Pl. Resp. Def. SOF"), a statement of additional material facts ("Pl. SOF"), and two affidavits.

[6] The nonmoving party must submit more than a mere scintilla of evidence supporting its opposition to summary judgment. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Industrial Co., LTD, et al., v. Zenith Radio Corp. et al.,* 475 U.S. 574, 586 (1986).

establish beyond a peradventure that the Author transferred his exclusive rights of copyright, and therefore the Motion for Summary Judgment must be denied.

   B. *Copyright Legal Principles.*

   Under long-established copyright principles, the Author, the Plaintiff DuPont is the presumptive owner of his work (the January 28, 2012 posting on the Ripoff Report Website, hereinafter the "Work"). 17 U.S.C. § 201(a) "Initial Ownership" ("Copyright in a work…vests initially in the author").  The United States has thereby granted to the individual author the right to control the exploitation of his work.  17 U.S.C. §106 provides that "an owner of copyright under this title has [specified] exclusive rights."  The Act's definition of a "transfer of copyright ownership" includes a grant of an "exclusive license" but specifically excludes a nonexclusive license.  17 U.S.C. §101.[7]  Any of the "exclusive rights comprised in a copyright…may be transferred" in whole or in part by an instrument of conveyance "signed by the owner of the rights conveyed or such owner's duly authorized agent" or by operation of law. 17 U.S.C. §201(d); 17 U.S.C. §204(a).  Only an owner "of any particular exclusive right is entitled, to the extent of that right, to all of the protections and remedies accorded the copyright owner by this title."17 U.S.C. §201(d)(2). *See John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F. 3d 26, 40 (1st Cir. 2003) ("Uses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits.").

   1. Exclusive License v. Nonexclusive License.

   Fundamental to the dispute between the parties is what rights—if any—the Author granted to Xcentric in his Work by posting his work on the Ripoff Report website.  Xcentric contends that it was thereby granted  an exclusive license in the Work, and therefore there were no sticks remaining in the

---

[7] "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." (emphasis added). "An assignment of a right is a manifestation of the assignor's intention to transfer it…". RESTATEMENT (SECOND) of CONTRACTS §317 (1981)  "Assignment of a Right" (1981).

bundle of copyright rights held by the Author when the copyright was transferred to the Plaintiff Goren, and in turn to Small Justice. The undisputed material facts, however, do not support such a finding. To the contrary, the undisputed facts clearly demonstrate that all Xcentric obtained from the Author was a nonexclusive license in the Work. [8]

### C. Xcentric Cannot Demonstrate Clear Intent to Convey an Exclusive License by the Author.

As outlined above, Xcentric bears the burden of proof on its affirmative defense that the exclusive rights of copyright were transferred to it by Christian DuPont ("Author"). *Jim Henson Productions, Inc. v. John T. Brady et al*, 16 F. Supp. 2d 259, 285 (S. D. N.Y. 1997); *John Beaudette, Inc.,* Supra. To meet this burden Xcentric must prove "that the mutual intention of…[the Author and Xcentric] was to effect an irrevocable transfer of…[the Author's] copyrights to [Xcentric]." *Jim Henson Productions, Inc.* at 285; *Craigslist Inc. v 3Taps Inc.*, 942 F. Supp. 2d 962, 973(N. D. CA 2013) ("'the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright'"). [9] Xcentric contends that the undisputed material facts demonstrate that the Author "was subject to the Terms and Conditions of the website. [And, t]hose Terms and Conditions granted Xcentric an exclusive, irrevocable license"[10] to the Author's posts. (Paper 55 at 7). According to Xcentric (*id.* at 10), it was impossible for the Author to have posted a work on its website without having clearly manifested his assent to a grant of an "irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy,

---

[8] "The law in this circuit is well established: a party that moves for summary judgment runs the risk that if it makes a woefully inadequate showing, not only might its own motion for summary judgment be denied, the court may grant summary judgment *sua sponte* against the movant. See *Berkovitz et al. v. Home Box Office, Inc. et al.,* 89 F.3d 24, 29–30 (1st Cir.1996); *Sanchez, et al. v. Triple–S Mgmt. Corp.,* 492 F.3d 1, 7–9 (1st Cir.2007).

[9] *Jim Henson Productions,* 16 F. Supp. 2d at 285 ("The purpose of U.S. copyright laws is to "promote" the production of creative works. U.S. Const., Art. I § 8, Cl. 8. It has long been recognized that in order to stimulate authorship and intellectual expression, authors must have the economic incentive of ownership rights. ... In enacting the 1976 Copyright Act, Congress strengthened protections for authors and created a legislative framework designed to prevent unintended divestments of their rights. The Act reaffirms the principle that the "author" is "the fundamental beneficiary of copyright under the Constitution." … Thus, …unless the author has given up his or her rights under copyright in a clear and unequivocal manner, he or she retains these rights….The clearest language is necessary to divest the author of the fruits of his labor.").

[10] An exclusive license under 17 U.S.C. § 106 gives the holder of such rights full authority to use the copyright to the exclusion of all others.

perform, display and distribute such information and content, and to grant and authorize sublicenses of the foregoing."

Xcentric also contends that because the Author "manifested an express intent to give Ripoff Report an irrevocable right to post his report[,]… Xcentric is entitled to summary judgment on Plaintiff DuPont's copyright claims."  (Paper 55 at 12-13).  However, as a matter of law, an irrevocable right to post a work on the website constitutes a nonexclusive license that is not one of the exclusive rights of copyright.  17 U.S.C. § 101.  Therefore the enforceability of the nonexclusive right to post is immaterial to the Author's assertion of his "exclusive rights" of copyright.  Indeed Xcentric implicitly concedes that absent ownership of the exclusive license to distribute and to grant sublicenses it is without authority to allow Google and other search engines to display on their servers copies of the Work. See Pl SOF ¶¶71-73.

This nonexclusive license provided Xcentric with nothing more than the right to post the Author's Work on its website, without the inclusion of any right to exclude others or authorize other to exercise any rights in the works.  See *Craigslist Inc. v. 3Taps Inc.* 942 F. Supp. 2d at 973-74 .[11] Therefore the Author's subsequent assignment effected a transfer of all of the exclusive rights of the copyrights.

In considering Xcentric's claim, the Court must bear in mind that Xcentric's purported instrument of transfer

> should be construed against the drafter [Xcentric]… Any ambiguities or doubts concerning the scope of rights assigned by…[the Author] as [the] author[] of rights protected under copyright, pursuant to…[the Author]'s registration for membership in the Ripoff Report] must be construed in favor of …[the Author].

*Jim Henson Productions,* 16 F. Supp. 2d at 285. See *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d at 974 (declining to read "exclusivity" "into the terms that Craigslist itself drafted").

---

[11] "The language assigning rights to the content did not use the phrase 'all rights,' and did not specify that the rights granted were "exclusive." *Id.* at 974.

Whether or not the Author and Xcentric entered into a contract is question of state contract law. While the contract Xcentric seeks to enforce includes a choice of law provision adopting Arizona law, it is obviously premature to apply Arizona law. See *Schnabel v. Trilegant Corp.,* 697 F. 3d 110, 119 (2d Cir 2012).[12]  Perhaps because according to its records the plaintiff Author had specified an address in Boston when he accepted the offer of a free membership, Xcentric seems to implicitly accept the applicability of the substantive law of Massachusetts for determination of the contract formation issue. (see Paper 55 at 7).  Under Massachusetts law,

> [a]n offer is the manifestation of willingness to enter into a bargain made in such a way as to justify the other person in understanding that his assent will conclude the agreement."… [Moreover,] "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.

*D'Agostino v. Fed. Ins. Co.*, 969 F. Supp. 2d 116, 127 (D. Mass. 2013).  There can be no acceptance of an offer the material terms of which are not disclosed. See *Goren v. Royal Investments Inc.*, 25 Mass. App. Ct. 137, 140-41 (1987).  That the purported contract was entered into online does not alter "the pertinent legal principles." *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. 565, 575 n. 12 (2013). Xcentric has the burden of establishing, on undisputed facts that the provisions of the…[contract it seeks to enforce including in particular the conveyance of the plaintiff author's ownership in his copyrights] were reasonably communicated and accepted. *Id.* 575 citing *Specht v. Netscape Communications Corp.*, 306 F. 17, 35 (2d Cir. 2002); *Craigslist Inc., supra* (same).This burden requires proof by clear evidence that (i) Xcentric had provided "[r]easonably conspicuous notice of the existence of [the] contract terms;" and, (ii) the author had "unambiguously manifest[ed his] … assent" to all the material terms of Xcentric's offer including the conveyance of all rights of exploitation of his work. *Ajemian v. Yahoo!,*

---

[12] Cf.  *Feeney v. Dell, Inc.,* 454 Mass. 192, 206 (2009)(applying Massachusetts "functional choice of law principles" where Texas law designated in undisputed contract and forum state law differ).

*Inc.*, 83 Mass. App. at 574-75. See RESTATEMENT (Second) of CONTRACTS §19(2)  (1981) and Illustration b.

The Court's determination of the  enforceability of a standard form contract proffered online requires a record of what was presented or displayed to the viewer and also of what terms and provisions that were not presented but of which a "reasonably prudent offeree would be on notice." See *Schnabel,* 697 F. 3d at 120 (question whether receipt of emailed terms can constitute constructive notice).  Without such a record there can be no adjudication "that the terms of any agreement were reasonably communicated or that they were accepted." *Ajemian v. Yahoo!,* 83 Mass. App. Ct. at 576.

That the Author had "the opportunity to review the Terms of Service… prior to submitting" his work "does not establish that the provisions of the… [Terms of Service] were reasonably communicated to the…[Author]." *Id.* 575.  That a link to Xcentric's Terms of Service was available at the bottom of the page does not satisfy Xcentric's burden to demonstrate the "reasonableness of communicating the… TOS via a link." *Id.*

1.  Xcentric's advertisement on the Ripoff Report website did not comply with the FTC Dot Com Disclosure guidelines.

Xcentric falsely represents the summary judgment record as to the reasonableness, *i.e.,* the inevitability,  of its disclosure.  Xcentric's contention (Paper 55 at 11) that it was "impossible for…[the Author]—or any poster for that matter—to fail to encounter the Terms and Conditions {contextually the Terms of Service}," is contradicted by the undisputed facts.  For reasons set forth below there is no evidence in the record on which a jury could rely to conclude that the Author was on "actual notice of circumstances sufficient to put a prudent man upon inquiry [notice of the contracting away of his ownership of all copyright and broadly indemnifying Ripoff Report]." *Schnabel v. Trilegant Corp.,* 697 F. 3d at 120 (citing *Specht*, 306 F. 3d at 30 n. 14).  The "clarity and conspicuousness" as well as the prominence of the "notice of the existence of [these] contract terms" are crucial predicates without

13

which there can be no jury question. *Id.; Ajemian v. Yahoo!*, 83 Mass. App. Ct. at 574-75 (same).  See,

e.g., 940 CMR §601.[13]); FTC Dot Com Disclosures: *Information About Online Advertising* (May 2000),

available at http://www.ftc.gov/os/2000/05/005dotcomstaffreport.pdf; updated by FTC Dot Com

Disclosures: *How to Make Effective Disclosures in Digital Advertising* (March 2013) available at

http:..www.ftc.gov/os/2013/03/130312dotcomdisclosures.pdf .   Addendum A.[14]

> If scrolling is necessary to view a disclosure the disclosure should be unavoidable, i.e., unable to
> proceed further with the transaction without scrolling through the disclosure.  The visible portion
> of the offering should draw attention to "important terms" below. Scroll bars should be plainly
> identified. Where material terms are not visible, there should be an explicit prompt: "see
> important terms below." As to links "simply underlining text may be insufficient to inform (the
> consumer)...that the text is a hyperlink. "The hyperlink should give consumers a reason to click
> on it. That is the label should make clear that the link is related... (To contracting away
> rights)(indicate the importance of the information to which the link leads "Hyperlinks that simply
> say ... 'Terms and conditions'... Do not convey the importance, nature and relevance of the
> information to which they lead and are likely to be inadequate."

Addendum B at I, 7, 9, 10, 11 and 12.

    In this case, the primary purpose of the act which Xcentric contends was the manifestation of

consent to a transfer of copyright ownership was the signing up for free membership enabling the

Author to post his work on a website. See *Specht*, 306 F. 3d at 32.[15] There was no statement alerting the

Author to scroll down to see "important terms below." There was no disclosure of any condition to this

"free membership" requiring him to contract away his constitutionally impelled property rights.  There

was no explicit prompt alerting him to the existence of any of the material provisions of the Terms of

---

[13] "Advertisement includes a: representation made...*via* the Internet." To be "clear and conspicuous" terms must be "so presented as to be readily noticed and understood by a reasonable person to whom it is being disclosed." "A disclosure is not clear and conspicuous if any material terms of the offer that...impose conditions on acceptance of the offer...are not disclosed in the advertisement itself."   A "Material Representation means any... statement, the disclosure of which has the tendency or capacity to influence the decision of reasonable buyers or reasonable prospective buyers whether to purchase the product." In determining whether an Internet disclosure meets the "clear and conspicuous" standard "all of the material terms of the disclosures must be prominently referenced by the seller and be accessible by the consumer before a purchase transaction can be completed."
[14] See also Addendum B.
[15] "When products are "free" and users are invited to download them in the absence of reasonably conspicuous notice that they are about to bind themselves to contract terms, the transactional circumstances cannot be fully analogized to those in the paper world of arm's-length bargaining." *Id.*

Service.  It is undisputed the Author was not required to scroll through the not-immediately visible Terms of Service.  The scroll bar was not identified as such. Pl. SOF ¶¶ 15-26. The underlined phrase "Terms of Service" at the bottom of the page view standing alone does not convey the importance, nature and relevance of the information to which they led.  Because  scrolling  was necessary to view the Terms of Service provisions contracting away all of the Author's copyright interests as well as broadly indemnifying Xcentric, the disclosure should be unavoidable, *i.e.*, the Author should have been unable to proceed further with the transaction without scrolling through the disclosure. *Schnabel, supra; Specht, supra; Ajemian, supra.*[16]   But it is undisputed the Author was not required to scroll and the disclosure was not inevitable. Pl. SOF ¶ 43.

Whether there was notice of all of Xcentric's contact information is immaterial.  That there is no evidence from which a jury could find inquiry notice of the contract provisions, is dispositive that there was no meeting of the minds. *Ajemian, supra.* The Author's checking box 5 and then clicking on the "Continue" button therefore cannot be evidence of his intent to transfer ownership of his copyrights and to broadly indemnify Xcentric or that he had reason to believe Xcentric might "infer from his conduct that he assent[ed to the transfer]." RESTATEMENT (SECOND) of CONTRACTS § 19(2) (1981). See *Schnabel*, 697 F. 3d at 119 (California and Connecticut law) (mutual assent should be "determined under an objective standard applied to the outward manifestations of expressions of the parties").

Xcentric's contention that the Author "could not have posted on the site if he did not manifest the required consent [to the Terms of Service]," is belied by the clear record to the contrary.  As in *Specht*, the Author was "responding to… [a free] offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms." *Specht*,

---

[16] Any user of Apple's ITunes® for music content on any one of their portable music devices is familiar with this type of disclosure of terms and conditions.  Before one can download a software update to their device via ITunes®, they must first move the scroll bar all the way down to the bottom of the terms and conditions before the box allowing acceptance of the terms and conditions is made accessible for clicking. The Ripoff Report website did not have such functionality.

306 F. 3d at 31, 32 (free offer).   Compare *Craigslist Inc. v. 3 Taps Inc*., 942 F. Supp. 2d at 973.[17]   It is undisputed that scrolling and actually viewing the Terms of Service is not required and also that Xcentric has no record of the Author's registration for his free membership. Pl. SOF ¶ 43.

Because Xcentric cannot produce "clear evidence that…[the Author] assented to an agreement that contained" clauses whereby he transferred his ownership of copyrights and also agreed to broadly indemnify Xcentric, "this [C]ourt cannot enforce any such clause[s]." *Ajemian,,* 83 Mass. App. Ct. at 576.

Because "the [undisputed] record does not reflect that the terms of any agreement were reasonably communicated or that they were accepted" (id.), the Court must deny Xcentric's motion for summary judgment on the copyright issues.

D.   The "Contract" between the Author and Xcentric is illusory

Xcentric's Terms of Service provide that "the terms and conditions of this Agreement… are subject to change by Xcentric, at any time, without notice, effective upon posting of updated Terms on our website…". Pl SOF ¶25.   "[T]here is nothing [in the contract] to suggest that once published [on the Ripoff Report website] the amendment would be inapplicable to disputes arising, or arising out of events, occurring, *before* such publication." *Morrison v. Amway Corp*., 517 F. 3d 248, 254 (5th Cir 2008).   Therefore Xcentric promised nothing; it gave no consideration. *Id.*   "[A] promise that binds one to do nothing at all is illusory and cannot be consideration." *Graphic Arts Finishers Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 43 (1970 (dicta).   Therefore, even assuming that there was inquiry notice and a manifestation of assent by the Author, the purported contract is unenforceable.

E.   Public Policy Prohibits Enforcement of the Contract

---

[17] "Users submitting posts to Craigslist were… presented with a notice that '[c]licking 'Continue' confirms that craigslist is the exclusive licensee of this content, with the exclusive right to enforce copyrights against anyone copying, republishing, distributing or preparing derivative works without its consent.'"

The Author who has been adjudged to have defamed Goren by false accusations of criminal conduct asks the Court to declare that the provision "once I post my report, it will not be removed, even at my request" though initially facially valid is unenforceable as applied on public policy grounds. "A … term of an agreement is unenforceable on grounds of public policy if … the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such [a] term[]." RESTATEMENT (SECOND) CONTRACTS §178 (1) (1981).[18] There is a strong public policy against *per se* libel. "The State's interest here resides in the private individual's right to the protection of his own good name, for this 'reflects no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty.'" *Stone v. Essex Cnty. Newspapers, Inc.,* 367 Mass. 849, 858 (1975).[19] Application of the RESTATEMENT consistent with Massachusetts law requires examination and weighing of specified factors in favor of enforcement of the provision against specified factors of public policy against enforcement. RESTATEMENT (SECOND) CONTRACTS §178 (2) and (3).  See also *Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado,* 685 F. Supp. 2d 217, 224 (D. Mass. 2010).[20]

---

[18] "A … term of an agreement is unenforceable on grounds of public policy if … the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such [a] term[]."
(2) In weighing the interest in the enforcement of a term, account is taken of
      (a) the parties' justified expectations,
      (b) any forfeiture that would result if enforcement were denied, and
      (c) any special public interest in the enforcement of the particular term.
(3) In weighing a public policy against enforcement of a term, account is taken of
      (a) the strength of that policy as manifested by legislation or judicial decisions,
      (b) the likelihood that a refusal to enforce the term will further that policy,
      (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
      (d) the directness of the connection between that misconduct and the term.

[19] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) ("The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'").

[20] According to Judge Stearns:
      The factors to be examined under Massachusetts law when determining whether a contract violating public policy should be enforced are the following: what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract;

1. The factors in favor of enforcement of term.

(a)      *Xcentric can have no justifiable expectation in enforcement*.  According to Xcentric's Terms of Service it was a condition of his posting that the Author "warrant and represent that the information is truthful and accurate."  Pl SOF ¶ 29.  The Terms of Service prohibited the Author from "post[ing] on ROR any defamatory or illegal material."  *Id*.  Xcentric specifically "reserve[s] the right … to delete" harmful information. *Id.* at ¶ 25.  And when provided proof the Ripoff Report will remove or redact libelous false accusations of the same criminal conduct of which Goren was falsely accused. *Id.* at ¶ 87.  Xcentric can have no morally or legally justifiable expectation to insist on enforcement of its no-removal term.

(b)      *Xcentric suffers no forfeiture if enforcement is denied.*  The posting was free and so there is no posting fee to be returned in whole or in prorated part. Moreover, because as a matter of law Xcentric gave no consideration, there can be no loss. Section C *supra*.

(c)  *There is no special public interest in enforcement of the term.*  On the contrary Section 230 of the CDA specifically provides ISPs with "Good Samaritan" protections for its actions "taken in good faith" to screen or delete objectionable material "whether or not such material is constitutionally protected."  And enforcement of state libel law that is consistent with the ISP's Section 230 rights to screen or delete in its exercise of a publisher's traditional editorial functions is patently in line with the CDA. See *Universal Comm'n Systems v. Lycos*, 478 F. 3d 413, 422 (1st Cir. 2007) (ruling that § 230 shielded service provider's "editorial decision" as to defamatory third-party posting).

2. The Public Policy factors against enforcement.

 *(a) The strength of the public policy against libel is manifested in both legislation and case law.*

---

what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall.
*Id.* aff'd sub nom. *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012).

> A public policy against enforcement of … terms may be derived by the court from (a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare, as is the case for judicial policies against for example, … (iii) interference with other protected interests [including "promises to commit [or terms tending] to induce the commission of a tort."]

RESTATEMENT (SECOND) CONTRACTS §§179, 192, illus. 5 (terms tending to induce libel).

The public interest "in the light of the circumstances of…[this] case…[lies] in the prevention of tortious harms." *Cf. Krebiozen Research Foundation v. Beacon Press, Inc*., 334 Mass. 86, 99 (1956) (*dicta*). There is no public interest in the re-publication of previously published false accusations of crimes. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245–246 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation…"); *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942) ("Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution").[21]

The Commonwealth has enacted legislation promoting retraction of libel. G. L. c. 231§93.

*(b) Refusal to enforce the term will obviously further the public policy.* Here the defamer seeks to cease republication of his libel on the Ripoff Report website and the Ripoff Report's further publication or display of the libel on Google and other search engines under color of Xcentric's claimed copyright.

*(c) Seriousness of the misconduct and its deliberate nature.* There has been an adjudication that the publication constitutes libel and that its continued publication causes injury to Goren. While this factor focuses on the defamer, it is noteworthy that Xcentric is deliberately violating its own Terms of Service when it insists on enforcement of this no-removal term.

---

[21] Because there is a compelling public "interest to protect against a serious and identified threat of harm," a prior restraint enjoining future, regurgitation of libel would not be unwarranted. *Com. v. Barnes*, 461 Mass. 644, 651-652 (2012). *See Balboa Island Village Inn, Inc. v. Lemen,* 40 Cal. 4th 1141 (2007) (narrowly tailored injunction prohibiting speech which trial court held defamatory was not an invalid prior restraint). *See also Hill v. Petrotech Resources Corp.*, 325 S.W. 3d 302 (KY 2010) (where "final judicial determination that speech is false," an injunction may enjoin republication of defamation).

***(d) The directness of the connection between the libel and the term***. While Xcentric presumably was initially unaware of the falsity of the accusations of criminal conduct, it now has proof, a judgment. While Xcentric may be immune under the CDA for its continuing publication, its insistence on enforcement of the no-removal term tends to induce the commission of a tort.

## F.  DEFENDANT LACKS STANDING TO CHALLENGE THE "INVOLUNTARY TRANSFER"

Xcentric's argument that because 17 U.S.C. § 201(e) prohibits the involuntary assignment of a copyright from its author assumes that it has standing to assert such an attack on the Plaintiffs' ownership of the copyright.  That assumption is necessarily based solely on the Defendant's argument that it was assigned an exclusive license by the Author.  As outlined above, that assumption is incorrect. Because as the holder of a nonexclusive license, Xcentric does not possess any of the exclusive rights under copyright, it has neither rights nor remedies under the Copyright Act. See Section B *supra.*  And assuming *arguendo* it to be a copyright owner, Xcentric is not the author and cannot claim the limited protection granted by Congress to "individual authors" against certain involuntary transfers.  As a matter of Massachusetts law the Superior Court has power in equity to appoint an agent or attorney in fact to transfer the author's copyright to effectuate a Massachusetts judgment. See *Wilson v. Martin-Wilson Automatic Fire-Alarm Co*., 151 Mass. 515, 518-520 (1890) (A court in equity having jurisdiction over an owner of a patent may validly authorize a court appointed master to execute an assignment of  the patent to satisfy a judgment).

As the proponent of the Section 201(e) defense, Xcentric has the burden of establishing the facts of its defense. See generally *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 590 (1994).  Section 201 of the Act specifies certain rights that are adherent solely to individual authors and prescribes other rights for the benefit of entity authors as well as subsequent owners of  any of the exclusive rights of copyright.  Subsection (d) "Transfer of Ownership" provides in relevant part:

**(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law,[22]…

**(2)** Any of the exclusive rights comprised in a copyright,…may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

Subsection (e) proscribes certain involuntary transfers by the individual author of a work.

(e) Involuntary Transfer.--When an ***individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author***, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

17 U.S.C. §201(e) (emphasis added).   By Section 201(e)'s unambiguous terms Congress granted protection only to "individual authors" and only in the absence of prior voluntary transfers of any of the exclusive rights under copyright.

In a case of first impression the Ninth Circuit held that an owner of the copyrights who had been the original author of the work[23] lacked standing to claim the protection of §201(e)[24] and that like any other intangible property under applicable state law[25] an owner's copyrights are subject to execution to satisfy a judgment. *Hendricks and Lewis PLLC v. Clinton,* 2012 WL 5947638 (W. D. WA 2012) *aff'd,*

---

[22] Excepting only transfers by operation of law, 17 U.S.C. §204(a) provides a transfer of ownership

is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

[23] In 1975, Mr. Clinton had entered into a contract with Warner Bros. Records whereby Warner Bros. acquired the sole and exclusive ownership of all copyrights in the recording artist's work. 2014 WL 2808138 at *1.  In 1982, Warner Bros. relinquished all rights to Clinton and at all times after 1982, Clinton has been the sole owner of all copyrights in Clinton's work. Id. at *2.

[24] "In entering its order, the district court considered the text and legislative history of Copyright Act § 201(e), ***which protects individual authors*** from the involuntary transfer of their copyrights." Id. at *3 (emphasis added).

25 While the Copyright Act recognizes the validity of transfers by operation of law without evidence of a writing signed by the owner to indicate a voluntary transfer (17 U.S.C. § 204(a)), it does not define "what constitutes a transfer by operation of law." *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F. 3d 29, 41 (1st Cir. 2012) (the few cases outside of the First Circuit "focus on whether the author of the transfer provided express or implied consent to such change of ownership").  See *Wilson v. Martin-Wilson Automatic Fire-Alarm Co.*, supra; *Ager v. Murray*, 105 U.S. 126 (1881) (cited by both the SJC in *Wilson* and the Ninth Circuit in *Clinton*).

2014 WL 2808138 __ F. 3d __ (9th Cir. June 23, 2014)("We know of no federal statutory law directly addressing whether copyrights are subject to execution to satisfy a judgment.").[26]

Therefore as a matter of law Xcentric cannot claim an affirmative defense to plaintiffs' infringement claims predicated on the protection of Section 201(e).[27]

### G.      M.G.L. c. 93A, § 11.

Goren is a Boston attorney whose litigation practice focuses on fraud and deceptive business practices. Pl SOF ¶ 40.  The January 31, 2012 and February 2, 2012 Ripoff Reports' accusations of criminal conduct by Goren have been adjudged to be completely false, without basis in fact and to impair his reputation as a lawyer.  Pl SOF ¶ 45.The judgment holds that Goren's reputation is damaged whenever a person or business conducting an internet search about him reads the defamatory reports.  *Id.* ¶ 59. For example as of October 22, 2013 on a search query for Goren as a fraud attorney the defamatory Ripoff Report was ranked first on Google. *Id.* ¶ 112. The search engine user interested in Goren need not go the Ripoff Report website.  Xcentric contends that the Author granted it

> an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing.

XCENTRIC holds itself out to search engines as the copyright owner of the Author's reports and pursuant to this claim of right Xcentric has authorized Google and other search engines to take a snapshot and create a "cached" copy that may be displayed and published on Google's servers. *Id.* at ¶¶71-73.  Whenever an interested party stays on the search engine server and clicks on the cached copy, she reads the most recent snapshot of the defamatory report on the top of which is displayed "Copyright

---

[26]  "[T]he provisions of the patent and copyright acts, securing a sole and exclusive right to the patentee [or author], do not exonerate the right and property ... from liability to be subjected by suitable judicial proceedings to the payment of his debts." 2014 WL 2808138 at *4 quoting *Ager v. Murray*, 105 U.S. 126, 127-28 (1881).

[27] In all events Xcentric lacks standing to collaterally attack the Superior Court judgment. Plaintiffs incorporate herein their December 10, 2013 Surreply and Reply (Paper 28) at 6-7.

© 1998-2014, Ripoff Report. All rights reserved." *Id.* at ¶ 77.  The Massachusetts judgment enjoined the Author as well as "any person or entity acting as his agent… or any other person or entity in active concert or participation with" the Author from "continuing to publish or to republish" the continued republication of the defamatory reports.

When served with the judgment, Xcentric notified Goren it will not take down or remove the report.  *Id.* at ¶ 61.  Instead Xcentric referred Goren to its website's strict non-removal policy.  When Google was served with the initial preliminary injunction it took steps to remove from its index the January 31, 2012 defamatory report. *Id.* at ¶¶75,76.  However, subsequent to Google's removal of one URL, that same URL was again indexed on Google.  *Id.*  Despite being subsequently informed of the Copyright Office's issuance to the plaintiffs of a certificate of registration for the January 31, 2012 report, Xcentric continues to authorize Google to display on Google's servers the most recent copy of the defamatory report with the notice: "Copyright © 1998-2014, Ripoff Report. All rights reserved." [28] *Id.*  ¶¶ 71, 72, 77.  Cached copies of the January 31, 2012 defamatory report continue to be published or displayed on Google's servers.  *Id.*  ¶ 77.

Xcentric's published policy is that it will not remove a report from its website even if the report is adjudged defamatory or even if the author requests the report to be taken down. XCENTRIC's policy is that any statement posted on its website is a "permanent record." *Id.* ¶ 79. However, Xcentric operates a reputation restoration business and offers alternative commercial fee based solutions for the subjects of false and/or defamatory reports posted on its Ripoff Report website. *Id.* ¶ 80.  So Goren visited XCENTRIC's Ripoff Report website[29] and was informed of the opportunity to "join"

---

[28] The Court has ruled that Xcentric's publication under color of copyright by itself is immune. (Paper 45 at 15-16).
[29] The FAC ¶3 (ii) alleges: Defendant deliberately has engaged in significant activities within the Massachusetts forum including without limitation using its website to solicit business and/or contracts from among others Richard A. Goren in Massachusetts and to encourage potential customers of the defendant's Ripoff Report Corporate Advocacy Business Remediation and Customer Satisfaction Program and the Ripoff Report Arbitration Program to contact the defendant through the use of its interactive website.

XCENTRIC's "Corporate Advocacy Program" whereby for some undisclosed fee Xcentric would "restore his reputation." *Id.* ¶81.  In its July 2013 online advertisement published in Massachusetts Xcentric stated:

> to make your search engine listings change from a negative to a positive all you need to know is this: by becoming a member of the Corporate Advocacy Program, no matter how you search your name on search engines, it will all look as it should. Positive.

*Id.* ¶ 81.

This Court held that Goren's allegations of  Xcentric's refusal to take down a report that had been adjudged defamatory "while simultaneously advertising services by which Goren can pay Xcentric to restore his reputation," were allowed to proceed under Chapter 93A.  Xcentric's motion for summary judgment fails to address the merits of the claim.  Blithely ignoring that it is Mr. Magedson and other Xcentric agents and employees who are the content providers for the advertising and marketing of the CAP program, Xcentric contends that the Court cannot assess its advertising and operation of its reputation restoration business because to do so would violate the CDA by treating Xcentric as the content provider of the defamatory reports. (Paper 55 at 19).

Massachusetts Gen. Laws Ch. 93A, § 2[30] prohibits "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce."  It "is a statute of broad impact" passed "to aid consumers and others . . . by making conduct unlawful which was not unlawful under the common law or any prior

---

[30] G. L. c. 93A§11 provides:

> Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action…, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

> Such person, if he has not suffered any loss of money or property, may obtain such an injunction if it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property.

statute." *Slaney v. Westwood Auto, Inc*., 366 Mass. 688, 693 (1975).   In particular, the definition of an

actionable unfair or deceptive act or practice "goes far beyond the scope of the common law action for

fraud and deceit." *Id.* at 703. "[T]echnicalities are not to be read into the statute in such a way as to

impede the accomplishment of substantial justice." *Leardi v. Brown*, 394 Mass. 151, 159 (1985).  An

unfair act or practice is not amenable to a bounded definition because, as courts have recognized, "[i]t is

impossible to frame definitions which embrace all unfair practices. There is no limit to human

inventiveness in this field." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503 (1979)

(quoting H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. (1914)).

    Following federal decisions under the Federal Trade Commission Act, courts employ the

following factors in evaluating whether conduct is unfair: (i) whether the practice is within at least the

penumbra of some common-law, statutory, or other established concept of unfairness; (ii) whether it is

immoral, unethical, oppressive or unscrupulous; and (iii) whether it causes substantial injury to

consumers, competitors or other business people. *PMP Assocs., Inc. v. Globe Newspaper Co*., 366 Mass.

593, 596 (1975) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)). "For the practice

to fall within the penumbra of a statute's concept of unfairness, it need not actually violate the statute.

Otherwise, there would have been no need for the Massachusetts Supreme Judicial Court to refer to

penumbras." *Cooper v. Charter Comm'ns Entertainments I LLC*, 2014 WL 3623594 at *7 (1st Cir. July

24, 2014) (reversing dismissal of "penumbra" claim of damages for violation of Mass regulation that did

not literally require a remedy).   "Whether a given practice runs afoul of these touchstones must be

determined from the circumstances of each case." *Levings*, 8 Mass. App. Ct. at 504.  The Court should

assess the "equities between the parties," as well as "[w]hat a defendant knew or should have known."

*Swanson v. Bankers Life Co.*, 389 Mass. 345, 349 (1983).  The Court should "focus on the nature of

challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G. L.

c. 93A fairness determination." *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass.

39, 43 (1995). If it "leaves a rancid flavor of unfairness," it is a violation. *Id.*

There need not be a finding of both unfair and deceptive conduct.  An act or practice can be

unfair without necessarily being deceptive.  See *Service Publications v. Goverman*, 396 Mass. 567, 578

(1986). An act or practice is deceptive if it has a tendency to deceive. *Leardi*, 394 Mass. at 156. See 940

CMR §3.04; §3.05(1); §6.03(proscribing misleading or deceptive advertising); §6.04(1)( "It is an unfair

or deceptive act for a seller to make any material representation of fact in an advertisement if the seller

knows or should know that the material representation is false or misleading or has the tendency or

capacity to be misleading…").

> In determining whether an act or practice is deceptive, 'regard must be had, not to fine
> spun distinctions and arguments that may be made in excuse, but to the effect which it
> might reasonably be expected to have upon the general public.'

*Leardi*, 394 Mass. at 156.   Nor must Goren prove that Xcentric intended to deceive him or that

he relied on the unfair or deceptive act or practice.  *Aspinall v. Philip Morris Cos*., 442 Mass. 381, 394

(2004).  It is sufficient if there is a causal relation between the act or practice and some injury to Goren.

*Fraser Eng'g Co., Inc. v.  Desmond*, 26 Mass. App. Ct. 99, 104 (1988). In addition while 93A applies

only to actions taken in the course of "trade or commerce," bad faith conduct in litigation coupled with

pre-suit unfair or deceptive acts constitutes a  violation. *Trenwick America Reinsurance Corp. v. IRC

Inc*., 764 F. Supp. 2d 274, 305 (D. Mass. 2011).

The simple and fatal flaw to Xcentric's motion is that the 93A claim is not based on the

information provided by the Author to Xcentric.  Goren's 93A claim arises out of Xcentric's

solicitations and advertisements for its CAP program.  The Author's "third party content" is immaterial.

 It is Xcentric's speech, its advertisements and solicitations which are to be assessed and after

discovery adjudicated.  As this Court recently held "CDA immunity does not apply if the interactive

computer service provider is also an 'information content provider'…" *Suk Jae Chang v. Wozo LLC*, 2012 WL 1067643 (D. Mass. 2012) (Casper, J.) (denying website owner's motion to dismiss 93A claim asserting unfair and deceptive internet advertisements).[31]  There is evidence of continuing injury to Goren's reputation as well as the loss of money casually connected to the undisputed solicitations and advertisements. See PL SOF ¶ 47.  In addition in both open court and in affidavits Xcentric has made false representations of the content of the step 5 box. See *Id.* ¶¶ 107-109.

There are good faith bases to proceed with discovery to demonstrate that: (i) the solicitation and advertisement of Xcentric's CAP program is both unfair **and** deceptive; and (ii) Xcentric's operation of the CAP program is immoral and unscrupulous in that Xcentric has funded or encouraged the posting of defamatory reports and solicited those subjects to pay fees to the CAP program to remediate the injury. Moreover, in this case Xcentric has made false representations, both in open court and by affidavit, as to the Ripoff Report's online contract forms.

The Ripoff Report's advertisement for its commercial reputation restoration services repeatedly states "we have always had a uniform policy of not removing reports filed on Ripoff Report" and even reports adjudged defamatory will not be removed.  The advertisement is false or misleading or has the tendency or capacity to be misleading because in fact Ripoff Report has removed or redacted reports in the past. *Id.* ¶86 ("As a matter of policy, **REDACTED … completely bogus**"); ("**(REDACTED WORDS PROVEN TO BE FALSE)**"); (by agreement "completely remove report …"); (exercise of "editorial discretion" redact report by removing name);**((((REDACTED))) the offending words because we found what was posted to be false**").  The Massachusetts advertisement is also false or misleading or has the tendency or capacity to be misleading because it does not disclose that one does

---

[31] The plaintiffs submitted this case to the Court at the February 24, 2014 hearing on Xcentric's motion to dismiss and provided a copy to Xcentric's counsel. PL SOF ¶113.

not need to join the CAP program to have false accusations of criminal conduct redacted or removed upon providing proof of the falsity of the accusations of criminal conduct. *Id.* ¶¶89, 98.

When Xcentric refused Goren's demand to take down or redact the false accusations of criminal conduct, Xcentric's advertisement for its CAP Program did not disclose to Goren that he would have to pay a one time $7,500 Programming fee plus $1,200 for the two reports and then have to pay $80 per month for a minimum of 36 months. *Id.* ¶102. In addition, there was no disclosure that after Goren had paid $11,580 over 36 months, if Goren did not then continue to pay Xcentric's monthly fees, the positive search engine results would cease. *Id.* ¶103.

An individual named Darren Meade wrote to plaintiffs' counsel that from January 2012 to May 2014 he had been employed by Xcentric to post reports on Ripoff Report and to solicit fees from the subjects of those reports to remediate the report. *Id.* ¶92. In June and September 2011 Mr. Meade testified that

> that he had resigned from a company that had a business plan of defaming people on the internet and then "turn[ing] around and send[ing] them out e-mails or solicitations and get their money to take it off;" … [and that] the Ripoff Report [w]as "the perfect place to defame somebody because it will always stay up, and for some reason it winds up ranking on the first page of Google.

*Id.* ¶91.

While denying that Meade was an employee, Xcentric's counsel informed plaintiffs' counsel that Xcentric or Mr. Magedson did make payments to him. *Id.* ¶92. According to a July 2014 Iowa search warrant affidavit, the SAC County Iowa Prosecuting Attorney avers to evidence that Xcentric/Magedson paid Meade approximately $80,000 in connection with the posting of defamatory reports on the Ripoff Report website. *Id.* ¶93. The Prosecuting Attorney alleges among other things:

> In January 2012, ED MAGEDSON and DARREN MEADE solicited the services of investigative journalist Glenn Puit to create what would become RIPOFF REPORT complaints Nos. 828918 and 829020…. MAGEDSON asked that Glenn Puit address specific issues and allegations against certain individuals in his article… MAGEDSON directed…MEADE to

> create other RIPOFF REPORT complaints…MAGEDSON had…MEADE edit various
> RIPOFF REPORT complaints to include certain content so that these complaints would be
> more visible and rank higher on internet search results.

*Id.* The Prosecuting Attorney also alleges Mr. Magedson and one Siamack Yaghobi who had an email address of sam@ripoffreport.com was employed as a salesman for the CAP program and in the course of that employment engaged in an extortionate scheme involving the takedown of three reports for consideration and after receipt of the consideration, namely Darren Meade's laptop computer, the three reports were reposted on the Ripoff Report. *Id*.

Contrary to Xcentric's suggestion (Paper 55 at 18) that its CAP program  is just like any other online reputation restoration business,  the subject matter of its CAP contract is the existence of "Reports … posted on the Ripoff Report about the company."  PL SOF ¶ 86.  The CAP program requires the company "to resolve the complaints described in the [Ripoff] Reports" ( *id.* ¶99)  and its advertisements clearly solicit companies who are the subject of a Ripoff Report. See, e.g, Exhibit N.

> NOTE: As a part of the Corporate Advocacy Program *Ripoff Report verifies all Reports and Rebuttals, and will expose those posted erroneously.*

Nothing in the Defendant's Motion for Summary Judgment or in the undisputed facts supports a finding that that the Plaintiffs' 93A claim is either barred as a matter of law, or lacking in the requisite evidentiary support to survive a Rule 56 Motion.  Rather, despite only a partially developed record[32], the Plaintiff has demonstrated that Xcentric falsely advertises its policies and that it applies such policies in a capricious manner.  The Plaintiffs submit that when discovery proceeds further evidence will surface illustrating that its policies are nothing more than a meaningless barrier to commercial victims' restoration of their good name, most often for a fee.

---

[32] Plaintiffs' demands for automatic disclosure of Xcentric's solicitations, and among other things its relationship with Mr. Meade have been refused. Pl SOF ¶¶88, 92.

V.      **CONCLUSION.**

Based on the foregoing and the Plaintiffs' Response to Defendant's Statement of

Facts and Plaintiff's Statement of Additional Facts, Plaintiffs request the Court to:

A.  Deny Defendant's June 13, 2014 Motion for Summary Judgment; and,

B.  Grant summary judgment to Plaintiffs on Defendant's affirmative defense of

ownership of an exclusive license to the January 31, 2012 work.

Respectfully submitted,
SMALL JUSTICE LLC, RICHARD A. GOREN, and
CHRISTIAN DUPONT,

Plaintiffs,
by their attorney,

August 4, 2014

*/s/ Richard A. Goren*
Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
101 Federal Street Suite 1900
Boston MA 02110
617-261-8585
rgoren@richardgorenlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on August 4, 2014.

*/s/ Richard A. Goren*