UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
SMALL JUSTICE LLC,                         )
RICHARD A. GOREN,                          )
and,                                               )
CHRISTIAN DUPONT dba                    )
ARABIANIGHTS-BOSTON                     )
MASSACHUSETTS                             )
                                                    )
Plaintiffs,                                        )
                                                    ) CIVIL ACTION NO. 1:13-cv-11701-DJC
v.                                                 )
                                                    )
XCENTRIC VENTURES LLC,                 )
                    Defendant.                 )
_____)

    Pursuant to Fed. R. Civ. P 56(f)(1) and  LR 56.1 Plaintiffs file this Statement of

Additional Material Facts  ("Pl. SOF") as to which they contend there is no genuine dispute

enabling the Court: (i)  to grant the non-movant plaintiffs summary judgment as

defendant's failures to present the essential elements of its affirmative defense(s) as to

ownership of all exclusive rights of copyright; and, (ii) to deny defendant's motion for

summary judgment on plaintiffs' affirmative and defensive 93A claims.

    ***Additional Facts regarding parties and Ripoff Report website disclosures.***

        1.      At all material times defendant Xcentric Ventures LLC ("Xcentric")

has been, and is, the owner and operator of the Ripoff Report. FAC (Paper 13) ¶7; Answer

(Paper[1] 49) ¶7; Def. SOF ¶ 4.

_____
[1] References to "Paper" herein shall mean the number assigned to a document as indicated on the docket in
the above-captioned case or in the other specific referenced cases.

2.      Ripoff Report is "an interactive website" which holds itself out as "an online consumer advocacy forum that allows users to post free complaints called 'reports' about companies and/or individuals who they feel have wronged them in some manner." FAC (Paper 13) ¶8; Answer (Paper 49) ¶8.

3.      Before posting a report on the Ripoff Report website a user creates a "free account" by furnishing his/her "Real Name" and address, a "Display Name" or pseudonym if different from his/her real name, an email address, and telephone number. FAC (Paper 13) ¶9; Answer (Paper 49 ) ¶9.

4.      David S. Gingras, Esq. is an Arizona attorney who has represented Xcentric in numerous matters from 2005. Affidavit of David S. Gingras dated August 8, 2013 (Paper 8-1) ("First Gingras Aff.") ¶3; Affidavit of David S. Gingras dated September 16, 2013 (Paper 15) ("Second Gingras Aff.") ¶3. From July 2009 through July 2013, Mr. Gingras was employed as Xcentric's general counsel. *Id.*  At all material times Mr. Gingras has had personal knowledge of the report submission process by which a user submitted his or her report and of the Ripoff Report's Terms of Service.  First Gingras Aff.; Second Gingras Aff.; Affidavit of David S. Gingras dated March 3, 2014 (Paper 37) ("Third Gingras Aff."); Affidavit of David S. Gingras dated March 12, 2014 (Paper 43) ("Fourth Gingras Aff.")

5.      An author who wishes to post his or her work on the Ripoff Report must complete a five step process which except for adding a step 4 to allow optional

2

posting of photos has been unchanged from April 2008 through at least all of 2012.  Third Gingras Aff.¶ 2, and n.1.

6.     In 2010 Mr. Gingras and Maria Crimi Speth, Esq. represented Xcentric in the case styled Herman & Russo et al v. Xcentric  Ventures LLC et al in the United States District Court, Northern District of Georgia, Atlanta Division, Case No: 10-cv-0398-CAP.. Affidavit of Richard Goren dated July 30, 2014 ("Fifth Goren Aff.") ¶7. On August 17, 2010, Xcentric moved for summary judgment in that case on the basis of immunity under the Communications Decency Act, section 230 (Papers 30, 30-1, and 30-2 in that case).  *Id*. At issue was the manner and steps involved in the posting of an anonymous author's work on the Ripoff Report website. *Id*.  Xcentric's statement of material facts as to which it contended there was no genuine dispute was supported by the affidavit of Justin Crossman, dated August 12, 2010 (Paper 30-4 in that case). The Crossman Affidavit is also Exhibit A (Paper 41-1) to the Affidavit of Richard A. Goren dated March 10, 2014 (Paper 41).  Mr. Crossman's affidavit attested that he is a provider of  computer information technology services to Xcentric relating to the operation of the Ripoff Report website and that he is "extremely familiar with the technical aspects of the site's operations including the manner in which reports, rebuttals, updates and similar submissions to the site are created." *Id*. ¶2. Xcentric's motion for summary judgment in the Herman & Russo case was granted. Fifth Goren Aff. ¶7.

7.     In 2010 Mr. Gingras and Maria Crimi Speth, Esq. represented Xcentric in the case styled *Asia Economic Institute et al v. Xcentric Ventures LLC et al* in

3

the United States District Court, Central District of California, case No: 2:10-cv-01360-SVW-PJW (hereinafter the "Asia Economic Docket"). On September 27, 2010, Xcentric moved for summary judgment in that case on the basis of immunity under the Communications Decency Act, section 230 (Asia Economic Docket at Paper 145). Fifth Goren Aff. ¶8.  At issue was the manner and steps involved in the posting of an anonymous author's work on the Ripoff Report website. *Id.*  Xcentric's statement of material facts as to which it contended there was no genuine dispute was supported by the affidavit of Ben Smith, dated August 12, 2010 (Paper 148 in that case). The Smith Affidavit is also Exhibit B (Paper 41-2) to the Affidavit of Richard A. Goren dated March 10, 2014 (Paper 41). Mr. Smith's affidavit attested that he is a provider of computer information technology services to Xcentric relating to the operation of the Ripoff Report website and that he is "extremely familiar with the technical aspects of the site's operations including the manner in which reports, rebuttals, updates and similar submissions to the site are created." *Id.* ¶2.  Xcentric's motion for summary judgment in the Asia Economic Institute case was granted. Asia Economic Docket at Paper 184.

8.      Each of Mr. Crossman and Mr. Smith attested to what an author who wished to post his or her work on the Ripoff Report website must do to post the work and also attested to exactly what was presented to the author.  According to Messrs. Crossman and Smith, one wishing to post his work must first

> create a free user account before they are allowed to post anything. During this process, the user is asked for his/her name, address, phone number, and other contact information, all of which may be falsified by the user. The user is also required to provide an email address which the site's server automatically confirms

4

by sending an email to that address which must be verified before the user is allowed to post anything.… [Xcentric's] server also automatically records the IP address of the user at the time his/her account is created and also each time they submit a report to the site.

Crossman Aff. ¶4; Smith Aff. ¶4.

9.      Then after registering an author is "guided through a five-step process. Crossman Aff. ¶5; Smith Aff. ¶5; Third Gingras Aff. ¶2. Each of the five steps is reflected on a screenshot which each of Crossman and Smith appended to his respective affidavits as Exhibits A, B, C, D and E.  Each of the Crossman and Smith affidavits attested to identical screenshots.  The five step screenshots are Exhibits A, B, C, D and E hereto.

10.      Step 1 is a screenshot presenting a series of blank forms requiring the author to specify certain identifying information about the subject of his work.  Beneath the last blank form is a button captioned in bold "**Continue**." Exhibit A.

11.      Step 2, entitled "**<span style="color:red">Report Title and Category</span>**" is a screenshot directing the author to identify the title of his work, to describe and categorize the work and to provide certain identifying information about the subject of the report/work.  Beneath the categorization segment are two buttons captioned in bold "**Continue**" and "**Back**." Exhibit B.

12.      Step 3, entitled "**<span style="color:red">Write Your Report</span>**" is a screenshot in which "the user enters the actual text for the body of" his work.  Crossman Aff. ¶8; Smith Aff. ¶8. Beneath that there is a box for the author to add his first name and city and state of

5

residence.  Beneath that are two buttons captioned in bold "**Continue**" and "**Back**." Exhibit

C.

   13. Step 4, entitled "**<span style="color:red">(Optional) Add Photos to your Ripoff Report</span>**" is

a screenshot that enables the author to attach images to his work. Beneath that are three

buttons captioned in bold "**Continue,**" "**Back**" [or] "**Skip**." Exhibit D.

   14. Step 5, entitled "**<span style="color:red">Submit your Report</span>**" is a screenshot in which

beneath that appears another caption "Terms and Conditions" which is above a

rectangular box. All that visibly appears in the box[2] is the following:

> **1. Ripoff Report Membership Terms & Conditions**
>
> To use this service, you must be at least 14 years old.
>
> www.RipoffReport.com ("ROR") is an online forum created to help keep
> consumers informed. ROR is operated by Xcentric Ventures, LLC located at:
>
> **Xcentric Ventures, LLC**
> Ripoff Report
> P.O. Box 310
> **Tempe, AZ 85280**
> **(602)359-4357**

Exhibit E.[3] Addendum A is the FTC DOT COM DISCLOSURE RULES (March 2013).

Upon information and belief based in part on the FTC DOT COM March 2013 disclosure

---

[2]  Without support in the record, and flying in the face of several affidavits it has filed in this and two other federal court cases, Xcentric argues that because "the visible portion [of the step 5 box as it appeared on an August 29, 2013 screenshot] included an incomplete mailing address… it was readily apparent that [on January 31, and February 2, 2012] there were additional terms to scroll through…".  (Paper 55 at 9).  We note that without foundation as to his personal knowledge Mr. Kunz's affidavit (Paper 56-7, ¶6 and Exhibit 1) purports to attest to screenshot of step 5 where there is an incomplete mailing address as of January and February 2012.  Xcentric contends not visible without scrolling was
"**Tempe, AZ 85280**
**(602)359-4357**"

rules and common knowledge[4] as of 2012 that what is visible in an online text box may vary depending on among other things the browser being used and the device itself.  Fifth Goren Aff. ¶15. And as the FTC explains: "Because of their small screens, smartphones (and some tablets) potentially require horizontal, as well as vertical, scrolling." See Addendum A at 8, 10, A-22.

15.     On the right vertical rectangular margin of the step 5 box is a square figure; this is a so-called scroll bar.  Exhibit E; See Third Gingras Aff. ¶3.

16.     There is no labeling of this square figure as a scroll bar. Exhibit E.; Exhibit A, Third Gingras Aff. (same).

17.     Beneath this box is a small square "check box" alongside which in its entirety is the following text:

> By posting this report/rebuttal, I attest this report is valid.  I am giving Rip-off Report irrevocable rights to post it on the website.  I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting the report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Rip-off Report arising out of this posting.

At the bottom of step 5 are two buttons captioned in bold "**Continue**" and "**Back**." Ex. E.

---

[3] Step 5 of the process as of January 31, 2012 and February 2, 2012 as reflected on Exhibit E is slightly different from Exhibit B to the First Amended Complaint. In the box of Exhibit E after the line "P.O. Box 310" two other lines are visible, namely a line "Tempe, AZ 85280" and beneath that "(602) 359-4357."

[4] The Court may take judicial notice of a "thing [or practice] in the common knowledge and use of the people throughout the country." *Brown v. Piper*, 91 U.S. 37 (1875)(ice cream freezer). See *U.S. v Hoyts Cinemas Corp*., 380 F.3d 558, 570 (1st Cir. 2004) (Rule 201"requires both that the noticed fact be 'not subject to reasonable dispute' and that it be so either (1) on the basis of general knowledge within the territorial jurisdiction of the trial court or (2) because it is capable of being determined by an assuredly accurate source.")

Beneath the two buttons captioned in bold "**Continue**" and "**Back**" are two rows of underlined terms or phrases; these are **(i)** Home**; (ii) File a Report; (iii) Consumer Resources; (iv) Search; (v) Link to Ripoff Report; (vi) Privacy Policy; (vii) Terms of Service; (viii) FAQ; (ix) About Us; (x) Contact Us; and, (xii) Why Ripoff Report will not release author information!.** Exh. E.[5]

18.     None of these underlined terms or phrases are explicitly labeled as hyperlinks. Id.  The font size of the underlined terms is not larger than the font size of the words in the box to be checked. *Id.*

19.     The author must check the step 5 box and click the "Continue" button in order to post his work.  Third Gingras Aff. ¶5.

20.     There is no direction or prompt in the step 5 process to scroll before checking the step 5 box. Exhibit E. Nor is there any direction to scroll before clicking on the "Continue" button.

21.     In fact the author can click on the step 5 box without scrolling. Fifth Goren Aff. ¶ 22; Third Gingras Aff. ¶2, n.1.  After clicking on the box the author can click "continue" without scrolling.  *Id.* Therefore,  disclosure to authors of the terms revealed only by scrolling down is not "unavoidable."

---

[5] We note that on the step 5 screenshot appended as Exhibit A to the Third Gingras Aff. there are 18 underlined terms set forth in four rows beneath the "**Continue**" button. While immaterial we also note such discrepancy might be attributable to the use of different browsers or different sized viewing screens.  Xcentric repudiated the Third Gingras Aff. acknowledging it to be materially inaccurate. Fourth Gingras Aff. (Paper 43).

22.     Xcentric contends that "[a]s part of this [five step] process users must affirmatively accept and agree to Xcentric's [twelve paragraph] Terms of Service." First Gingras Aff. ¶5; Second Gingras Aff. ¶5.

23.     According to Xcentric, its Terms of Service that were in effect in January and February 2012 are set forth as Exhibit A to the First Gingras Aff. (Paper 8-2).[6]

24.     Putting aside whether or not the City, state, zip code, telephone and fax numbers were visible, it is evident that only by using the unlabeled scroll bar and scrolling down is there possible disclosure of a  12 numbered paragraph document bearing a title: "About us: Terms of Service." See Addendum A at 8, 10, A-22 (possible need for horizontal scrolling as well as vertical scrolling on smartphones and some tablets).

25.     Paragraph 1 of the "Terms of Service" is entitled: "**Ripoff Report Membership Terms & Conditions**" (color and emphasis original). Exhibit A to the First Gingras Aff. Material terms of this paragraph 1, Ripoff Report Membership Terms and Conditions that are not visible in the step 5 box without scrolling down include the following:

> This is a legal agreement ("Agreement") between you and Xcentric Ventures, LLC ("Xcentric"). Please read the Agreement carefully before registering for ROR. By registering for ROR, you agree to be bound by the terms and conditions of this

---

[6] Plaintiffs regret any confusion between the operative "Terms of Service" and the "Ripoff Report Membership Terms and Conditions." The latter is the first paragraph of the 12 paragraph "Terms of Service." We note that the exhibit B referenced in FAC ¶10 was entitled August 29, 2013 Ripoff Report Terms and Conditions. This allegation was imprecise. We note further Xcentric's  answer and counterclaim against the plaintiff DuPont (Paper 49 at 12-16: After registering an author "must agree to Ripoff Report's Terms of Service prior to posting on Ripoff Report as a condition of posting on Ripoff Report" (¶7);  "Ripoff Report's Terms of Service requires posters to grant Xcentric an exclusive worldwide license over any and all posts on Ripoff Report" (¶9); "Ripoff Report's Terms of Service requires posters to indemnify Xcentric for any disputes arising from any post on the website" (¶10).

Agreement (the "Terms"). If you do not agree to the Terms, you are not permitted to use ROR.

The Terms are subject to change by Xcentric, at any time, without notice, effective upon posting of updated Terms on our website….

Xcentric reserves the right to immediately suspend or terminate your registration with ROR, without notice, upon any breach of this Agreement by you which is brought to Xcentric's attention.
…

*Id.*

26.     While  on the step 5 screenshot there appears the underlined phrase "**Terms of Service**," an author who does not use the unlabeled scroll bar to find and read the Terms of Service and paragraph 1, is not informed of Xcentric's request to "please" read the "Agreement" and is not informed of the importance of the "Agreement" *i.e.*, "[i]f you do not agree to the Terms, you are not permitted to use ROR." *Id.*

27.     Paragraph 1's reservation of Xcentric's unilateral "right" to change the "Terms of Service," is not explicitly limited to prospective changes. *Id.*

28.     An author who does not use the unlabeled scroll bar to find and read the Terms of Service and paragraph 1, is not informed of that Xcentric can unilaterally amend the Terms of Service.

29.     Paragraph 2 of Xcentric's Terms of Service is entitled: "**Online Conduct.**"  Material terms of this paragraph 2 include

… You will NOT post on ROR any defamatory or illegal material or any material that infringes or violates another party's intellectual property rights.  … By posting information on ROR, you warrant and represent that the information is truthful and accurate.

You will not post, distribute or reproduce in any way any copyrighted material …
without obtaining the prior written consent of the owner of such … rights or except
as otherwise permitted by law.

*Id.*

30.     Paragraph 4 is entitled: "**Indemnity.**"

You will defend, indemnify, and hold harmless Xcentric, its officers, directors,
employees, agents and third parties, for any losses, costs, liabilities and expenses
(including reasonable attorneys' fees) relating to or arising out of your use of ROR,
including, but not limited to, any breach by you of the terms of this Agreement.

*Id*.

31.     Without using the unlabeled scroll bar to find and read the Terms of

Service and paragraph 4, an author is not informed that by his act of checking the box and

clicking "continue," he is thereby contracting to indemnify and hold Xcentric harmless for

certain of Xcentric's conduct or actions and to do so for periods beyond one year from

clicking. *Id.*

32.     Paragraph 5 is entitled: "**Removal of Information at User's**

**Request**."

ROR is a permanent record of disputes including disputes which have been fully
resolved. In order to maintain a complete record, information posted on ROR will
not be removed.  By posting information on ROR, you understand and agree that
the material you post will become part of ROR's permanent record and will NOT
be removed even at your request.

*Id.*

33.     Paragraph 6 is entitled: "**Proprietary Rights/Grant of Exclusive**

**Rights.**"

11

> By posting information or content to any public area of www.RipoffReport.com, you automatically grant and you represent and warrant that you have the right to grant to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing.

*Id.*

34.     An author who does not use the unlabeled scroll bar to find and read the Terms of Service and paragraph 6, is not informed that by his act of checking the box and clicking "continue," he is thereby conveying all his exclusive rights under copyright of his work. *Id.*

35.     Paragraph 7 is entitled: "**Disclosure of Information Supplied by You.**" Material terms of this paragraph 7 include

> Except as provided otherwise in its privacy policy, Xcentric will keep confidential all information supplied by you to Xcentric, and shall use or disclose such information only for the purposes for which such information was collected, or as required by law.

> From time to time, Xcentric may receive subpoenas seeking the identity of an ROR user. … Xcentric may comply with the subpoena and may disclose your identity without incurring any liability to you.

> Although, you are legally entitled to publish your comments anonymously, at the discretion of Xcentric the personally identifying information of any user who is found to have posted numerous complaints about the same company and/or individual using different pseudonyms may lose the confidential protections afforded by this section.

> You further agree and understand that in order to facilitate the resolutions of complaints, Xcentric may disclose your identity to any company who joins our Corporate Advocacy Business Remediation and Customer Satisfaction Program. Disclosures made under this section shall be limited only to reports submitted on or after the company joins our program and shall only occur where the company has

<u>agreed not to sue you and has agreed to waive any/all claims it may have against</u>
<u>you based on any reports you have posted on ROR.</u>

In its sole discretion, Xcentric may also disclose your identity to any federal, state
or local law enforcement agency ….

You further agree to release and hold Xcentric harmless from any claims that
Xcentric disclosed your identity pursuant to these terms and conditions.

Id. (emphasis added).

36.     While  on the step 5 screenshot there appears the underlined phrase

"**<u>Why Ripoff Report will not release author information!</u>**," an author who does not use

the unlabeled scroll bar to find and read the Terms of Service and paragraph 7, is not

informed that Xcentric will release "author [identifying] information" to companies who

join its Corporate Advocacy Program.

37.     An author who does scroll through the Terms of Service is not

informed that under its standard "Corporate Advocacy Program Agreement" Xcentric "will

look at the origin (including the IP address and profile of the author) of the Reports and …

will provide that information to the Company …". (Paper 56-7 at 49 of 63, ¶1.3).  This

privacy disclosure includes the initial or  single report and is not limited to "reports

submitted on or after the company joins …[the Corporate Advocacy Program]."

38.     Paragraph 11 is entitled: "**General Provisions**."

You agree that Arizona law (regardless of conflicts of law principles) shall govern
this Agreement, that any dispute arising out of or relating to this Agreement shall be
subject to the exclusive venue of the federal and state courts in the State of Arizona,
and that you submit to the exclusive jurisdiction of the federal and state courts in
the State of Arizona in connection with ROR or this Agreement. The failure of
Xcentric to exercise or enforce any right or provision of the Terms of Service shall
not constitute a waiver of such right or provision. The failure of Xcentric or You to

13

exercise in any respect any right provided for herein shall not be deemed a waiver of any further rights hereunder. This Agreement, accepted upon registering for ROR, contains the entire agreement between you and Xcentric regarding the use of ROR. This Agreement may only be amended upon notice by Xcentric to you, or by a writing signed by you and an authorized official of Xcentric. Unless otherwise explicitly stated, the Terms will survive termination of your registration with ROR. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect.

39.     Paragraph 12 is entitled: "**Copyright Policy/Termination of User Privileges for Infringement and Contact Information for Suspected Copyright Infringement/DMCA Notices.**"

We comply with the safe harbor provisions of the Digital Millennium Copyright Act. 17 U.S.C § 512 (the "DMCA") and we will terminate the privileges of any user who uses ROR to unlawfully transmit copyrighted material without a license, express consent, valid defense or fair use exemption to do so. In particular, users who submit content to ROR, whether articles, images, stories, software or other copyrightable material must ensure that the content they upload does not infringe the copyrights of third parties.

If you believe that your copyright has been infringed through the use of ROR, please contact our Customer Service Department at: support@ripoffreport.com, legal@ripoffreport.com, or mail/fax at:

Ripoff Report Legal Department - Copyright Policy
P.O. Box 310
Tempe, AZ 85280
Fax: (602) 668-3623

Or:

M. Speth
3200 N. Central Avenue, Suite 2000
Phoeniz AZ 85012
Fax: (602) 248-0522

14

At a minimum, any DMCA removal request is required to include at least the following things:

(1) Your name, address, telephone number and e-mail address;
(2) A description of the copyrighted work that you claim has been infringed;
(3) The exact URL or web address where the alleged infringing material is located;
(4) A statement by you that you have a good faith belief that the disputed use has not been authorized by you, your agent, or the law;
(5) Your electronic or physical signature or the electronic or physical signature of the person authorized to act on your behalf; and,
(6) A statement by you made under penalty of perjury, that the information in your notice is accurate, that you are the copyright owner or authorized to act on the copyright owner's behalf.

NOTE: If you submit a removal request and you are NOT the copyright owner, or if you make any false statement in your demand (including a statement that our use of images is infringing when the use is clearly fair), you should be aware that the law imposes substantial liability for any damages and any attorney's fees incurred as a result. 17 U.S.C. §512(f).

Last updated: 4/8/10

***Additional Facts regarding Christian DuPont, his January 31, 2012 and February 2, 2012 postings; Goren's Superior Court's lawsuit; and assignment of copyrights.***

40.     The plaintiff Richard A. Goren practices law dba Law Office of Richard Goren with offices in Boston, Massachusetts ("Goren"). Fifth Goren Aff. ¶41. Goren has practiced law in Massachusetts since 1974 and for more than twenty years as a trial lawyer with a concentration on fraud, unfair and deceptive practices and business litigation. *Id.* In 2009, Goren represented an individual in lawsuit she brought against one Steven C. DuPont aka S. Christian DuPont aka Street Search Advisors in Suffolk Superior Court civil action No. 2009-2224F. *Id.* Exhibit F is a copy of the docket of that Superior Court action. *Id.* Mr. DuPont was duly served including by email and was represented by

15

Robert Scarino, Esq. *Id.*  DuPont appeared, answered the complaint and participated in

some discovery. *Id.* When the Court denied DuPont's motion to modify a prior discovery

Order, his counsel moved to withdraw; and, in February 2011 DuPont appeared personally

before the Hon. Bonnie MacLeod. *Id.*  Judgment entered in favor of Goren's client for

fraud and violation of Chapter 93A for treble damages plus sanctions plus an award of

attorney's fees in August 2011. *Id.*

      41.    On January 31, 2012, Christian DuPont registered on Xcentric's

Ripoff Report website with a display name of Arabianights-Boston Massachusetts, listing

an address in Boston Massachusetts, a phone number and email address. Affidavit of

Service, filed in *Goren v. Doe et al*, Suffolk Superior Court CA 2012-4121-H executed

by David S. Gingras, Esq. as general counsel of Xcentric.   Fifth Goren Aff. ¶42; Def.

SOF¶11.

      42.    On January 31, 2012, after registering for a free account, Christian

DuPont aka Arabianights-Boston Massachusetts, posted Report # 831689 on the Ripoff

Report website captioned "Complaint Review: Richard A. Goren (the January 31, 2012

Ripoff Report is Exhibit C to the First Gingras Aff., document 8-4). Def. SOF¶11.

      43.    Xcentric does not maintain a record of each individual author's

processing of each of the five step process for posting works.  Fifth Goren Aff. ¶44.

Xcentric does not have a record of the plaintiff Christian DuPont's electronic checking of

the step 5 box or the "continue" button.  *Id.* Because an author can check the step 5 box

and then click continue without any requirement of scrolling to view the not immediately

visible information, Xcentric does not have any direct evidence that it gave the Author

actual notice of its Terms of Service including without limitation the paragraph 6 grant of

an exclusive license to his January 31, 2012 work. *Id.*

44.     Therefore Xcentric has no direct evidence that as part of the

undisputed five step process the plaintiff Christian DuPont affirmatively accepted and

agreed to Xcentric's twelve paragraph Terms of Service, including without limitation the

paragraph 6 grant of an exclusive license to his January 31, 2012 work.

45.     The January 31, 2012 Ripoff Report  alleges that Goren routinely

commits crimes in his practice of law, routinely defrauds both his clients and others,

routinely commits perjury and has a history of violent crimes in his personal life. FAC

¶¶11,12; Def. SOF ¶11; Affidavit of Richard A. Goren dated November 9, 2012, filed in

Suffolk Superior Court in civil action 2012-4121-H, styled Richard A. Goren v John Doe

dba Arabianights et al ("Goren 2012 Superior Court Aff.")(Exhibit I hereto) ¶3.

46.     On February 2, 2012, after following the exact same protocol,

plaintiff Christian DuPont posted Report #833025.  FAC ¶¶16, 17; Def. SOF ¶12. The

February 2, 2012 Ripoff Report  alleges that Goren routinely commits crimes in his

practice of law, routinely defrauds both his clients and others, routinely commits perjury

and has a history of violent crimes in his personal life. *Id.*

47.     Copies of Christian DuPont's January 31, 2012 and February 2,

2012 works have been displayed on Google and other search engines repeatedly from

after the original posting on the Ripoff Report website to date. Fifth Goren Aff. ¶ 48;

Exhibit I, Goren 2012 Superior Court Aff.¶2.  According to Goren  these works have

been read by potential clients in Massachusetts resulting in a loss of income to him. Fifth

Goren Aff. ¶ 48; Exhibit I, Goren 2012 Superior Court Aff.¶¶2, 8-11.

48.     Xcentric contends that as a condition of his posting of his work on

its Ripoff Report website, the author, the plaintiff DuPont conveyed to Xcentric an

exclusive license, i.e., all rights of ownership of his work. First Gingras Aff. ¶¶5,6;

Second Gingras Aff. ¶¶5,6; See Counterclaim (Paper 49) ¶¶ 16 (author "contracted with

Xcentric for the right to post on the Ripoff Report"); 17 ("contract required the author to

grant Xcentric an exclusive worldwide license over his posts"); 18 ("contract required the

author to indemnify Xcentric for disputes arising from those posts"); 22, 23 ("[b] failing

to defend Xcentric's exclusive license … the author has breached that contract … [and is

responsible for Xcentric's] attorneys' fees … as required by the contract"). See also Def.

SOF ¶8.

49.     Xcentric contends that by his January and February 2012 posting of

his work, the author, the plaintiff DuPont "has a contractual obligation to indemnify"

Xcentric for Goren's claims for damages in this lawsuit originally filed in July 2013. *Id*.

50.     On October 30, 2012, Goren wrote to Xcentric in care of Maria

Crimi Speth, Esq. requesting "that the January 31, 2012 Ripoff Report…be taken down

from the Ripoff Report [website] as it is 'harassing' and 'objectionable' and therefore

within your discretion to do so without liability to the Information content provider."

Fifth Goren Aff. ¶ 51.  Goren also informed Xcentric that he  recognized DuPont's  photo

which had been posted on the website . *Id.* Goren informed Xcentric in less than two

months after DuPont had been sanctioned in Goren's case against him, in two anonymous

Ripoff Reports, four days apart, some poster who Goren believed to be DuPont alleged

that "according to Massachusetts Court Records ..." Goren's client committed perjury. *Id.*

Goren's October 30, 2012 letter  provided documented allegations that in addition to

these reports about Goren's client DuPont had "posted 14 false and defamatory Ripoff

Reports." *Id.* The documentation all of which had been posted on the Ripoff Report

identified the author of the January 31, 2012 as Steven Christian DuPont and included a

photograph of DuPont. *Id.*

   51. After filing the November 2012 Superior Court lawsuit Goren

communicated with David S. Gingras, Esq. as the general counsel of Xcentric. *Id.*;

Exhibit I, Goren 2012 Superior Court Aff.¶12.  Xcentric informed Goren that absent a

court order Xcentric would not disclose the identity and contact information of the author

of the January 31, 2012 work. Id. Xcentric also informed Goren that it would not delete,

redact or retract the work under any circumstances including if the work were to be

adjudged defamatory. *Id.*; Exhibit I, Goren 2012 Superior Court Aff.¶13.  Xcentric

accepted service of a subpoena and order of notice of Goren's application for a

preliminary injunction.  Fifth Goren  Aff. ¶ 52. The subpoena directed Xcentric to

disclose the identifying information of the author provided the author after notice did not

object; and the Superior Court order also required Xcentric to provide notice to the author

of both the subpoena and the application for a preliminary injunction. *Id.*   The affidavit

of Xcentric's general counsel, which Goren filed with the Superior Court, attested to service by email Xcentric of the Verified Complaint, the Affidavit of Goren, the Motion for TRO and Proposed Order, Motion for leave to serve third party subpoena and proposed Order, Order granting leave to serve third party subpoena, and Order of notice for a hearing on a preliminary injunction.  *Id.*  At no time did Xcentric indicate that its emailed service was ineffective. *Id.* Indeed Xcentric's general counsel informed Goren "that I have not received any response from the author." *Id.*  Service of the papers was also made to the address specified on DuPont's registration with the Ripoff Report which was the address on DuPont's 2010 Massachusetts driver's license. Id.

52.     On January 18, 2013, Goren served Christian DuPont with notice of his Motion for Alternate Service of Process and Application for Judgment.  Fifth Goren Aff. ¶ 53. Service was effected by email to two email addresses to which DuPont had attested in the 2009 case against him. *Id.*  The motion requested the Superior Court to satisfy itself that it had in personam jurisdiction over DuPont. *Id.* The Motion requested the Court to find that alternate service by email provided adequate notice. *Id.*

53.     On February 6, 2013, Goren's Rule 55(a) Request for default (Paper 56-2 in this case) was docketed (as Paper 9 in that case) in the Superior Court.  Fifth Goren Aff. ¶ 54.

54.     On February 5, 2013, Goren served DuPont with a Rule 41(a) (1) Notice of Voluntary Dismissal of Counts I and III claims for Damages. Id.  Goren's Notice stated that the dismissal without prejudice would be filed "in connection with his

contemplated application for default judgment in the form of a permanent injunction."
See Exhibit G.

55.     On February 22, 2013, Goren served DuPont with his Application
for Default Judgment (Exhibit C, Def. SOF {Paper 56-3}). Fifth Goren Aff. ¶ 56. The
same day, February 22, 2013, Goren filed: (i) the January 18, 2013 Motion for Alternate
Service of Process and Application for Judgment; (ii) Proposed Order for Alternate
Service of Process and Application for Judgment; (iii)  the February 5, 2013 Rule 41(a)
(1) Notice of Voluntary Dismissal of Counts I and III claims for Damages; (iv) Rule 55
(b) (4) Service Members Relief Act affidavit; and, (v) the February 22, 2013, Application
for Default Judgment. *Id.*

56.     On February 25, 2013, Goren appeared before Judge Cosgrove who
granted  the Motion for Alternate Service (Paper 15 on Superior Court docket). Fifth
Goren Aff. ¶ 57. The Motion with the February 25, 2013 marginal Order allowing the
motion is Paper 29-1 in this case.  The Court entered an Order (Paper 30-1 in this case) as
follows:

> Before the Court are: (i) Plaintiff's Ex-Parte Motion for Alternate
> Service of Process and Application for Entry of Default; (ii) Plaintiff's Rule
> 41(a) Notice of Dismissal of Claims for Damages under Counts I and III of
> Plaintiff's Verified Complaint; (iii) Plaintiff's Rule 55(a) request for Default
> against defendant Steven DuPont aka Steven Christian DuPont; (iv) Rule
> 55(a) and (b) (4) Affidavit of Richard A. Goren; and, (v)  Plaintiff's
> Application for Default Judgment.
> After considering the papers, and being satisfied each of the two
> defendants is subject to the personal jurisdiction of this Court and that each
> of the two defendants having been provided reasonable notice and an

opportunity to be heard has failed to plead, appear or otherwise defend, the
Court enters the following Orders:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1. Service of process under Rule 4 and service under Rule 5 shall be
   deemed complete on each of defendant John Doe dba Arabianights-
   Boston MA nka Christian DuPont and defendant Steven DuPont aka
   Steven Christian DuPont upon email to dupontmaui@gmail.com and
   dupontmaui@yahoo.com and by either hand delivery or first class mail
   to Christian DuPont aka Steven Christian DuPont 46 Rutland Square,
   c/o Sextus Norden Jr., Boston MA 02118.
2. The Clerk shall enter the default of each of defendant John Doe dba
   Arabianights-Boston MA nka Christian DuPont and defendant Steven
   DuPont aka Steven Christian DuPont.
3. Plaintiff shall serve a copy of the summons, complaint, this Order, the
   Application for Default Judgment, Rule 55 (a) and (b)(4) Affidavit on
   the defendants in or within seven (7) days of the date of this Order.
4. Plaintiff's Application for Default Judgment shall be heard on March
   20th 2013 at 2:00 pm.


57.     After entry on the docket of the allowance of the motion for

Alternate Service, the Court entered on the docket (Paper 16 on the Superior Court

docket) the Rule 41(a) (1)(i)  Notice of Voluntary Dismissal of Counts I and III claims

for Damages. Fifth Goren Aff. ¶ 58; Exhibit G.

58.     Pursuant to the Court's February 25th Order, on February 26, 2013

Goren served DuPont with the original summons, the Verified Complaint, the Order

approving approving Alternate Service and the application for Default Judgment. Fifth

Goren Aff. ¶ 59;  Goren notified DuPont that the Court set a hearing date of March 20,

2013 at 2:00pm on plaintiff's application for Default Judgment and Entry of Judgment.

Id.

22

59.    On March 20, 2013, Christian DuPont did not appear (id.); and, the Court entered judgment and a permanent injunction. (Paper 30-2 in this case).  The Court specifically predicated its judgment on:

> being satisfied that each of defendant John Doe dba Arabianights-Boston Massachusetts and defendant Steven  DuPont aka Steven Christian DuPont had no less than fourteen days' actual notice of the Application for Default Judgment and hearing this day, and upon consideration thereof,  being satisfied that the continued republication of John Doe dba Arabianights-Boston Massachusetts' January 31, 2012  Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren" presents a continuing threat of irreparable harm to the plaintiff Richard A. Goren that cannot be remedied by an award of damages warranting continuation of the Court's November 26, 2012 Preliminary Injunction as a sufficiently narrow permanent injunction, the defendants not opposing the entry of a permanent injunction, and plaintiff having dismissed his claims for money damages under Counts I and III of his Verified Complaint,

60.    On March 25, 2013, Goren served DuPont with his motion to amend judgment and directed him to serve Goren with any response and also to file same with the Court. Fifth Goren Aff. ¶ 62; Exhibit H.  Def. SOF ¶21.  DuPont neither responded nor appeared on the motion to amend judgment.  On May 8, 2013, the Court granted the motion and entered an amended judgment and permanent injunction. (Paper 29-4 in this case; and Exhibit A, Complaint, Paper 1 at 10-15). The Court specifically predicated its judgment on:

> being satisfied that the continued republication of John Doe dba Arabianights-Boston Massachusetts' January 31, 2012  Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren" presents a continuing threat of irreparable harm to the plaintiff Richard A. Goren that cannot be remedied by an award of damages warranting continuation of the Court's November 26, 2012 Preliminary Injunction as a sufficiently narrow permanent injunction, the defendants not opposing the entry of a permanent injunction, and

23

plaintiff having dismissed his claims for money damages under Counts I and III of his Verified Complaint,

*Id.*

The Amended Judgment **ORDERED and ADJUDGED**:

1.      that the Defendant, John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont and the Defendant Steven DuPont aka Steven Christian DuPont, and any person or entity acting as his agent, attorney, servant, employee, or any other person or entity in active concert or participation with either of John Doe dba Arabianights-Boston Massachusetts, , nka Christian DuPont or the Defendant Steven DuPont aka Steven Christian DuPont,  who receives actual notice of this Order, is **PERMANENTLY ENJOINED and RESTRAINED** from continuing to publish or to republish all or parts of the John Doe dba Arabianights-Boston Massachusetts' January 31, 2012 Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren."
**IT IS FURTHER ORDERED and ADJUDGED**:
2.      that the Defendant, John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont shall take any and all steps and action necessary or appropriate, including without limitation institution of legal proceedings in a court of competent jurisdiction, to cause the removal, retraction, and/or deletion from the Ripoff Report website of the John Doe dba Arabianights-Boston Massachusetts' January 31, 2012  Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren."
3.      that all rights in and to ownership of the copyright by the author John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont of the January 31, 2012  Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren" is hereby transferred to the plaintiff Richard A. Goren, meaning and intending to convey, transfer and assign by this Order and Judgment the full and exclusive ownership of copyright in and to that work so as to qualify as a transfer of ownership under 17 U.S.C. §201 (d) and/or under 17 U.S.C. §204.
4.      that the plaintiff Richard A. Goren is hereby appointed attorney-in-fact, coupled with an interest, with power of substitution, in the name and place of Defendant John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont, to execute and deliver a conveyance, transfer, and assignment of all rights in and to ownership of the copyright by the author John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont of

24

the January 31, 2012  Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren."

5.      that the plaintiff Richard A. Goren is hereby appointed attorney-in-fact, coupled with an interest, with power of substitution, in his own name as owner of copyright or otherwise as well as in the name and place of Defendant John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont, to take all steps and action necessary or appropriate in the name and place of said defendant to cause the removal, retraction, and/or deletion from the Ripoff Report website of the John Doe dba Arabianights-Boston Massachusetts' January 31, 2012  Report # 831689 posted on the Ripoff Report website captioned "Complaint Review: Richard A. Goren" including without limitation institution of legal proceedings in a court of competent jurisdiction.

6.      that the acts of said attorney-in-fact shall for all purposes and effects constitute the acts of the Defendant John Doe dba Arabianights-Boston Massachusetts, nka Christian DuPont as if done by said defendant.

61.    On May 14, 2013, Goren served Xcentric with a copy of the May 8, 2013 Judgment. Fifth Goren Aff. ¶ 63. Goren demanded that Xcentric remove from its Ripoff Report website the January 31, 2012 posting. Id.  On June 25, 2013, with no response from Xcentric, Goren informed Xcentric that barring notice that Xcentric will comply with the May 8th Judgment, he will file suit. Id.  On June 27, 2013, Xcentric notified Goren that it "will not agree to remove the report." Id.  Goren then visited Xcentric's website. Id.

62.    On July 3, 2013, John Doe dba Arabianights-Boston Massachusetts by Richard A. Goren, his attorney in fact, pursuant to the May 8, 2013 Amended Judgment and permanent injunction,  executed under seal a "COPYRIGHT ASSIGNMENT" whereby FOR GOOD AND VALUABLE CONSIDERATION the author

irrevocably transfer[red] and assign[ed] to … Goren, his successors and assigns, in perpetuity, all right (whether known or not now known), title and interest,

25

> throughout the world, including any copyrights and renewals or extensions thereto in and to the Ripoff Report, Report #831689 "Complaint Review: Richard A. Goren" January 31, 2012.

Fifth Goren Aff. ¶ 64.  The May 8, 2013 Judgment and Order appointing Goren as attorney in fact was attached to the Copyright Assignment. Id.  The July 3, 2013 Copyright Assignment by the author's attorney in fact was acknowledged by a Massachusetts Notary Public, Michelle A. Dumas. *Id*.  Immediately following that assignment, Goren

> irrevocably transfer[red] and assign[ed] to Small Justice LLC… , its successors and assigns, in perpetuity, all right (whether known or not now known), title and interest, throughout the world, including any copyrights and renewals or extensions thereto in and to the Ripoff Report, Report #831689 "Complaint Review: Richard A. Goren" January 31, 2012.

*Id*. The July 3, 2013 Copyright Assignment by  Goren to Small Justice LLC was acknowledged by a Massachusetts Notary Public, Michelle A. Dumas. *Id*

63.     On July 3, 2013, Goren filed an application for copyright registration with the United States Copyright Office for the January 31, 2012 work.  Affidavit of Richard A. Goren dated December 10, 2013  (Paper 29 in this case) ¶3. Goren paid the $35 fee and uploaded the January 31, 2012 work. Id.

64.     On August 30, 2013, as attorney in fact for Christian DuPont Goren executed under seal a "COPYRIGHT ASSIGNMENT" whereby FOR GOOD AND VALUABLE CONSIDERATION the author

> irrevocably transfer[red] and assign[ed] to … Goren, his successors and assigns, in perpetuity, all right (whether or not now known), title and interest, throughout the world, including any copyrights and renewals or extensions thereto in and to: (i) the Ripoff Report, Report #831689 on the Ripoff Report website captioned "Complaint Review: Richard A. Goren" January 31, 2012; and, (ii) the Ripoff Report, Report #

833025 on the Ripoff Report website captioned "Complaint Review: Bodoff &Associates, P.C." February 2, 2012.

Affidavit of Richard Goren dated October 15, 2013 (Paper 20-1 in this case) ¶2.   The

August 16, 2013 Judgment and Order appointing Goren as attorney in fact was attached to

the Copyright Assignment. Id.  The August 30, 2013 Copyright Assignment by the author's

attorney in fact was acknowledged by a Massachusetts Notary Public, Neuza Tavares. *Id*.

Immediately following that assignment, Goren

> irrevocably transfer[red] and assign[ed] to Small Justice LLC… , its successors and
> assigns, in perpetuity, all right (whether known or not now known), title and
> interest, throughout the world, including any copyrights and renewals or extensions
> thereto in and to (i) the Ripoff Report, Report #831689 on the Ripoff Report
> website captioned "Complaint Review: Richard A. Goren" January 31, 2012; and,
> (ii) the Ripoff Report, Report # 833025 on the Ripoff Report website captioned
> "Complaint Review: Bodoff &Associates, P.C." February 2, 2012.

*Id*. August 30, 2013 Copyright Assignment by  Goren to Small Justice LLC was

acknowledged by a Massachusetts Notary Public, Neuza Tavares. *Id*

65.     On August 29, 2013, Goren registered for a free membership in the

Ripoff Report. Affidavit of Richard A. Goren, dated March 10, 2014 (Paper 41 in this case)

¶2.  Contrary to the Third Gingras Aff.,   the August 29, 2013, the Step 5 "Submit your

Report" screen  did not include either: (i) the clause: "I agree to the Ripoff Report Terms

and Conditions" or, (ii)  any clause "granting Ripoff Report's operators an exclusive

license." *Id.* ¶4.

66.     On August 29, 2013 at 2:57pm Xcentric sent Goren two emails, the

first acknowledging that his report had been filed  and a second that the report had been

approved with a link to the report.  Fifth Goren Aff. ¶ 67.  Neither email made any mention

or reference to terms and conditions, terms of service, or any conveyance of ownership of

copyrights. Id.

       67.    On September 2, 2013, Goren filed an application for copyright

registration with the United States Copyright Office for the February 2, 2012 work.

Affidavit of Richard A. Goren dated December 10, 2013  (Paper 29 in this case) ¶3. Goren

paid the $35 fee and uploaded the February 2, 2012 work. *Id.*  That application remains

pending. Fifth Goren Aff. ¶ 69.

       68.    The United States Copyright Office issued a Certificate of

Registration Number TX-7-775-718 bearing a stated effective date of July 3, 2013 for the

work entitled "Ripoff Report #831689 'Complaint Review: Richard A. Goren' January 31,

2012."  Affidavit of Richard Goren dated February 12, 2014 and Exhibit A thereto (Paper

33-1 in this case).  The Copyright Registration, Paper 33-1 in this case, specifies that the

author's "Transfer Statement" was by "assignment."  Id.

     ***Unfair and Deceptive business acts and practices by Xcentric; copyright***

***infringement***

       69.    As of October 22, 2013, and as of  July 18, 2014, on the Ripoff

Report website at the bottom of each page of each of the January 31, 2012 and February

2, 2012 work appears this copyright notice, "Copyright © 1998-2013, Ripoff Report. All

rights reserved."  (in October 2013) and  "Copyright © 1998-2014, Ripoff Report . All

rights reserved." (in July 2014).   Affidavit of Spencer Neitzke, dated July 28, 2014

("Neitze Aff.")¶ 3.  According to Xcentric

> [e]very report page on the Ripoff Report site includes meta tags based on unique keywords supplied from the author such as the name of the company involved and other words used by the author to create the title for their {sic} report. Xcentric's servers also automatically include three different keywords-rip-off, ripoff, rip off— into the meta tags on every page on the site … [which] are … indexing references used by search engines in order to accurately reflect the source of the indexed page.

Smith Aff. ¶15; Crossman Aff. ¶17; See Third Gingras Aff.(Paper 37) (process

unchanged).

70.     The meta-tags or descriptive words Xcentric provided Google for

indexing the two works included "rip-off," "ripoff," "rip off," and "scam." Neitze Aff.")¶

5  Neither of the January 31, 2012 and February 2, 2012 works included any one or more

of the words "rip-off," "ripoff," "rip off," and "scam." Id.

71.     XCENTRIC holds itself out to Google, Yahoo, Microsoft's Bing

and other search engines as the copyright owner of the reports posted on its Ripoff Report

website, including without limitation Christian DuPont's January 31, and February 2,

2012 Ripoff Reports.  FAC ¶36; Answer ¶36 (admitted).By way of example as copyright

owner XCENTRIC regularly makes, and upon information and belief successfully

enforces, thousands of copyright removal requests to Google of content found on other

websites as to which XCENTRIC claims copyright ownership. Id.

72.     According to its published guidelines Google does not claim

ownership of any content that a user chooses to "upload, submit, [or] store …[and y]ou

retain ownership of any intellectual property rights that you hold in that content."   Fifth

Goren Aff. ¶ 72. Google's policy regarding Cached Links discloses that cached version is

a snapshot that Google stores on its server of "a webpage the way it looked when Google

last visited the page." Neitze Aff. ¶¶4, 7, 8.  The published explanation is that:

> Google crawls the web and takes snapshots of each page as a backup in case the
> current page is not available. These pages then become part of Google's "cache."
> If you click on a link that says **Cached**, you'll see the previous version of the site
> that we have stored.

Fifth Goren Aff. ¶ 72; Neitze Aff. ¶4.

73.    Xcentric includes instructions in the coding of its website to Google

and other search engines.  Neitze Aff. ¶¶4, 5, 6.  Xcentric's instructions in its coding do

not include a "no-archive meta-tag;" and hence do not prevent Google and other search

engines from storing "cached" versions of DuPont's work posted on the Ripoff Report

website. Id.

74.    On November 26, 2012, upon a finding that the continued

republication of the January 31, 2012 Ripoff Report presented a continuing threat of

irreparable harm to Goren, the Massachusetts Superior Court entered a preliminary

injunction enjoining the author and "any other person or entity in active concert or

participation" with the then pseudonymous author Arabianights-Boston Massachusetts

from continuing to publish or republish the January 31, 2012 Ripoff Report.  Fifth Goren

Aff. ¶ 73.

75.    On November 26, 2012, Goren served a certified copy of the

Court's preliminary injunction on Google, Inc. and requested the removal of two specific

so-called URLs linked to the January 31, 2012 Ripoff Report. Fifth Goren Aff. ¶ 74. On

December 27, 2012 Google's removal team informed Goren that it had removed from its

search results the following URL: http://www.ripoffreport.com/lawyers/richard-a-

goren/richard-a-goren-richard-a-go- E4302.htm. Id.

76.     On January 8, 2013, Goren informed Google that he had learned of

the presence of several more URLs, including upon information belief four URL's linked

to the same two which in late November 2012 Goren had requested Google to remove. Id.

On January 11, 2013 Google's removal team notified Goren "the following URL's no

longer appear on Google.com

    http://www.ripoffreport.com/directory/richard-a.aspx
    http://www.ripoffreport.com/lawyers/richard-a-goren/richard-a-goren-richard-
    a-go-e4302.htm"

Id.

77.     Instead of solely providing a link directing the searcher back to

Xcentric's Ripoff Report website's publication, as of October 22, 2013 and July 14,

2014, Google displayed on  its servers a cached copy of each of the January 31, 2012

work and the February 2, 2012 work. Neitze Aff. ¶¶7-10.   What was displayed on

Google's servers was the snapshot of the January 31, 2012 work taken on October 14,

2013 at 1:36:14 GMT and the snapshot of the February 2, 2012 work taken on October

10, 2013 at 19:46:53 GMT.  Id.  As of July 18, 2014, Google displayed on its servers a

cached copy of each of the January 31, 2012 and February 2, 2012 works. Id.   These

were snapshots taken on July 11, 2014, respectively.  Id. In each instance that a searcher

clicks on the Google cached copy he or she does not visit Xcentric's website and does not

see the original work. Id. In each instance the searcher stays on the Google website and is

shown the most recent copy of the work on Google's server; and each such cached copy

bears the copyright notice: "Copyright © 1998-2014, Ripoff Report. All rights reserved."

Id.

> 78.     In each instance that a person views on the Ripoff Report website

server the January 31, 2012, work Xcentric states: "Ripoff Report has an exclusive

license to this report. It may not be copied without the written permission of Ripoff

Report." Fifth Goren Aff. ¶ 76.

> 79.     Xcentric's published policy is that it will not remove a report from

its website even if the report is adjudged defamatory or even if the author requests the

report to be taken down.  FAC ¶32; Answer ¶32 (admitted). XCENTRIC's policy is that

any statement posted on its website is a "permanent record." Id.  XCENTRIC touts that it

"has always had a strict no-removal policy" and that "we have spent millions of dollars of

legal fees over the years defending that policy" and that under the federal

Communications Decency Act while "victims [who are defamed on the Ripoff Report

may] pursue the original _author_ of a false statement" (emphasis original), the Ripoff

Report [and its owner XCENTRIC are each] immune and may not be sued."  Id. Xcentric

takes the position that "Ripoff Report has adopted a strict non-removal policy." Kunz

Aff. ¶ 13 (Paper 56-7 in this case). Xcentric's advertisement in Massachusetts for its CAP commercial reputation repair business represents that

> **What membership will NOT do for your business.** Ripoff Report gives consumers a place to research businesses and their history of complaints, regardless of how long ago the complaint was lodged. Since all reports are a permanent record on the Internet, **we have always had a uniform policy of not removing reports filed on Ripoff Report**. To do so is like putting a band-aid on skin cancer. It does nothing to make the problem go away.

Fifth Goren Aff. ¶ 77 (emphasis added).

80.     XCENTRIC offers alternative commercial fee based solutions for the subjects of false and/or defamatory reports posted on its Ripoff Report website.  FAC ¶33; Answer ¶33 (admitted).

81.     On more than one occasion in 2013 Goren visited XCENTRIC's Ripoff Report website and each time was informed of the opportunity to "join" XCENTRIC's "Corporate Advocacy Program."  Fifth Goren Aff. ¶ 77.  Goren was informed that if he submitted an application and then registered to join XCENTRIC's "Corporate Advocacy Program" for some undisclosed fee Xcentric  would  "restore his reputation."  *Id.*  As of late July 2013, Xcentric published an advertisement in Massachusetts that:

> to make your search engine listings change from a negative to a positive all you need to know is this: by becoming a member of the Corporate Advocacy Program, no matter how you search your name on search engines, it will all look as it should. Positive.

*Id.*

82.     "Edward Magedson is the founder and manager of Xcentric and the "ED"itor of the Ripoff Report website." *Asia Economic Institute LLC v. Xentric Ventures LLC* 2:10-cv—1360-SVW-PJW, United States District Court, Central District of California, Memorandum of Decision granting Xcentric summary judgment (Paper 184 in that case) at 3 of 14). Exhibits K (regarding removal of defamatory reports), L (regarding no investigation of CAP members), and M (fees)   are excerpts of draft transcript of June 2, 2010 deposition of Edward Magedson filed Asia Economics case. Fifth Goren Aff. ¶ 79. In June 2010 Mr. Magedson testified that the CAP "program changes a negative listing on a search engine into a positive …" *Id.*

83.     Exhibit N is Ripoff Report #167471 originally posted on the Ripoff Report website on December 9, 2005 and updated on November 3, 2012, in which Ed Magedson, founder of Ripoff Report stated:

> As a matter of policy, when Rip-off Report is retained by a company to mount an independent investigation and to publish our findings, we examine the truthfulness of the consumer complaints using every bit of information at our disposal. … NOTE: As a part of the Corporate Advocacy Program *Ripoff Report verifies all Reports and Rebuttals, and will expose those posted erroneously.*

Id. (emphasis original).   As of July 21, 2014, Xcentric continues to advertise that it "[r]eviews all reports and contacts the author, verifying for unfair, unjust, unbalanced or phony filings [and d]etermines the truthfulness of the complaints as best we can." Id.

84.     This is false and deceptive advertising in that in fact Xcentric does not "mount an independent investigation;" nor does it "examine the truthfulness of" a posting.  Exhibit L; Fifth Goren Aff ¶ 79. (Magedson June 2, 2010 testimony).

85.     Xcentric contends it is entitled to summary judgment that its provision of the so-called CAP program and its "solicitation of victims of defamatory reports to participate in its fee-based Corporate Advisory Program ("CAP") … is [neither] oppressive… [nor] unethical" within the meaning of G.L. c. 93A.[7] In support of this contention Xcentric relies on a purported standard CAP contract, one in effect as of October 22, 2012 and the other presently in effect from and after October 22, 2103. (Exhibit 4, Kunz Aff. {Paper 56-7, 47-63}).

86.     The Massachusetts advertisement is silent about fees to be paid. Fifth Goren Aff. ¶ 78; See Exhibit N.  In fact, Xcentric charges a mandatory $7,500 "set up fee" plus $600 per report plus monthly fees that must be paid for a minimum of 36 months.  Exhibits M at 29 and O.  Xcentric's specimen CAP contract form proffered to demonstrate that its Massachusetts advertising is neither unfair nor deceptive does not disclose the mandatory set up fees nor does Xcentric inform the Court the amounts or ranges of what fees are required by Xcentric to be paid. (Paper 56-7 at 52 (10/22/13 form) and 59 (10/22/12 form)).  The subject matter of the CAP form contract to be remediated is the existence of "Reports [which] have been posted on the Ripoff Report about the Company." (Paper 56-7 at 48 (10/22/13 form) and 56 (10/22/12 form)).                87.

The advertisement for the CAP and the VIP arbitration programs that Ripoff Report has "always had a uniform policy of not removing reports filed on Ripoff Report"

---

[7] Memorandum of Decision on Xcentric's Motion to Dismiss and plaintiffs' cross motion for judgment on the pleadings, Paper 45 at 15-17.

is false or misleading or has the tendency or capacity to be misleading because in fact

Ripoff Report has removed or redacted reports in the past including:

(i) Complaint Review:XXXX  (Fifth Goren Aff. ¶77 .This report's number

was omitted. Id.

"**REDACTED becuase {sic} this Report was completely bogus   Rochester New York**

REDACTED MATERIAL
NOTICE:
*As a matter of policy, Ripoff Report REDACTED this material on  this Report.*

The information that was posted here was completely bogus and is under investigation[.] This person was never a client of this Attorney. Reports like these will not be tolerated, and will be exposed as we find them [.] Any questions as to the Report that was here, you can contact this website for any updates."

(ii)     Report #972981 **COMPLAINT REVIEW**: Dr. XXXXX Plastic

Surgery, November 23, 2012: Dr. XXX "is a Criminal."  Updated March 19, 2014. This

plastic surgeon was the subject of a Ripoff Report on November 23, 2012 and accused of

among other things of being a "swindler," a "criminal" and a "cheat." (Fifth Goren Aff. ¶

82.  This plastic surgeon paid an unspecified fee to join the CAP. Id.   The original

report's accusations of criminal conduct have been redacted. Id.  Following ten printed

pages of CAP endorsements of the surgeon a portion of the original report is published.

Id.

**Plastic Surgery, Dr. XXXX and (((REDACTED WORDS PROVEN TO BE FALSE))) …. California**

36

**<span style="color:red">Notice: About the Report below.
Ripoff Report (((REDACTED))) the offending words because we found
what was posted to be false. …It is our opinion, the Report filed below
is bogus. If the doctor was that bad, Ripoff Report would have had
many more negative Reports about Dr. XXXX…</span>**

Id.  According to Xcentric its report was based in part on "an onsite inspection held by a

third party verification company with no biases." Id.  On January 25, 2013 a rebuttal to

this report was posted by an individual purporting to be the spouse of the surgeon who had

been the subject of what this person characterized as "hurtful and completely **FALSE!**  Id.

> I am XXXX. I am married to Dr. XXX. <u>We know who posted this inflammatory
> and false posting in an attempt to damage my husband's name and reputation.</u> It
> is sad and should be unlawful that **this site then charges thousands of dollars to
> have slanderous and false postings removed**.

Id. (emphasis original).

(iii)   According to the affidavit of Kenton Hutcherson, Esq. dated July 20, 2010

and filed in the Asia Economic case as Paper 96-12 in that case, in connection with a

certain settlement agreement Xcentric "completely remove[d] report number 510675."

Id.

(iv)   Paper 125-6 filed in the Asia Economic case on August 23, 2010 appears to

be a series of emails between David Gingras, Esq., in his stated capacity as General

Counsel of Xcentric and a Pennsylvania law firm which had requested the removal of a

report. A redacted copy of that Paper 125-6 in the Asia Economic case is Exhibit J, Fifth

Goren Aff ¶ 82.  Xcentric explained among other things,

> First, as a general rule, Ripoff Report does not remove reports. There are numerous
> factual and legal reasons for this policy explained on our website here:

http://www.ripoffreport.com/ConsumersSayThankYou/WantToSueRipoffReport.as px Indeed, we have spent millions of dollars in legal fees over the past several years defending our users' rights to post comments, and to date we have never lost a case. As such, we are generally not willing to serve as the arbiter of disputes over the accuracy of a report.

Second, although we generally are unwilling to remove or redact reports, we always have the editorial discretion to do so. In this instance, while we are not willing to remove the original report, we believe that XXXX  should not be punished for mistakes  XXXX { *a specified related person*}  may have made …. . As such, and in keeping with the Christmas spirit, we are willing to help as follows – we are willing to partially redact the report by removing the name "XXXX". This would hopefully mean that anyone searching for XXXX should not see the report in the search results.
If this is acceptable to you, please let me know and this change can be made within a few days.

Finally, though it goes without saying, this offer should not be construed as an admission that we are under any obligation to change or remove this report. On the contrary, we firmly believe that we are under no legal obligation to make any such changes. However, there are times when the requirements of law are secondary to moral obligations, and in this case, we believe that making a rare exception to our general rule is a reasonable thing to do.

Id.

(v)     Report  #1096526  **COMPLAINT  REVIEW**:  Dr.  XXXXX  hair  loss

treatment, California November 2, 2013, Updated December 11, 2013.  (Fifth Goren Aff.

¶ 82.  This physician paid an unspecified fee to join the CAP. Id.   The original report's

accusations have been redacted. Id.  The information provided in the CAP endorsement

reportedly was "based on comments made by … Dr. XXX during an onsite inspection

held by a third party verification company with no biases toward XXXX." Id.

**Dr. XXXX Hair Restoration and (((REDACTED))) …. California**

**Notice: About the Report below.**

38

**Ripoff Report below was found to be false. Ripoff Report (((REDACTED))) the offending words because we found what was posted to be false.**

**Ripoff Report was contacted by the author begging us to remove it. The author admits to and basically told us that the report is false. To be clear, there have been no crimes committed by Dr. XXXX and Ripoff Report was not sent any evidence for the claims the author of the Report made below. It should be known, that the Doctor did not and is not suing this person….**

(((REDACTED))) **…** this Report was found to be false, just to try and hurt the Doctor—Seems like this was a personal issue. The Doctor doing a favor to help someone as a friend. Then turns on them to maybe squeeze money out of them.  This Report has nothing to do with the good doctor's performance.

Id. (emphasis original).

88.     Xcentric has objected to providing Rule 26 automatic disclosure to plaintiffs of its removal and/or redaction of reports whether for a fee or otherwise.  Fifth Goren Aff. ¶ 80.

89.     Edward Magedson admitted on deposition in June 2010 that "after verifying whatever proof that we can" the Ripoff Report will redact false accusations of child abuse, sexual misconduct and other crimes.  Exhibit K at 94-99.  According to Mr. Magedson an individual who has been falsely accused of certain crimes and who can prove the falsity of the allegations can have the defamatory words redacted without having to pay the CAP fee and join the CAP program. See id. at 99.

90.     Xcentric's published policy regarding false and defamatory postings made in violation of Xcentric's Terms of Service is as follows:

39

As explained on this page, although our Terms of Service prohibit users from posting false information, we simply cannot serve as the judge or jury in disputes between two parties. If you contact us and demand that we remove information because you contend that it's false and therefore a violation of our TOS, we have no way to determine if this is true, of if the information is really accurate. These issues have to be determined in court, not by us.

However, if a report contains information which you allege is false, the staff of Ripoff Report cannot simply remove information based on your request because doing so would place us in a position of having to determine which side is telling the truth. Because we cannot make such determinations, if you allege that a report contains false and defamatory statements, you should pursue legal action against the author if determine such action is warranted.

Fifth Goren Aff. ¶ 83 .

91.     In June and September 2011 one Darren Mitchell Meade of Laguna Beach California testified in the case of *Connelly v. Does 1 through 25*, Superior Court of the State of California, County of Orange, case no 30-2011-00453171. Fifth Goren Aff. ¶ 84. Mr. Meade testified that he had resigned from a company that had a business plan of defaming people on the internet and then "turn[ing] around and send[ing] them out e-mails or solicitations and get their money to take it off." Id.  Mr. Meade described the Ripoff Report as "the perfect place to defame somebody because it will always stay up, and for some reason it winds up ranking on the first page of Google." Id. Mr. Meade also testified that another facet of the potential business opportunity was a "product offering that would allow you to remove ripoff reports." Id.

92.     In May 2014 Darren Meade emailed plaintiffs' counsel about a claim he purports to have in connection with his alleged

2.4 years employment with Xcentric Ventures / Ed Magedson…. [When I became ill] Ed, felt I should power through and finish some research into some reports I

40

posted on Ripoff Report, I was unable for 3-4 weeks and for the first time in 2.4 years he stopped my weekly pay ( my compensation package also included my rent being paid to my landlord ) until I completed some reports. Prior to [becoming ill] , I worked 12-16 hours per day, 7 days a week, including holidays, for 2.3 years. Ed referred to me as his top confidant. … I was paid initially from payroll check from Xcentric Ventures, then they asked to pay my landlord directly ( $3500 per month ) and utilized Green Dot for an additional $500 weekly….[Mr. Meade also alleged there may be evidence] regarding Mr. Magedson and/or his services, including drafts, correspondence, lead lists, and both the alias and real names of a sales person in California. Whom created post and then tried to re-mediate the problem, also created additional false posts, if the person denied the CAP, or so I am told….

This does not constitute a complete or exhaustive statement of what I may or may not know.

Fifth Goren Aff. ¶ 85.  According to Mr. Meade he was so employed from January 2012 to May 2014.  Id.  Xcentric admits that it or Mr. Magedson did make some unspecified payments to Mr. Meade. Id.  Xcentric has declined to made Rule 26 automatic disclosure of the relationship with Mr. Meade. Id.

       93.     On July 7, 2014, the District Court of Iowa for SAC County granted the State of Iowa a search warrant seeking evidence used to commit crimes specified in the 124 page affidavit of Ben Smith SAC County Prosecuting Attorney. Fifth Goren Aff. ¶ 86. The search warrant application was preceded by production of documents and materials produced in response to more than 100 investigatory subpoenas duces tecum. Id.  Some excerpts from the prosecuting attorney's affidavit are set forth below:

  (i)  (p 25) On December 21, 2011, DARREN MEADE sent an e-mail, which contained the job proposal he pitched to ED MAGEDSON I RIPOFF REPORT.";

  (ii)    (p47-48)    On September  5, 2012, DARREN MEADE  (dmeade@kairos-meade.com)  wrote  the  following  to  his  friend  SIAMACK  YAGHOBI (siamack.yaghobi@gmail.com):

41

:The 'Tracey Story' is the article I have written, read the narrative and when it gets to the links
'of the Dateline episode, watch them in sequence. I have documents and reports which will
also be embedded in the article. The flow charts I asked if you can help me with, will be apart
,of the article. In the ["players"] document, you will see one section that [is] the Michael &
Tracey outline, that is what needs to be detailed and also a flow chart on the jury tampering
·itself. We can work at my house, but it would be a few hours [until] we can, I had some early
!meetings, and need to sleep more [than] pray. What is your schedule like later today? Let me
:know as well if you [are able to] follow the article.

Included in this e-mail, DARREN MEADE attached two MS Word documents. One of these
documents is DARREN MEADE's RIPOFF REPORT complaint No. 938843 (as it appears
on RIPOFF REPORT, but in MS Word format) mentioned and discussed at great lengths
throughout the remainder of this affidavit) The other attached MS Word document contained
DARREN MEADE's notes on all the State's witnesses and law enforcement officials titled
"The Players."

On September 6, 2012, in his response to DARREN MEADE's e-mail above, SIAMACK
YAGHOBI gave DARREN MEADE suggested additions to what ultimately would become
DARREN MEADE's RIPOFF REPORT complaint No. 938843. Most damning in SIAMACK
YAGHOBI's response, however, is SIAMACK YAGHOBI told DARREN MEADE that he
(SIAMACK YAGHOBI) planned to **"FILE A REBUTTAL"** on the article that would attack
Michael Roberts. The significance of SIAMACK YAGHOBI's statement to DARREN MEADE
here cannot be understated, as it and other information discussed in this affidavit
demonstrates that ED MAGEDSON / RIPOFF REPORT and DARREN MEADE know the
anonymous authors publishing add-on complaints and rebuttals to DARREN MEADE's
RIPOFF REPORT complaints, including RIPOFF REPORT complaint No. 938843.


      (iii)    (p69) in January 2012, ED MAGEDSON and DARREN MEADE solicited
the services of investigative journalist Glenn Puit to create what would become
RIPOFF REPORT complaints Nos. 828918 and 829020. The following factual assertions can
be taken from DARREN MEADE's e-mail and other communications to and from ED
MAGEDSON and others between December 2011 through February 2012: ED MAGEDSON
paid DARREN MEADE to work directly with investigative journalist, Glenn Puit. ED
MAGEDSON personally directed content edits and changes to Glenn Puit's work. ED
MAGEDSON / RIPOFF REPORT's attorneys reviewed Glenn Puit's complaint before it was
published on RIPOFF REPORT's website. ED MAGEDSON asked that Glenn Puit
address specific issues and allegations against certain individuals in his article. ED
MAGEDSON directed DARREN MEADE to create other RIPOFF REPORT complaints.
ED MAGEDSON had DARREN MEADE edit various RIPOFF REPORT complaints to
include certain content so that these complaints would be more visible and rank higher on
internet search results. ED MAGEDSON suggested that DARREN MEADE format DARREN
MEADE's complaints in a way that would make them more viewer friendly. DARREN
MEADE told investigative journalist Glenn Puit the only way ED MAGEDSON would

allow certain audio / visual content to appear in journalist's complaint is through DARREN MEADE and if the articles were beneficial to RIPOFF REPORT's interests. ED MAGEDSON directed DARREN MEADE to "create new titles for the preexisting derogatory RIPOFF REPORT complaints about DARREN MEADE. ED MAGEDSON promised to "optimize" them so that existing unfavorable RIPOFF REPORT complaint(s) about DARREN MEADE would be effectively removed from the internet.

On January 11, 2012, ED MAGEDSON / RIPOFF REPORT paid DARREN MEADE $2,500.00 (check No. 002498) with the memo "[Public Relations] thru Feb 15th 2012."

(iv) (p76-77) On September 5, 2013 (9:39 a.m.), SIAMACK YAGHOBI (Siamack.Yaghobi@gmail.com) pitched the following in a RIPOFF REPORT CAP / VP sales e-mail to a prospective RIPOFF REPORT CAP customer (RIPOFF REPORT victim / subject), and copied in ED MAGEDSON / RIPOFF REPORT (EDitor@ripoffreport.com) on the e-mail as well:

> We see you have complaints on [www.pissedconsumer.com]. if, [sic] for some reason they come before Ripoff Report on a search...[sic] and the business (like yours) is a member of one of our programs, at our request, they should be removing it at our request. Why? .. this [sic] was part of an out of courrt [sic] settlement when Ripoff Report caught them stealing thousands of Reports.

On September 5, 2013 (7:25 p.m.), ED MAGEDSON (EDitor@ripoffreport.com) sent the following reply to SIAMACK YAGHOBI (Siamack.Yaghobi@gmail.com): "You need to REMOVE the paragraph I have in Yellow [sic] highlight if there are no Reports on them on [www.pissedconsumer.com]!!!"

(v) (p79-80) On October 19, 2013, ED MAGEDSON / RIPOFF REPORT issued SIAMACK YAGHOBI the following e-mail address: sam@ripoffreport.com

On Sunday, October 20, 2013, 9:15 p.m. PST, SIAMACK YAGHOBI sent an e-mail from siamack.yaghobi@gmail.com to ED MAGEDSON's e-mail address EDitor@ripoffreport.com, with the subject heading "OC PC contact#" and message body that simply read: "Daniel Danino 714-869-####" Approximately 10 minutes later, (9:26 p.m. PST), ED MAGEDSON replied from EDitor@ripoffreport.com: "You would text this to me once you are maybe on your way in that area- if you said, ED< I am about 1 or 2 hours away- check to see if he will be there.. I will do that." ED MAGEDSON's above-reply proves he was an active principal in this scheme to extort Danino. Ten minutes later, SIAMACK YAGHOBI acknowledged Magedson's e-mail instructions with a simple e-mail reply: "Ok sounds good"

On October 21, 2013, at 1:19:15 p.m. PST, SIAMACK YAGHOBI initiated a call from cell phone number (949) 600-0673 to Daniel Danino's mobile phone, which is (714) 869-1660. According to Daniel Danino, the pretext for this call was that SAM YOUBANKS, needed to give multiple laptops to Daniel Danino for repair. Daniel Danino did not know at the time SIAMACK YAGHOBI was associated with DARREN MEADE. This same day, sometime

after 1:00 p.m. PST, SIAMACK YAGHOBI arrived at Daniel Danino's gated estate without any computers for repair and identified himself to Daniel Danino as "SAM YOUBANKS." SIAMACK YAGHOBI revealed that he was a business partner of DARREN MEADE and was there to collect DARREN MEADE's laptop.  Daniel Danino told SIAMACK YAGHOBI he needed the three above-mentioned RIPOFF REPORT complaints / articles concerning Danino's family and business removed. SIAMACK YAGHOBI then made a call to an unknown person. After that, SIAMACK YAGHOBI told Daniel Danino that the three RIPOFF REPORT complaints about Daniel Danino, his family, and business had been removed. Daniel Danino checked RIPOFF REPORT for these three complaints, and after observing

they had in fact been removed, Daniel Danino gave SIAMACK YAGHOBI DARREN MEADE's laptop computer.

On October 21, 2013, RIPOFF REPORT deleted the three defamatory pages (complaints Nos. 1079952, 1081741 and 1084023). The removal of these complaints were carried out, presumably, at the direction of ED MAGEDSON in an attempt to coerce Daniel Danino into complying with DARREN MEADE's extortion demands.

On October 21, 2013, there were seven calls and eight text messages  between DARREN MEADE's cell phone (949) 357-6193 and ED MAGEDSON's  cell phone (602) 518-4357

Later, on Oct 21 2013, after SIAMACK YAGHOBI retrieved DARREN MEADE's  computer from Danino,  and after SIAMACK YAGHOBI and ED MAGEDSON had exchanged phone calls, the three aforementioned RIPOFF REPORT complaints concerning Daniel Danino and his family were republished as follows: complaints No. 1084023 at 04:42 P.M. (UTC-07:00), complaints No. 1081741 at 07:25 P.M. (UTC-07:00) and complaints No. 1079952 at 10:40 P.M. (UTC-07:00)

   (vi)     (p102) Despite having unimpeachable  evidence as early as January 2012, that DARREN MEADE had previously been hired / paid by convicted felons to defame witnesses online and that most of the content in DARREN MEADE's RIPOFF REPORT complaints were patently false, ED MAGEDSON / RIPOFF REPORT paid DARREN MEADE  to create defamatory, harassing RIPOFF REPORT complaints about the State's witnesses, and provided him with unfettered access to RIPOFF REPORT, a "great place to destroy someone's reputation," which by DARREN MEADE's own admissions, had the ability to attract up to two million viewers per day. In addition to paying DARREN MEADE over at least $80,000.00 to create RIPOFF REPORT complaints about the State's witnesses and publicize the same, ED MAGEDSON / RIPOFF REPORT, aware of the factual, under oath assertions contained in DARREN MEADE's deposition, sought out major news media to advertise and vouch for the credibility  of  DARREN MEADE's work on  RIPOFF  REPORT,  specifically,  DARREN MEADE's RIPOFF REPORT complaint No. 938843.

   (vii)     (p103) e-mail ED MAGEDSON / RIPOFF  REPORT sent to SIAMACK YAGHOBI on September 18, 2013:

   I put [the reviews] at the beginning for a reason. Look- the ONLY f reason why [RIPOFF REPORT customers / victims] are talking to you (SIAMACK YAGHOBI aka SAM YOUBANKS, RIPOFF REPORT CAP and Verified salesman) is, because, they are listed on Google and they want that f ing listing to change!!! Once [the RIPOFF REPORT customer / victim sees] that- that the title is changed out! And we inject over 500 to over 1,000 words before the [RIPOFF REPORT customer's / victim's defamatory RIPOFF REPORT complaint] with new titles that reflect [the RIPOFF REPORT customer's / victim's commitment to satisfaction etc.. that is all they will care about – they will listen to anything you have to say my Aladdin.

   (viii) (p104) DARREN MEADE's SPRINT PCS mobile phone records for number (949) 357-6193 shows that through April 2012 and December 2013, DARREN MEADE called (602) 518-4357, which is a Leap Wireless (dba Cricket Wireless) believed to be ED MAGEDSON's phone, 366 times for a total of approximately  50 hours. ED MAGEDSON is the owner / operator of ROR. In

this same timeframe DARREN MEADE sent Magedson 854 text messages. Also in this same timeframe, Magedson called DARREN MEADE 1,503 times for a total of 279 hours. In this same time, ED MAGEDSON sent DARREN MEADE 954 text messages

(ix) (p104). In addition to knowing the defamatory, harassing complaints, were patently false, DARREN MEADE and ED MAGEDSON / RIPOFF REPORT, crafted said complaints so the same would be highly visible in legitimate Google-type search results for the State's witnesses and / or their businesses..

(x) (p109) ED MAGEDSON / RIPOFF REPORT agents / employees DARREN MEADE and / or YAGHOBI contacted Dr. John Pitman and offered to remove all RIPOFF REPORT complaints about him for $10,000, which were created and published by DARREN MEADE and ED MAGEDSON / RIPOFF REPORT, DARREN MEADE, ED MAGEDSON / RIPOFF extorted Dr. John Pitman.

94.     Upon information and belief based in material part on Mr. Meade's 2011 deposition testimony, the Iowa search warrant affidavit, and Mr. Meade's correspondence with plaintiffs' counsel,  Xcentric has engaged and/or contracted and/or employed persons to author defamatory posts on the Ripoff Report website. Fifth Goren Aff. ¶¶87, 88.

95.     Xcentric advertises that it must charge fees for its CAP program "because CAP requires engagement of Xcentric staff and outside services." Fifth Goren Aff.¶ 89. Upon information and belief based on the Iowa search warrant affidavit, Mr. Meade's correspondence with plaintiffs' counsel, and Mr. Magedson's June 2010 deposition testimony, engagement of outside services was both to publish reports on the Ripoff Report website and to solicit fees from the subjects of those reports for their removal or redaction. Id. ¶¶87- 89.

96.   While the Massachusetts advertisement is silent about fees to be paid, in fact, according to Mr. Magedson, Xcentric charges a mandatory $7,500 "set up fee" plus $600 per report plus monthly fees that must be paid for a minimum of 36 months.  Exhibit M at 29. Upon information and belief based on an undated "Costs for the CAP Program," the $600 per report fee is for up to the first 20 reports and the monthly monitoring fee is $40 per number of

original reports. Exhibit O. Xcentric's specimen CAP contract form proffered to demonstrate that its Massachusetts advertising is neither unfair nor deceptive does not disclose the mandatory set up fees nor does Xcentric inform the Court of the amounts or ranges of what fees are required by Xcentric to be paid. (Paper 56-7 at 52 (10/22/13 form) and 59 (10/22/12 form)).

97.    The Massachusetts advertisement is false or misleading or has the tendency or capacity to be misleading because it does not disclose that in the past Xcentric has participated in the posting of reports on the Ripoff Report website.  Pl SOF ¶94 supra.

98.    The Massachusetts advertisement is false or misleading or has the tendency or capacity to be misleading because it does not disclose that one does not need to join the CAP program to have false accusations of criminal conduct redacted or removed upon providing proof of the falsity of the accusations of criminal conduct.  Fifth Goren Aff. ¶ 91.

99.    Participation in the CAP program requires the subject of a defamatory posting on the Ripoff Report to agree:

> To address and negotiate with their customers in good faith to resolve the complaints described in the Reports and to thereby improve its public image.

(Paper 56-7 at 48 (10-22-13 form) and at 56 (10-22-13 form)).  The CAP program contract in section 2.3 (id at 51 {10-22-13 form} and section 2.2 (id. at 59 {10-22-12 form} provides that the company so defamed on the Ripoff Report:

> will not initiate a lawsuit, and will not initiate or take any legal action against any author of any Report whose name or contact information was obtained by the Company solely from Xcentric, unless Xcentric authorizes such action in writing. By this Agreement, Xcentric authorizes the Company to take any legal action against any fraudulent postings by employees posing as customers, customers posing as employees, non-customers posing as customers, and/or customers posting numerous complaints under different names from different cities or states.

In its undated CAP "Costs for The CAP PROGRAM," Exhibit O Xcentric explains

BY BEING PART OF THIS PROGRAM YOU ARE ALSO AGREEING TO NEVER SUE A CUSTOMER FOR FILING A RIP-OFF REPORT.

100.    When Goren provided Xcentric with proof of the falsity of the accusations of criminal conduct, Xcentric failed to disclose to Goren that a person or company who has been falsely accused of criminal conduct and who presents proof of the falsity of such accusation can have the false accusations of criminal conduct redacted or removed without joining the CAP program.  Fifth Goren Aff. ¶ 91.

101.    When Xcentric refused Goren's demand to take down or redact the false accusations of criminal conduct, Xcentric knew or should have known the then anonymous author had not been a client or customer or employee of Goren and also that Goren had obtained from Xcentric the author's name or contact information . Fifth Goren Aff. ¶ 52.

102.    When Xcentric refused Goren's demand to take down or redact the false accusations of criminal conduct, Xcentric's advertisement for its CAP Program did not disclose to Goren that he would have to pay a one-time $7,500 Programming fee plus $1,200 for the two reports and then have to pay $80 per month for a minimum of 36 months. Pl SOF ¶96 supra.

103.    When Xcentric refused Goren's demand to take down or redact the false accusations of criminal conduct and referred him to its website, Xcentric's advertisement for its CAP Program did not disclose to Goren that after he had paid $11,580 over 36 months, if Goren did not then continue to pay Xcentric's monthly fees, the positive search engine results would cease. See CAP contract (Paper 56-7 in this case) at 56 ("During the term of this Agreement, and as long as the Company is in compliance with its obligations, Xcentric will do the following;"); See also SAC County search warrant affidavit excerpts. *Id.* ¶ 86.

104.    Goren contends that he has suffered and continues to suffer injury to his reputation as a lawyer as a result of Xcentric's policies and actions. Fifth Goren Aff. ¶ 95.

105.     Goren contends that he and Small Justice LLC have expended money for US Copyright Office applications, legal fees, third party fees and expenses and incurred other out of pocket expenses as a result of Xcentric's policies, actions as of this date of approximately $5,000. Fifth Goren Aff. ¶¶ 93, 96.

**Bad Faith conduct in litigation; pattern or practice.**

106.     In the Asia Economic case Xcentric presented two  sworn affidavits in support of its motion for summary judgment (the Crossland Aff.,  Paper 41-1 in this case and the Smith Aff., Paper 41-2 in this case).   In each affidavit Xcentric mischaracterized to Judge Wilson the written content of  the screenshot image of step 5 reflected on Exhibit E to each affidavit:

> As this image shows, the user is asked to review the Terms of Service (which require them, among other things, to refrain from posting anything false or defamatory). The user is also asked to review and affirm that their report is valid. If the user refuses to check this box, their report cannot be submitted to the site.

Contrary to this twice made representation, Exhibit E did not so "ask the user to review the Terms of Service."  Supra ¶¶14-17.  A copy of the relevant portion of the Crossman and Smith Exhibit E is below:



107.    In his Chambers Order (Paper 184 in the Asia Economic case) dated May 4, 2011 Judge Wilson granted Xcentric's motion for summary judgment. Fifth Goren Aff. ¶ 98. While the Court did not render factual findings in setting out the factual background for his grant of summary judgment Judge Wilson adopted the apparently uncontested sworn to description of the five step process. (Paper 184 in the Asia Economic case at 3):

> Finally, users are asked to review the Terms of Service, which require the users to (among other things) refrain from posting anything false or defamatory.

*Id*.

108.    In this case on February 24, 2014 on the hearing of its motion to dismiss, Xcentric's counsel, made certain representations to the Court about the words contained in the step five box as they appertained to the issue of a meeting of the minds as to the grant of an exclusive license.

> THE COURT: So it's not anything particular to these reports, it's as under the terms and conditions -- at least your position is, under the terms and conditions that someone makes a report on this website, they're issuing you a license

MS. SPETH: Yes, your Honor, an irrevocable, exclusive license.

Your Honor, Mr. Goren has said that because it's in paragraph 6 and it's down a ways that perhaps there was no meeting of the minds. And one of the things I think the papers do not do a good job of is explaining that the little box that the author has to check to submit not only says that the author is agreeing to the terms of use, but specifically says, I agree to the Ripoff Report terms and conditions and that by posting this rebuttal, this report or rebuttal, I attest this report is valid. I'm giving Ripoff Report irrevocable rights to post it on the website **and granting Ripoff Report's operators an exclusive license.**

Your Honor, I I see that you have an overhead projector, I can put this on the overhead projector, and that is the box that actually gets checked by the author agreeing to the terms of use.

So not only is the statement in the agreement of use, but the statement is in the actual box that gets checked by the author. **There was clearly a meeting of the minds that this was an exclusive license and it was irrevocable.**.

… your Honor, Xcentric did have a legally binding, exclusive, irrevocable license. So whether or not they had a registration of the individual reports is not relevant. Now, it was not my argument, and I'm sorry if I didn't speak clearly, but it was not my argument that paragraph 6 of the terms of use has some sort of box next to it to check. **My argument was that the box that you check when you post the report specifically says that you agree to the terms of use and you provide an exclusive license. I**t is in paragraph 6 of the terms and conditions, but it's also in the box -- in the paragraph.

Your Honor, may I submit this to the Court?

THE COURT: Do you have a copy for your brother?

MS. SPETH: I don't. May I show it to him?

THE COURT: Yes.

MS. SPETH: I think, your Honor, both parties agree that the terms of conditions have not changed since this report was submitted.
(Pause.)

MR. GOREN: I can't read it closely. Is this the same

thing as Exhibit A on my –

MS. SPETH: No, this is -- so Mr. Goren is asking me
if this is the same as Exhibit A.
This is the box that you have to check to get to
Exhibit A. So is Exhibit A -- I said that wrong.
Exhibit A is what's in this box here, this is the box
outside --

MR. GOREN: Does this comport with the affidavit filed
by Mr. Gingras in this case?

MS. SPETH: Your Honor, Mr. Goren is asking me if it
comports with Mr. Gingras' affidavit. It is not inconsistent
with Mr. Gingras' affidavit, but I will agree that Mr. Gingras
did not address this issue, he addressed the terms of use. But
then Mr. Goren said, Well, we don't think the terms of use has
a meeting of the mind, and my point is, before you even get to
the terms of use, you have to check the box. It is in addition to, it is not
inconsistent with.

February 24, 2014 transcript at 5-6, 19, 20, 21.   Ms. Speth filed an affidavit dated November

5, 2010 in the Asia Economic case (Paper 181 in that case) in which she stated that she has

"represented Mr. Magedson and Xcentric Ventures for the past ten years and [that she has]…

been actively involved in the current [Asia Economic] litigation since its inception." Fifth

Goren Aff. ¶ 99.  Ms. Speth and Mr. Gingras were counsel of record on Xcentric's motion for

summary judgment in the Asia Economic case which was supported by the Crossman and

Smith Affidavits each attesting to the five step process and the screenshot image of step 5. Id.

109.   On March 3, 2014, Xcentric filed the Supplemental Affidavit of David S.

Gingras (Third Gingras Aff.) (Paper 37 in this case).  Xcentric represented to the Court that

except for adding a step 4 to allow optional posting of photos the five step process "has been

substantially the same since mid-2008." Third Gingras Aff. ¶2.  Xcentric represented to the

Court that Exhibit A to the Third Gingras Aff. is an accurate depiction of the step five

screenshot presented to the author Christian DuPont on January 31, 2012 and February 2, 2012.

Third Gingras Aff. ¶3.  Xcentric represented to the Court that the following paragraph is what appeared in the step 5 box on January 31, 2012 and on February 2, 2012:

> **<u>I agree to the Ripoff Report Terms and Conditions</u>**. By posting this report/rebuttal I attest this report is valid. I am giving Ripoff Report irrevocable rights to post it on the website **and granting Ripoff Report's operators an exclusive license**. I acknowledge that once I post my report it will not be removed even at my request. Of course I can always update my report to reflect new developments by clicking on UPDATE. Further I agree that by posting the report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Ripoff Report arising out of this posting or the report to which this posting relates.

Id.  ¶4, ¶5. (emphasis added).

Xcentric represented to the Court that continuously since 2008 the "little box" to be checked has included both an express acceptance of the terms of service and words granting an "exclusive license." Id.  Upon information and belief Exhibit A to the Third Gingras Aff. is the same document Xcentric's counsel showed Goren during the February 24, 2014 hearing. Fifth Goren Aff. ¶ 100.

110.  Xcentric's represention to this Court that the step 5 screenshot image presented to the author Christian DuPont included both an express acceptance of the terms of service and words granting an "exclusive license" was false and Xcentric so admits. Corrected Supplemental Affidavit of David S. Gingras, dated March 12, 2014 (Paper 43).

111.  Xcentric's false representations to this Court concerned material facts peculiarly within the knowledge of both Xcentric and its counsel. See Papers 8-1, 15, 37, 43; See Pl SOF ¶108.

112.  On October 22, 2013, a search on Google for the following search queries was conducted and the search ranking  for the January 31, 2012 Ripoff Report was as follows:

| Search Query | Rank |
|---|---|
| Richard Goren fraud attorney | 1 |

| | |
|---|---|
| Richard Goren Boston attorney | 2 |
| Richard Goren abuse | 2 |
| Richard Goren perjury | 3 |
| Richard Goren violent or violence | 1 |
| Richard Goren discrimination | 1 |
| Richard Goren fraud | 1 |

Neitze Aff. ¶ 9.  Each search result on Google included a "cached" copy of the January 31, 2012

Ripoff Report.  Id.  A searcher on Google on October 22, 2013 who clicked on the cached copy did

not view a snapshot copy of the original January 31, 2012 Ripoff Report ; what was viewed on

Google's servers was a snapshot copy  with the addition of the two rebuttals.  Id. Each October 14,

2013 snapshot copy viewed on Google's servers displayed the copyright notice: "Copyright © 1998-

2013,  Ripoff Report. All rights reserved." Id.

113.    At the February 24, 2014 hearing on Xcentric's Motion to Dismiss plaintiffs

submitted to the Court a copy of its decision in *Suk Jae Chang v. Wozo LLC*, 2012 WL 1067643

(D. Mass. 2012) (Casper, J.) (denying website owner's motion to dismiss 93A claim asserting

unfair and deceptive internet advertisements).  Plaintiffs provided defendant a copy of the

decision contemporaneously with handing it up to the Court.


Respectfully submitted,
SMALL JUSTICE LLC, RICHARD A. GOREN,
and CHRISTIAN DUPONT,

Plaintiffs,

by their attorney,

August 4, 2014

*/s/ Richard A. Goren*

54

Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
101 Federal Street Suite 1900
Boston MA 02110
617-261-8585
rgoren@richardgorenlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on August 4 , 2014.

*/s/ Richard A. Goren*