**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT dba ARABIANIGHTS-BOSTON MASSACHUSETTS,<br><br>Plaintiffs,<br><br>v.<br><br>XCENTRIC VENTURES LLC,<br><br>Defendant. | Civil Action No. 1:13-cv-11701-DJC<br><br>**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| XCENTRIC VENTURES LLC,<br><br>Counterclaimant,<br><br>v.<br><br>CHRISTIAN DUPONT,<br><br>Counterdefendant. | |

Defendant Xcentric Ventures, LLC ("Xcentric" or "Defendant"), through counsel, hereby submits its Reply in Support of Motion for Summary Judgment. Summary judgment should be granted on grounds that there are no genuine issues of material fact and Xcentric is entitled to judgment as a matter of law. Plaintiff has no right to the copyrights in question, Xcentric was granted irrevocable rights to post the reports, and the Plaintiffs' claims are clear attempts to circumvent the Communications Decency Act. This Motion is supported by the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs' Response to the Motion for Summary Judgment—and the hundreds of irrelevant and inadmissible pages filed therewith—was essentially an attempt to throw a giant pot of spaghetti against the wall in hopes that something would stick. Quantity aside, Plaintiffs' claims are factually unsupported and a jury could never reasonably find in his favor. As demonstrated in the Motion for Summary Judgment, and again below, allowing Goren's case to proceed will achieve nothing beyond the unwarranted consumption of public and private resources.

Plaintiffs highlight four points at the beginning of their Opposition, each of which was individually addressed and refuted in the Motion for Summary Judgment, and will be addressed further below. Those points include: (1) whether the Terms & Conditions on the Ripoff Report website are enforceable; (2) whether Xcentric has exclusive copyrights to the posts at issue; (3) whether public policy allows enforcement of the Terms and Conditions to the material in question; and (4) whether Xcentric's practices constitute unfair or deceptive practices under Mass. G.L. c. 93A. (Opposition to Motion for Summary Judgment ("Opp. to MSJ") p. 1). Xcentric has shown, and will demonstrate further, that nothing in Plaintiffs' Opposition can demonstrate a genuine issue of material fact, and that Xcentric is entitled to judgment as a matter of law.

**II.   SUMMARY JUDGMENT STANDARD**

In a motion for summary judgment, there is no genuine issue of material fact if the nonmovant fails to offer evidence sufficient to establish the existence of an element essential to the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). The nonmovant cannot attempt to create a material factual issue with evidence that cannot be proven at trial. Fed. R. Civ. P. 56(c); *Geiserman v. MacDonald*, 893 F.2d 787, 792-93 (5th Cir. 1990). Mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact when none would

otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (citing *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). Plaintiff Goren must come forward with admissible evidence to support each element of his claim, and he has not done so. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986) (emphasis in original).

III.  **AS A MATTER OF LAW, DEFENDANT XCENTRIC VENTURES, LLC IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR.**

   A.  **The Terms & Conditions on the Ripoff Report website are enforceable.**

Plaintiff Richard Goren attempts to paint a picture of confusion of the Ripoff Report's posting process even though the actual screen shots demonstrate otherwise. (See Opp. to MSJ, Appendix, p. 36 of 183; Affidavit of Adam Kunz in Support of Motion for Summary Judgment ("Kunz Aff."), Exhibit 1). Goren claims the scrollbar was not labeled as a scrollbar, so nobody could possibly know what it was. (Opp. to MSJ p. 15). He argues the scrollbar did not explain how to use it, so nobody could possibly know how to scroll down. (*Id*.) He argues, therefore, that the Terms and Conditions were hidden and nobody could have known they were there or would have been on notice that they were there. (*Id*.). Goren concludes that "[t]he underlined phrase 'Terms of Service' at the bottom of the page view standing alone does not convey the importance, nature and relevance of the information to which they led." (*Id*.) The Ripoff Report website has a link to the terms at the bottom of each page. But Goren conveniently leaves out considerable webpage detail to support his theory that visitors could not have possibly known Terms and Conditions applied.

The final "Submit your Report" page has a heading entitled "Terms and Conditions." (See Opp. to MSJ, Appendix, p. 36 of 183; Kunz Aff., Exhibit 1). That title sits directly above a scrollable box and concludes with a colon, indicating that the Terms and Conditions followed. (*Id*.) Secondly, the first term within the scrollable box includes the phrase "Terms & Conditions"

in bold. (*Id.*) Goren argues that all that appears in the box under those titles is an address so nobody could have known there were Terms and Conditions below. (Opp. to MSJ p. 15). Logically, however, the opposite would be true: Where there is an indication that Terms and Conditions are below, the lack of visibility of any such terms in an incomplete scrollbox that sits below would unquestionably put someone on notice that they have to scroll down to see them. A quick glance at the clean and clear layout of the page further illuminates this fact. (*See* Opp. to MSJ, Appendix, p. 36 of 183; Kunz Aff., Exhibit 1) [1]

Below the scrollable box is a paragraph of the salient terms. (*Id.*) So, not only is the visitor provided the full list of terms, he or she is also provided a summary version of the most important, material terms. Beyond this, the visitor must acknowledge the terms by clicking the radio button next to the summary. Again, the website is programmed so the visitor cannot post until this box is checked in acknowledgment. (Kunz Aff. ¶ 8). Then, and still before the visitor can post, the visitor must click the "Continue" button, which is at the bottom of the page, below all the Terms and Conditions. (*Id.*) And, of course, there is an "underlined phrase 'Terms of Service' at the bottom of the page view" that provides yet another method of viewing the terms by link. (Opp. to MSJ p. 15). But that link at the bottom of the page is far from "standing alone."

At the end of the day, the Ripoff Report is just a website—plain and simple. Despite Goren's attempt to frame the website as some alternative and strange world, the scrollbar is a standard scrollbar, the kind typically used in the most basic computer programs and websites. Anyone who can navigate the internet sufficient to find the website and reach this final point in the posting process could not possibly be as confused and disoriented as Goren claims to be. And anyone who speaks English well enough to reach this point is clearly notified of the terms and

---

[1] Xcentric previously pointed out that the incomplete address in the scrollable box further indicated that the box was scrollable. (MSJ p. XX). Goren claims that, because he was able to manipulate his screen so the entire address appears, there is a question of fact as to whether the poster had notice of the terms. Despite the fact that the Complaint demonstrated the poster saw the scrollable box with only a partial address and the fact that Goren's new-found page view now shows the top of letters to indicate text is below, the scrollable box is so blatantly obvious that it is not material that Goren could manipulate his screen to show the entire address.

must manifest assent to the terms before posting. It is the most basic operation by visitors of a standard website. No jury could find otherwise.

Mr. Goren attempts to buoy his claims that there was insufficient disclosure of Terms and Conditions by citing to a Federal Trade Commission pamphlet concerning online advertising and sales. (Opp. to MSJ p. 14). The pamphlet is completely inapplicable to the current matter and facts. The FTC pamphlet does not address the situation where a website user knows that he is submitting content to a website for posting on the website. The purpose of the pamphlet, rather, is described in its Overview: "to ensure that products and services are described truthfully online, and that customers understand what they are paying for." (*Id*. Appendix, FTC Pamphlet, p. 3 of 53). The pamphlet provides examples such as the following:

- "The disclosure 'imitation' needs to accompany the triggering term 'pearl,' so that consumers are not misled about the type of pearls being sold." (*Id*., p. 28 of 53); and
- "This ad must disclose that the diamond weights are not exact and that a ¾ carat diamond may weigh between .72 and .78 carats." (*Id*., p. 29 of 53)

The FTC Pamphlet instructs: "To make a disclosure clear and conspicuous, advertisers should . . . place the disclosure as close as possible to the triggering claim." (*Id*., p. 4 of 53). It continues: "Preferably, design advertisements so that 'scrolling' is not necessary in order to find a disclosure." (*Id*.). "When using a hyperlink to lead to a disclosure, make the link obvious; label the hyperlink appropriately to convey the importance, nature, and relevance of the information . . . ." (*Id*.) The pamphlet prohibits neither scrolling nor links to vital disclosures. In the context of ensuring consumers know that they are purchasing "imitation" pearls rather than real pearls, the emphasis Goren places on the disclosure instructions of this advertising pamphlet is a bit overstated, to say the least.

Goren then claims that "[b]ecause scrolling was necessary to view the Terms of Service provisions contracting away all of the Author's copyright interests as well as broadly indemnifying Xcentric," the Court should invalidate the agreement. (Opp. to MSJ p. 15). But, again, Goren's inflammatory language is designed only to disorient so the context is blurred. A

5

step back reveals the practicality of the situation: No money changed hands. No credit card information required protecting. In fact, very little of value changed hands. An author wanted to post a complaint on a passive online message board. In exchange for the ability to post, he had to agree that his post became the property of the website. It is that simple. Moreover, without ever reading any of the terms, the author unequivocally knew that he was choosing to publish his words on the website. This is not a debate over ownership of a multi-platinum song that might generate billions in revenue for the owner. Yet Goren seeks to portray the message board Terms and Conditions as the surreptitious stealing of an artist's most valuable creative ideas. It is questionable whether the report would have even been created if not for online message boards, like Ripoff Report. Goren cannot survive summary judgment by creating a fictionalized and unrealistic version of reality.

Although Goren tries to portray the posting process as murky and confusing, noticeably absent from Plaintiffs' opposition is any evidence that the Plaintiff Author did not actually intend to be bound by the terms or that he did not have actual knowledge of the terms—only the academic argument about some hypothetical visitor of the site. Dupont has not submitted his own declaration or affidavit that he did not intend to be bound by the terms or had no knowledge of the terms. As a result, all that is present in the record is Goren's irrelevant affidavit and his purely academic arguments. But these are insufficient to challenge Xcentric's evidence and to invalidate the assented-to Terms and Conditions. Although Goren may be the party with the highest level of interest because he was the subject of the complaints, he was not a party to the agreement he now assails. With no evidence that the Terms and Conditions are disputed, Goren cannot support his claims that Xcentric does not have exclusive copyrights in the reports at issue.

Goren also argues that Xcentric lacks standing to challenge the involuntary transfer. (Opp. to MSJ p. 20). But this argument is nonsensical. Xcentric has not invoked federal jurisdiction, and Xcentric is not here seeking redress. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992). Xcentric is being sued for displaying the very content that the Author chose to post on Ripoff Report and Goren now claims that Xcentric lacks

standing to defend itself from the forced transfer of the real author's rights to Goren. Even if Xcentric had filed the current lawsuit, Xcentric would still have standing to challenge the involuntary transfer because Goren's attempt to illegally take Xcentric's copyrights constitutes an imminent, concrete, and particularized invasion of Xcentric's legally protected interest; the injury is directly related to his illegal taking; and the injury could be redressed by a favorable decision. *Id*. at 560, 112 S. Ct. 2130, 2136. This argument should therefore be discarded.

Under any possible version of the facts, the state court transfer was invalid. Section 201(e) of the Copyright Act provides that:

> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

17 U.S.C. § 201(e). Goren cites a Ninth Circuit decision, where the court held that Section 201(e) did not protect a musician's work from execution of a judgment where the work was either a "work made for hire" or was previously voluntarily transferred to the record company (and later transferred back). *See* Opp. to MSJ p. 21-22; *Hendricks & Lewis PLLC v. Clinton*, 2014 WL 4197388 *6, __ F.3d __ (9th Cir. Aug. 26, 2014). The Ninth Circuit first reiterated that the legislative purpose of Section 201(e) was to prevent involuntary transfer as a means of censorship, exactly what Goren hopes to accomplish here. The Ninth Circuit then explained that Section 201(e), based on the plain language of the statute, "does not apply where a copyright was previously 'transferred voluntarily by that individual author.'" *Id*. At no point did the Ninth Circuit, or the district court below, address standing of any party to that action. Here, Xcentric maintains that the Plaintiff Author DuPont had no remaining rights to transfer—and, of course, Xcentric was not a party to the state court action, so the judge had no authority to transfer the copyrights. But, assuming *arguendo* that DuPont did retain copyrights to his posts, then no prior

voluntary transfer would have occurred, and Section 201(e) would apply to bar any attempt by the state court to involuntarily transfer those rights from DuPont to Goren.

### B. While Xcentric has demonstrated it has exclusive copyrights of the reports at issue, the Court need not find that Xcentric has exclusive rights for Xcentric to prevail.

Unsurprisingly, Plaintiff Goren mischaracterizes Xcentric's Motion for Summary Judgment. He asserts that "Defendant's Motion for Summary Judgment rests on a requisite finding that the Author transferred to it his exclusive rights of copyright." (Opp. to MSJ p. 8). This assertion is false. Goren sets up this straw man because he believes he can survive if he portrays the posting process as murky and unclear. But even if the Court gave Goren everything he requests regarding the website's Terms and Conditions and struck all the terms not immediately visible, the short paragraph of salient terms would remain:

> By posting this report/rebuttal, I attest this report is valid. <u>I am giving Rip-off Report irrevocable rights to post it on the website</u>. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting this report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Ripoff Report arising out of this posting or the report to which this posting relates.

(See Opp. to MSJ p.3) (emphasis added).

Although the paragraph does not indicate the poster grants Xcentric exclusive license to copyrights in the post (which may not be meaningful to a lay person), Goren nevertheless acknowledges the effectiveness of this paragraph: "the undisputed facts clearly demonstrate that all Xcentric obtained from the Author was a nonexclusive license in the Work." (Opp. to MSJ p. 10-11; *see also* Pl's Response to Xcentric's SOF ¶ 9 ("there is no visible indication, notice or warning that by checking the box the member is agreeing to anything other than the paragraph alongside the box to be checked.")). Goren asserts that Xcentric has a nonexclusive license in order to justify the state court's involuntary transfer of DuPont's copyrights to him. But, his acknowledgment of the terms also comes with clear notice that authorization to post the report on the website is irrevocable. Although Goren elsewhere challenges enforcement of the stated

nonremoval policy in this paragraph, he does not challenge the irrevocability of Xcentric's right to post the report. (*See* Opp. to MSJ p. 17). And despite his challenge to the nonremoval acknowledgment on public policy grounds, he admits that the statement in the paragraph—and implicitly, the entire paragraph—is "facially valid." (*Id.*)

Thus, even if the only meeting of the minds was the immediately visible paragraph, the author clearly and unequivocally granted Xcentric irrevocable rights to display the report, and the Court should not ignore the plain language of that agreement—especially when the author has proffered no admissible evidence to dispute it, and Goren's purported rights are from a transfer in violation of Section 201(e).

### C. Public policy allows enforcement of the Terms and Conditions on the Ripoff Report website.

In attempt to invalidate the nonremoval acknowledgment in the short paragraph, Goren argues it is contrary to public policy and exposes the true purpose of his remaining claims: an end-run around the Communications Decency Act (the "CDA"), 47 U.S.C. § 230. (Opp. to MSJ p. 16-17). Goren even argues: "There is a strong public policy against *per se* libel." (*Id.* p. 17). Despite the fact that his libel claims were previously dismissed based on CDA immunity, he audaciously tries to invalidate a provision of Xcentric's Terms and Conditions—which speaks specifically to the exercise of Xcentric's traditional editorial function—by arguing that the law and policy concerning *libel* bars enforcement of the contractual provision. Goren then conveniently turns his argument back into a claim for libel. (*See id.* p. 17-19).

But the provision Goren seeks to invalidate does not speak to libel, either explicitly or implicitly. In fact, the poster must simultaneously "attest [that] this report is valid." (*See* Opp. to MSJ, Appendix, p. 36 of 183; Kunz Aff., Exhibit 1). Other terms also strongly discourage and condemn libel: "You will NOT post on ROR any defamatory, inaccurate, abusive, obscene, profane, offensive, threatening, harassing, racially offensive, or illegal material, or any material that infringes or violates another party's rights." (*See* FAC, Exhibit B; Kunz Aff., Exhibit 2).

9

Moreover, the "provision" Goren seeks to invalidate—"I acknowledge that once I post my report, it will not be removed, even at my request"—is not really a term that is subject to invalidation. Rather, the attestation is included in the short paragraph so the poster is notified of, and acknowledges, Xcentric's nonremoval policy. Even if the Court were to invalidate the acknowledgment, which Goren admits is "facially valid," Xcentric could still exercise editorial control by its adoption of a general nonremoval policy. The CDA specifically protects Xcentric's right to do so. *See Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007). Goren claims that "[w]hile Xcentric may be immune under the CDA for its continuing publication, its insistence on enforcement of the no-removal term tends to induce the commission of a tort." (Opp. to MSJ p. 20). But the acknowledgment and the policy are inseparable. Xcentric does not lose its immunity by nature of providing notice of its policies. Goren's attempted end-run around the CDA, therefore, should not be allowed to survive.

Goren then throws in an argument that the Terms and Conditions are illusory and that Xcentric gave no consideration because Xcentric is able to update its terms by posting notice on its website. (Opp. to MSJ p. 16). He cites dicta that states "a promise that binds one to do nothing at all is illusory and cannot be consideration." (*Id*. (citing *Graphic Arts Finishers Inc. v. Boston Redev. Auth.*, 357 Mass. 40, 43 (1970)). But this argument is inapposite because Xcentric immediately performs under the contract—it allows the visitor to post a report. And the CDA then immunizes Xcentric for any subsequent exercise of a publisher's traditional editorial function. *See Universal Commc'n Sys., Inc.*, 478 F.3d at 422.

### D.   Xcentric's practices are fair and honest.

The indefinite nature of Mass. G.L. c. 93A, § 11 provides fodder for the last eight pages of Goren's Opposition. His arguments to justify surviving summary judgment truly resemble a giant pot of spaghetti. He throws all sorts of irrelevant claims at the wall to see if anything sticks. Goren first cites the state court's default "judgment" that Goren, himself, authored. (Opp. to MSJ p. 22). But, the findings that the posts are "completely false" were not actually determined on the merits and are essentially Goren's view of the world—with literally nothing to do with

Xcentric's practices being unfair or deceptive. Nor are they admissible in this case. Xcentric was not a party to that action and had no opportunity to be heard. And, while Xcentric certainly contends it has exclusive license to the copyrights of all the posts on the website, whether it holds itself out as the owner to search engines is similarly irrelevant.

Goren parades a slate of pithy quotes on the nebulous test for evaluating a c.93A claim. (Opp. to MSJ p.23). But the broad know-it-when-I-see-it "rancid flavor of unfairness" standard that Goren champions does not bring any of Xcentric's actions into the scope of c.93A. No matter how Goren characterizes Xcentric's practices, he has not put forth any admissible evidence to support his claims. Xcentric does everything above board and in the open. Xcentric simply provides options for subjects to address reports—some for free if it requires no staffing, others for a fee if it requires employee time and attention. While Goren stops just short of making a public policy argument against paying employees, he does not dispute that these are the bases for Xcentric's additional services. But even if he did, it would not matter because the only point that differentiates Xcentric from other similar service providers is that it exercises editorial control over the content.

To get around this inconvenient fact, Goren argues that the difference is Xcentric is the content provider for its own *advertisements*. (Opp. to MSJ p. 24). But there is nothing unlawful about Xcentric's advertisements. The advertisements do not actually play a role in any part of this lawsuit. Goren does not claim he is defamed by any ads. There is nothing deceptive about Xcentric's ads. Goren presents no evidence that might indicate how any particular advertisement is misleading. There is nothing unfair about Xcentric's ads. Goren's argument that the ads are unfair is based solely on his displeasure that someone criticized him and he cannot force the critic's silence—again, nothing to do with Xcentric's advertisements. Goren has not partaken of any of Xcentric's services. None of his claims actually arise out of Xcentric's services. And any interaction he may have had with Xcentric's services do not rise to the level of unfair or deceptive practices. And for that matter, Goren has only alleged a reputational injury that <u>arose</u>

11

from the author's posts. Goren has not and cannot demonstrate any injury proximately caused by any purported unfair/deceptive act.

But Goren's pot of spaghetti is not yet empty. Goren argues that Xcentric's advertisements acknowledge the website's general nonremoval policy. He claims this statement is false and misleading because "it does not disclose that one does not need to join the CAP program to have false accusations of criminal conduct redacted or removed upon providing proof of the falsity of the accusations of criminal conduct." (Opp. to MSJ p. 27-28). First, a "policy," by definition, is a general principle that provides guidance to an organization, not an infallible truth. Second, the CDA protects Xcentric's right to implement such policies as well as its method of implementation. Third, Xcentric generally redacts false statements of fact as part of its VIP Arbitration program. (Kunz Aff. ¶ 15). The CAP Program is designed to allow the subject to address the individual concerns of the consumer/poster, not to redact statements. (Kunz Aff. ¶ 16). So, essentially, Goren claims the ad is misleading because the ad doesn't direct him to alternative services. This argument, however, is a false dilemma: Though simultaneous presentation of a full menu of services might be considered good customer service, failing to provide a full menu of services does not mean deception or unfairness is occurring. Failing to disclose that Goren's particular situation would best be addressed with a free rebuttal or through the arbitration program is not misleading. Advertisements are geared toward a general audience. They inform consumers about a particular item—in limited space, among limited attention spans. They cannot reasonably be expected to address all of Goren's options. Xcentric should not be charged with anticipating and educating Goren about every possible alternative.

Plaintiffs' next "noodle" is based on the fact that a particular advertisement did not include the price of a service. (Opp. to MSJ p. 28). It is difficult to imagine how the absence of a price tag causes an advertisement to be misleading. By this logic, every magazine advertisement peddling luxury products is deceptive and unfair. And Goren provides neither argument nor evidence that might indicate the advertisement misled him to believe the price would be different.

12

In the last two pages of his Opposition, Goren makes his final attempt to keep his case alive, relying on the inadmissible, unsupported, and false representations made in an unrelated matter in a small town in Iowa. (Opp. to MSJ p. 28-29). This entire section of Plaintiffs' Response should be disregarded as inadmissible under Rule 56. While it is entirely unreasonable that Xcentric should have to address this argument, it will do so briefly in case the Court is at all persuaded by this mud-slinging.

By juxtaposing the 2011 testimony of "Darren Meade" from an unrelated case referring to a company adverse to Xcentric with a recent email that Goren received from Meade, Plaintiffs attempt to show that there is some big dark secret to be uncovered in discovery. First, Darren Meade was never actually employed by Xcentric, although Xcentric did pay him money in 2012 and 2013, though entirely unrelated to any claims in this case. (Supplemental Affidavit of Adam Kunz ¶ 4). Second, his testimony from 2011, which is inadmissible here (Xcentric was not a party to that case) was a reference to his work at a "reputation management" company before Xcentric personnel ever met Meade or knew who he was. (*Id.* ¶ 5-6). Meade's 2011 testimony is a reference to him and a man named Michael Roberts charging businesses money to hide negative information about the business from search results, which they accomplished by illegally hacking Ripoff Report by injecting malicious code on the website. (*Id.* ¶ 6).

Plaintiffs then segue from Meade to the allegations of a prosecutor in Iowa who is friends with Michael Roberts and has accused Meade of using Ripoff Report as a forum to harass witnesses who testified in the murder trial of Michael Roberts' wife Tracy Richter several years ago (the "Richter Trial"). What actually occurred was that after Meade and Roberts' hacking enterprise collapsed, they turned on one another. (*Id.* ¶ 7). Meade used Ripoff Report to publicize his belief that it was really Roberts who was responsible for the murder and that Tracy Richter was an innocent woman who had been wrongly convicted. (*Id.*). Meade's posts not only accused Roberts of wrongdoing, but accused the prosecutor in the Richter Trial of prosecutorial misconduct. (*Id.* ¶ 8). Meade then reached out to the founder of Xcentric and convinced him that Richter was innocent and had been framed by Roberts. (*Id.* ¶ 9). He enlisted Xcentric's help in

13

featuring the posts about Roberts and the prosecutor on the front page of Ripoff Report, and he convinced Xcentric to fund his efforts to uncover evidence which would free this innocent mother. (*Id*.). Recently, the prosecutor in the Richter Trial leaked his affidavit in support of a search warrant of Richter's mother's computer. (*Id*. ¶ 10). The affidavit, upon which Goren now relies, includes the prosecutor's entirely unsupported, and entirely incorrect allegation that Meade and Xcentric were conspiring to harass witnesses. (*Id*.). Ironically, the Richter Trial prosecutor is attempting to do exactly what Goren is attempting to do in this case—silence his critics. Indeed, while adamantly stating to Xcentric's counsel that he has no intention of charging Xcentric's principal with any crime, he has filed a civil case in Iowa asking the Iowa court to issue an injunction ordering Ripoff Report to remove content. (*Id*. ¶ 12). All of this information is entirely irrelevant and inadmissible. It cannot create a genuine issue of material fact sufficient to survive the motion for summary judgment.

Goren then summarizes his Opposition with the concluding statement that Xcentric's "policies are nothing more than a meaningless barrier to commercial victims' restoration of their good name . . . ." (Opp. to MSJ p. 29). This parting thought demonstrates that Goren's claims are nothing but a disguised defamation action, intended only to circumvent the CDA. He has presented no evidence to demonstrate otherwise. There being no genuine issues of material fact in this case, Xcentric is entitled to a judgment as a matter of law.

## IV.   CONCLUSION

For all the foregoing reasons, Defendant Xcentric Ventures, LLC respectfully requests that this Court grant it summary judgment as to the remaining claims against it.

/ / /

/ / /

/ / /

DATED this 2nd day of September, 2014.

        Daniel G. Booth (BBO# 672090)
        BOOTH SWEET LLP
        32R Essex Street, Suite 1
        Cambridge, MA 02139
        Telephone: (617) 250-8602
        Facsimile: (617) 250-8883
        dbooth@boothsweet.com

        /s/Maria Crimi Speth
        Maria Crimi Speth (admitted *pro hac vice*)

        JABURG & WILK, P.C.
        3200 N. Central Avenue, 20th Floor
        Phoenix, AZ 85012
        mcs@jaburgwilk.com

        *Counsel for Defendant Xcentric Ventures, LLC*

## CERTIFICATE OF SERVICE

I, Debra Gower, hereby certify that I electronically filed the foregoing Motion for Summary Judgment by using the Court's ECF system on this September 2, 2014, thereby causing a true copy of said document to be served electronically upon Plaintiff Richard A. Goren personally and in his capacity as counsel of record for Plaintiffs.

        /s/Debra Gower