UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT d/b/a ARABIAN NIGHTS-BOSTON, MASSACHUSETTS,<br><br>Plaintiffs,<br><br>v.<br><br>XCENTRIC VENTURES LLC,<br><br>Defendant. | Civil Action No. 13-cv-11701 |

MEMORANDUM AND ORDER

CASPER, J.                                                                                              March 27, 2015

## I. Introduction

Plaintiffs Small Justice LLC ("Small Justice"), Richard A. Goren ("Goren") and Christian DuPont d/b/a Arabiannights-Boston, Massachusetts ("DuPont") (collectively, the "Plaintiffs") have filed this lawsuit against Defendant Xcentric Ventures LLC ("Xcentric") seeking declaratory judgment as to the ownership of copyright and alleging copyright infringement. D. 13. The Plaintiffs also allege that Xcentric violated Mass. Gen. L. c. 93A. Id. Xcentric has moved for summary judgment. D. 55 at 1. For the reasons stated below, the Court ALLOWS the motion.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a

1

matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific, admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.   Factual Background

This factual recitation is drawn from the undisputed facts submitted by both parties, unless otherwise noted. Goren is a practicing attorney. D. 56 ¶ 1. Xcentric operates a website called the RipoffReport.com ("ROR"). Id. ¶ 4. ROR is an interactive website providing an online consumer advocacy forum allowing users to post free complaints, called "reports," about companies and individuals whom they feel have wronged them in some manner. D. 66 ¶ 5.

To post a report on the ROR website, a user must create a free account by providing his or her name, address, posting pseudonym, e-mail address and telephone number. D. 56 ¶ 6. After the user provides details regarding the company or individual at issue, D. 64-1 & 64-2, and writes his or her report, D. 64-3, the user encounters a screen that says "Submit your Report" and "File a Report," D. 64-5. Below those headings appears a box titled "Terms and Conditions" with a scroll bar running down the right side of the box. D. 64-5, D. 56 ¶ 7, D. 65 ¶¶ 14-16. One

of the terms, which is not visible unless a user employs the scroll bar, provides that "[b]y posting information or content to any public area of [the ROR], you automatically grant and you represent and warrant that you have the right to grant to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content . . . ." D. 56 ¶ 8;[1] D. 65 ¶ 33. A check box appears beneath the box containing the terms and conditions. D. 65 ¶ 17. Next to the checkbox is text that provides, in relevant part: "By posting this report/rebuttal, I attest this report is valid. I am giving Rip-Off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request." D. 64-5, D. 65 ¶ 17. To post a report, a user must check the box and click on a "continue" button. D. 65 ¶ 19. Finally, at the bottom of the screen are several links, including one called "Terms of Service." D. 64-5, D. 65 ¶ 17.

In January 2012, DuPont posted a report alleging that Goren engaged in improper conduct in his professional and personal life. D. 56 ¶ 11, D. 65 ¶¶ 42, 45. In February 2012, DuPont made a similar report (collectively, the "Reports"). D. 56 ¶ 12, D. 65 ¶ 46. In November 2012, Goren responded by filing an action against DuPont in Suffolk Superior Court for libel and intentional interference with prospective contractual relations. D. 56 ¶ 13, D. 66 ¶ 13. In February 2013, Goren notified DuPont that he intended to waive his claim for damages in favor of an injunction. D. 56 ¶ 17, D. 66 ¶ 17. In March 2013, Goren obtained a default judgment against DuPont. D. 29-3, D. 56 ¶ 16, D. 66 ¶ 16. Goren also obtained orders appointing himself attorney-in-fact for DuPont and purporting to transfer to him DuPont's copyright to the January 2012 report. D. 56 ¶¶ 18, 20-21, D. 66 ¶ 20-21. Thereafter, Goren executed an assignment of DuPont's copyright to himself, which he then assigned to Small

---

[1] Xcentric's quotation of this term omitted the word "perpetual."

Justice. D. 13 ¶ 55, D. 56 ¶¶ 22. In July 2013, Goren sought an amended judgment from the Suffolk Superior Court to include the February 2012 report. D. 56 ¶ 25, D. 66 ¶ 25. In August 2013, the Suffolk Superior Court amended the default judgment and purported to transfer to Goren "all rights in and to ownership of the copyright by [DuPont]" to both Reports. D. 13-3. Goren was again appointed attorney-in-fact for DuPont, allowing Goren to execute an assignment of DuPont's copyrights to himself, and then to Small Justice. D. 13 ¶ 55, D. 13-3, D. 56 ¶¶ 26-27.

Pertinent to the Plaintiff's Chapter 93A claim are two dispute resolution programs offered by Xcentric. If a party contests the content of a report posted on the ROR, he may avail himself of two, fee-based programs administered by Xcentric -- an arbitration program and the Corporate Advocacy Program (the "CAP"). D. 56 ¶ 10; D. 65 ¶¶ 79-81. The former program utilizes an arbitration panel to determine if a report contains false statements, which will then be redacted by Xcentric. D. 56 ¶ 10. The latter program requires participants to pledge to perform certain customer service activities and calls for Xcentric staff to monitor reports regarding the participant. Id. The CAP advertises that members' "search engine listings [will] change from a negative to a positive." D. 65 ¶ 81.

### IV.    Procedural History

The Plaintiffs instituted this action on July 16, 2013. D. 1. They filed their first amended complaint on September 2, 2013. D. 13. Xcentric moved to dismiss on September 16, 2013, D. 14, which the Court allowed in part, D. 45. The Court dismissed Count III (libel), Count IV (intentional interference with prospective contractual relations), and all bases but one for Count V (violation of Chapter 93A). D. 45. The parties proceeded with discovery regarding the remaining counts, which include Count I (declaratory judgment as to ownership of copyright),

Count II (copyright infringement), and Count V (violation of Chapter 93A by Xcentric's CAP and arbitration program). Xcentric now moves for summary judgment. D. 55. The Court heard the parties on the pending motion and took the matter under advisement. D. 87.

## V.   Discussion

### A.   Ownership of the Copyrights to the Reports

The plaintiffs and Xcentric disagree as to whether a ROR user is bound by the terms and conditions contained in the box on the screen where the user submits his report. D. 55 at 7-12, D. 64 at 10-13. When the user accesses that screen, the only term visible in the box is an age restriction and some or all of Xcentric's address (the parties dispute how much of the address is visible). D. 56-7 at 7, D. 64 at 3, D. 64-5. Further terms are revealed only when the user employs the scroll bar running down the right side of the box. Among those terms is a transfer of copyright ownership from the user to Xcentric: "[b]y posting information or content to any public area of [the ROR], you automatically grant . . . to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content."[2] D. 13-2 at 2. Below the terms and conditions is a check box that the user must select before his post is accepted by the website. D. 64 at 3, 6; D. 64-5. By checking the box, the user agrees that he is "giving Rip-off Report irrevocable rights to post [the report] on the website." D. 64-5.

Xcentric argues that DuPont agreed to the terms and conditions when he clicked the checkbox, and, therefore, it owns the copyright by virtue of the grant of an exclusive license. D. 55 at 9. The Plaintiffs, on the other hand, argue that Xcentric has failed to show that the contract

---

[2] 17 U.S.C. § 101 provides that the conveyance of an exclusive license is a transfer of copyright ownership. "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license." 17 U.S.C. § 101.

5

terms were "reasonably conspicuous" and that DuPont "unambiguously manifested his assent" to the terms. D. 64 at 12 (quoting Ajemian v. Yahoo!, Inc., 83 Mass. App. 565, 574-75 (2013) (alterations omitted)).

There are two types of contracts formed online: "clickwrap" and "browsewrap" agreements. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014). In a clickwrap agreement, users must select a check box or radio button to indicate that they agree to the website's terms and conditions. Id. In contrast, browsewrap agreements do "not require the user to manifest assent to the terms and conditions expressly. A party instead gives his assent simply by using the website." Id. at 1176 (quoting Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009) (alterations omitted)). Clickwrap agreements are generally upheld because they require affirmative action on the part of the user. Van Tassell v. United Mktg. Grp., LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011). "Because no affirmative action is required by a website user to agree to the terms of a [browsewrap] contract other than his or her use of the website, the determination of the validity of a browsewrap contract depends on whether the user has actual or constructive notice of a website's terms and conditions." Id. If there is no evidence of actual notice, then the website owner must show that it "put[] a reasonably prudent user on inquiry notice of the terms of the contract." Nguyen, 763 F.3d at 1177 (citing Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 30-31 (2d Cir. 2002)).

Xcentric construes the terms and conditions as a clickwrap agreement, but the user never affirmatively indicates his agreement. The terms accompanying the checkbox do not state that "I agree to the terms and conditions" or other such language indicating express accord. By checking the box, the user agrees only to the terms accompanying the checkbox. This means that

the terms and conditions, including the grant of an exclusive license, which is paramount to a copyright transfer, constitute a browsewrap agreement.

The record before the Court is undisputed as to the material facts. Both parties acknowledge that there is no evidence that DuPont took notice of the terms and conditions. See D. 55 at 10-12. In the absence of evidence that DuPont had actual knowledge of the terms and conditions, for Xcentric to obtain the copyrights to his Reports, it must demonstrate that a reasonably prudent user would have had inquiry notice of the conveyance of an exclusive license to Xcentric. Nguyen, 763 F.3d at 1177. The parties' dispute centers on whether the evidence shows that a reasonably prudent user would have had such notice.

To determine whether a user has inquiry notice of a browsewrap agreement, the Court must examine "the design and content of the website and the agreement's webpage." Id. Courts look to the "conspicuousness and placement" of a link to the terms and conditions, "other notices given to users of the terms of use, and the website's general design" to determine whether a reasonably prudent user had inquiry notice of the terms. Id. "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." Id. (citing Specht, 306 F.3d at 23 (terms visible only if user scrolled below button that initiated download of software)); In re Zappos.com, Inc., 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (link to terms buried among other links and website did not direct users to terms); Van Tassell, 795 F. Supp. 2d at 792-93 (term at issue accessible only by clicking on several links)). At the other end of the spectrum, if a website notifies a user that his continued use of a site indicates his assent to the terms, then a browsewrap agreement is more likely to be enforced. Nguyen, 763

F.3d at 1177 (citing Cairo, Inc. v. Crossmedia Servs., Inc., No. 04-04825, 2005 WL 756610, at * 2, * 4-5 (N.D. Cal. Apr. 1, 2005)).

Here, the Court concludes that a reasonably prudent user was on inquiry notice of the terms and conditions associated with the ROR, and, therefore, the transfer of copyright ownership was valid. The screen where users submitted their reports prominently featured a portion of the terms in the center of the screen, above the "continue" button that the users clicked to conclude the posting process. D. 64-5. That screen, along with at least two of the other screens used in the posting process, also contained blue links to the terms of service at the bottom of the page which were conspicuously visible without scrolling beyond the "continue" button used to progress to the subsequent screen. D. 64-1, D. 64-4, D. 64-5. The conspicuousness of the terms is supported by the contrasting color of the link to them coupled with the placement of the terms themselves on the final screen prior to submission. See PDC Labs., Inc. v. Hach Co., No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) (granting defendant's motion for partial summary judgment in part as to a contract's enforceability where link to terms appeared on separate pages of online order process and users were directed to review terms on final screen); Hubbert v. Dell. Corp., 835 N.E.2d 113, 983-84 (2005) (concluding that arbitration agreement was part of online contract and deeming terms valid where links to the terms were visible throughout order process, on marketing web pages, and final online forms stated that sales were subject to terms and conditions); cf. Nguyen, 763 F.3d at 1178-79 (holding that conspicuous link to terms on every page of website was insufficient for constructive notice without further notice to users or "affirmative action to demonstrate assent").

Unlike in Nguyen, in this case, Xcentric provided further notice to users beyond the links at the bottom of the pages of the ROR. The beginning of the list of terms was visible above the "continue" button on the final submission screen. A review of those terms, by means of the scroll bar, would have revealed the term requiring users to transfer an exclusive license to Xcentric. The Plaintiffs dispute that a reasonable user would understand the function of the scroll bar running down the side of the box containing the terms. D. 64 at 3 (observing that there is "no marking or identification of the function as a vertical scroll bar" and that "[t]here is no direction, explicit prompt or even suggestion to use the scroll bar to view any additional disclosures"). A reasonably prudent internet user, however, is conversant in the basic navigation tools required to effectively utilize a website.[3] See Forrest v. Verizon Commc'ns, Inc., 805 A.2d 1007, 1011 (D.C. Cir. 2002) (in affirming dismissal based upon a forum selection clause, stating that "the use of a 'scroll box' in the electronic version that displays only part of the [a]greement at any one time [is not] inimical to the provision of adequate notice"); see also PDC, 2009 WL 2605270, at *3 (resolving question of whether online terms were sufficiently conspicuous on summary judgment).

In addition, even if a reasonably prudent user could be deemed to be unfamiliar with a scroll bar, the ROR user was also required to check a box below the terms and conditions affirming that he granted an irrevocable right to Xcentric to post his report on the website. D. 64-5. If the user failed to appreciate that scrolling was required to view all of the terms, he was

---

[3] The Plaintiffs make a cursory argument that the any contract between DuPont and Xcentric was illusory because Xcentric reserved the right to change the terms and conditions. D. 64 at 16. They do not allege, however, that Xcentric did change terms and conditions in any way during the relevant time period. Without a change to the terms that affected that Plaintiffs' rights or remedies, the Court is not persuaded that the contract was illusory. Cf. Morrison v. Amway Corp., 517 F.3d 248, 257 (5th Cir. 2008) (holding arbitration agreement was illusory where Amway unilaterally amended rules of conduct to require arbitration of claims arising prior to implementation of arbitration program).

informed that he was giving an irrevocable right with the further explanation that his post "will not be removed, even at my request."

The notice next to the check box has two consequences. First, a user who has any hesitation regarding the grant of an irrevocable right to display his post is prompted to investigate further, either by reading the terms and conditions placed prominently over the check box, or by clicking on the link to the terms of service at the bottom of the screen. Second, even if the browsewrap agreement were somehow invalid, a user's assent by means of the checkbox granted to Xcentric, at the very least, a non-exclusive license to publish the Reports. A copyright owner who grants a license to his work waives his right to sue the licensee for copyright infringement provided that the licensee's use does not go beyond the scope of the non-exclusive license. John G. Danielson, Inc. v. Winchester-Conant Prop., Inc., 322 F.3d 26, 40 (1st Cir. 2003) (noting that "[u]ses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits"); see Sony Corp. of Am. v. Universal City Studios, Inc. 464 U.S. 417, 433 (1984) (noting that "anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute . . . is not an infringer of the copyright with respect to such use") .

The Court concludes that DuPont transferred copyright ownership to Xcentric by means of an enforceable browsewrap agreement. Xcentric is thus entitled to summary judgment as to Count I (declaratory judgment as to copyright ownership) and Count II (copyright infringement). Moreover, even if the browsewrap agreement were considered invalid and DuPont retained ownership of the copyrights to the Reports, he nonetheless granted a non-exclusive license to Xcentric and, therefore, he waived his right to sue Xcentric for infringement where its use did

not exceed the scope of that license.  The latter scenario also requires summary judgment for Xcentric as to Count II.

> **B.     Section 201(e) and the Subsequent Transfer of Copyright Ownership**

Because Xcentric acquired exclusive ownership of the copyright from DuPont, DuPont ceased to be a holder of copyright and had no remaining rights to assign to Goren pursuant to Goren's Superior Court action.  DuPont's purported assignment to Goren (executed by Goren as his attorney-in-fact) of the copyrights to the Reports had no legal effect and Goren acquired nothing supporting a right to sue Xcentric for copyright infringement.

Even if DuPont retained ownership of the copyrights, however, the Superior Court's transfer of rights was barred by 17 U.S.C. § 201(e) which provides:

> When an individual author's ownership of a copyright, or any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under copyright, shall be given effect under this title, except as provided under title 11.

Pursuant to this provision, the purported transfer of copyright ownership by the order pursued by Goren was ineffective.  Goren, therefore, did not acquire any rights to transfer to Small Justice.  Even so, the Plaintiffs suggest that the transfer was proper to satisfy the default judgment against DuPont.  D. 64 at 21.  Section 201(e) precludes any involuntary transfer from the author of his copyright.  See Veeck v. Southern Bldg. Code Congress Internat'l, Inc., 293 F.3d 791, 803 (5th Cir. 2002) (noting that Section 201(e) "reflects Congress's intention to protect copyrights from involuntary appropriation by government entities").  The transfer here was not rendered voluntary by the fact that DuPont was apprised of the default judgment against him.

The Plaintiffs further argue that Xcentric lacks standing to challenge the ostensible transfer by the Superior Court.  D. 64 at 20-21.  They base this argument on two grounds.  First,

11

they assert that Xcentric was not assigned an exclusive license to the copyrights. Id. As discussed above, that contention is without merit. Second, they argue that, even if Xcentric acquired ownership of the copyrights, it was not the author and, therefore, cannot take advantage of Section 201(e)'s shield, which, by its express terms, is available only to individual authors, not to assignees of the original author. Id.; 17 U.S.C. § 201(e). Xcentric, however, is not the party shielded by Section 201(e) here. Section 201(e) applies to the attempt by the Superior Court to transfer rights from DuPont, assuming he retained any, to Goren. DuPont, as an individual author who had not previously transferred his rights, could not be divested of his ownership, if any, by the actions of a governmental body. See Hendricks & Lewis, PLLC v. Clinton, No. C12-0841-RSL, 2012 WL 5947638, at * 3 (W.D. Wash. Nov. 27, 2012) (observing that Congress sough "to accomplish the goal of precluding all involuntary transfers of copyrights from an individual author unless specifically excluded"), aff'd, 766 F.3d 991 (9th Cir. 2014). Goren, therefore, acquired no rights to the copyrights, even if DuPont still owned the copyrights at the time of the Superior Court judgment.

In addition to the reasons set forth above, *supra* Section V.A, Section 201(e) eliminates any ownership interest in the copyrights claimed by Goren and Small Justice. Xcentric is, therefore, entitled to summary judgment on Counts I and II with respect plaintiffs Goren and Small Justice.

### C. Chapter 93A and the CAP and Arbitration Program

Finally, Xcentric seeks summary judgment on the Plaintiffs' remaining claim under Mass. Gen. L. c. 93A § 11. The Plaintiffs allege that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based CAP and arbitration program is oppressive and unethical. D. 13 ¶¶ 33-35. Xcentric argues that the Plaintiffs' claim is barred by the

Communications Decency Act ("CDA"), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). According to Xcentric, because the CDA shields it from claims related to its editorial control over the content of its website, its provision of arbitration services with respect to that content is also shielded. D. 55 at 17-18. Xcentric asserts that to find its services oppressive and unethical is to treat it as the speaker or publisher of information provided by a third party – exactly what is barred by the CDA. Id.

In this case, however, the Plaintiffs' claims arise not from third-party content, but from Xcentric's own solicitations and advertisements. "[A]n interactive computer service provider remains liable for its own speech." Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007). "Put another way, CDA immunity does not apply if the interactive computer service provider is also an 'information content provider,' which is defined in the CDA as an entity that is 'responsible, in whole or in part, for the creation or development of' any allegedly fraudulent 'information.'"[4] Suk Jae Chang v. Wozo LLC, No. 11-10245-DJC, 2012 WL 1067643, at * 14 (D. Mass. Mar. 28, 2012).

While the CDA does not bar the Plaintiffs' allegations, however, the requirements of Chapter 93A itself defeat their claim. Chapter 93A requires the Plaintiffs to have suffered harm: "[a]ny person who engages in the conduct of any trade or commerce and who *suffers any loss of money or property*, real or personal, as a result of the use or employment by another person who

---

[4]The CDA also defeats the Plaintiffs' assertion that public policy prohibits enforcement of the ROR's terms and conditions. D. 64 at 17-20. Congress, through the CDA, chose to confer immunity on interactive computer service providers like Xcentric for libelous content provided by third parties. 47 U.S.C. § 230(c)(1). The Plaintiffs cannot invoke public policy to make an end-run around this statutory determination.

engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action . . . ." Mass. Gen. L. c. 93A § 11 (emphasis added). There must be a "causal link between the . . . wrongful conduct and the loss a plaintiff claims to have suffered." R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 80-81 (2001). The Plaintiffs argue that "[t]here is evidence of continuing injury to Goren's reputation as well as the loss of money [causally] connected to the undisputed solicitations and advertisements." D. 64 at 27.

The CAP and arbitration program, however, are not the source of Goren's reputational injury. The defamatory Reports caused the harm allegedly inflicted on Goren's reputation, and, as the Court previously held, the CDA confers immunity on Xcentric for the content of the Reports. D. 45 at 10-13. Further, Goren has failed to demonstrate how he lost money as a result of the solicitations for the CAP and arbitration program. He does not allege that he incurred the cost of participating in either program, D. 13, or explain how he suffered a financial loss, other than any loss of business related to the shielded Reports. "In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery." Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., 403 Mass. 722, 730 (1989); see Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 823 (2014) (stating that plaintiffs proceeding under c. 93A § 11 must "ultimately . . . prove a distinct injury") (internal quotation marks omitted). Because Goren has not proffered any evidence of a loss caused by the programs of which he complains, the Court allows Xcentric's motion with respect to Claim V.[5]

---

[5]The Plaintiffs, citing to hearsay, such as excerpts of testimony from a state court proceeding in California and an e-mail to Goren, argue that Xcentric further violated Chapter 93A by engaging in an extortionate scheme to post complaints about companies that were then solicited to pay money to restore their reputations. D. 64 at 28-29. These allegations are not

## VI.     Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 55.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

contained in the Plaintiffs' amended complaint, D. 13, nor is such inadmissible and unsupported evidence sufficient to withstand summary judgment. Fed. R. Civ. P. 56(c).